**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TESSA KNOX | |
| Plaintiff, | |
| v. | Civil Action No.  1:17-cv-00772 (GWG) |
| JOHN VARVATOS ENTERPRISES, INC. | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOHN VARVATOS**
**ENTERPRISES, INC.'S MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION .................................................................................................................1

SUMMARY OF UNDISPUTED FACTS ...........................................................................3

    I.       Dress Code for Sales Professionals.........................................................................3

    II.     Varvatos Employee Discounts & Clothing Allowance for Male
           Sales Professionals...................................................................................................6

    III.    Impact of Male Sales Professionals Wearing/Modeling Varvatos
           Clothing...................................................................................................................8

    IV.    The Historical Varvatos Women's Line & Female Clothing
           Allowance ...............................................................................................................9

ARGUMENT .....................................................................................................................10

    I.       Varvatos is Entitled to Summary Judgment on Plaintiffs' Equal
           Pay Act Claims. ....................................................................................................12

           A.      Plaintiffs' Equal Pay Act Claim Fails Because They Cannot
                    Demonstrate That Male and Female Sales Professionals
                    Receive Unequal Wages. .......................................................................12

           B.      Plaintiffs' Equal Pay Act Claim Fails Because Female
                     Sales Professionals do not Perform Equal Work as Male
                     Sales Professionals.................................................................................13

           C.      Plaintiffs' Equal Pay Act Claim Fails Because the Role of
                     Male Sales Professionals Requires Different Skills, Effort,
                     and Responsibility Than Female Sales Professionals...............................15

    II.     The Clothing Allowance is Based on a Factor Other Than Sex. ...........................19

    III.    Varvatos is Entitled to Summary Judgment on Plaintiffs' Title VII
           Claims Because Plaintiffs' Cannot Establish Prerequisites for, or
           the Elements of, Those Claims. .............................................................................20

           A.      Plaintiffs Cannot Meet Their Burden of Establishing a
                     Prima Facie Title VII Claim. .................................................................21

           B.      Varvatos has a Legitimate Nondiscriminatory Reason for
                     its Clothing Allowance. .........................................................................22

            C.      Plaintiffs Cannot Demonstrate That Varvatos's Clothing
                     Allowance Policy Is Motivated by Discriminatory Animus.....................24

i

**<u>TABLE OF CONTENTS</u> – cont'd.**

<u>Page</u>

D.     Plaintiffs Did Not Meet the Prerequisite for a Title VII Claim of Filing a Verified Charge with the EEOC...................................25

IV.    Plaintiffs' New York State Law Claims Fail for the Same Reasons as Their EPA and Title VII Claims.........................................................................26

A.     NYLL § 194 Requires the Same Elements as a Federal EPA Claim, Plus Additional Requirements, None of Which Plaintiffs Can Establish...............................................................................26

B.     Plaintiffs Cannot State a Valid Claim Under New York Executive Law § 296 for the Same Reasons That Their Title VII Claim Fails. ...............................................................................28

CONCLUSION......................................................................................................29

84077291_3

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456 (2d Cir. 2001) .............................................11

*Belfi v. Prendergast*, 191 F.3d 129 (2d. Cir 1999) ...............................................................19, 21

*Byrne v. Telesector Res. Group, Inc.*, 339 Fed. App'x 13 (2d Cir. 2009) .....................................14

*Chiaramonte v. Animal Med. Ctr.*, 677 Fed. App'x 689 (2d Cir. 2017).................................12, 26

*E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247 (2d Cir. 2014) ................................12, 13, 15

*Ferrara v. City of Yonkers*, No. 13 Civ. 1221 (KBF), 2015 U.S. Dist. LEXIS
    66906 (S.D.N.Y. May 21, 2105).................................................................................29

*Francis v. City of New York*, 235 F.3d 763 (2d Cir. 2000)...........................................................25

*Gad v. Kansas State Univ.* 787 F.3d 1032 (10th Cir. 2015) ........................................................25

*Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111 (2d Cir. 2000) ...................................................24

*Grady v. Affiliated Cent., Inc.*, 130 F.3d 553 (2d Cir. 1997)..................................................21, 24

*Gross v. Nat'l Broad Co.*, 232 F. Supp. 2d 58 (S.D.N.Y. 2002) ..................................................22

*Hodgson v. Robert Hall Clothes, Inc.*, 473 F.2d 589 (3rd Cir. 1973)............................................19

*Hyek v. Field Support Servs.*, 461 Fed. App'x 59 (2d Cir. 2012).................................................28

*Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d 419 (S.D.N.Y. 2010) ..........................................20

*Liang v. Café Spice SB, Inc.*, 911 F. Supp. 2d 184 (E.D.N.Y. 2012) ...........................................21

*Martinez v. Davis Polk & Wardell LLP*, 713 Fed. App'x 53 (2d Cir. 2017)................................22

*Parada v. Banco Indus. de Venez., CA.*, 753 F.3d 62 (2d Cir. 2014) ...........................................20

*Pierre v. Air Serv Sec.*, No 14-CV-5915 (MKB) (ST), 2016 U.S. Dist. LEXIS
    128891 (E.D.N.Y. Sept. 21, 2016)............................................................................23

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000).......................................................24

*Risco v. McHugh*, 868 F. Supp. 2d 75 (S.D.N.Y. 2012)...............................................................23

84077291_3

## TABLE OF AUTHORITIES – cont'd.

Page(s)

*Spiegel v. Schulmann*, 604 F.3d 72 (2d Cir. 2010) ..........................................................28

*Sprague v. Thorn Ams.*, 129 F.3d 1355 (10th Cir. 1997)...............................................22

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) .................................................21

*Talwar v. Staten Island Univ. Hosp.*, 610 Fed. App'x 28 (2d Cir. 2015)......................26

*Truelove v. Northeast Capital*, 95 N.Y.2d 220 (N.Y. 2000).......................................28

**Statutes and Rules**

29 U.S.C. § 206................................................................................................11, 15, 19

29 U.S.C. § 255................................................................................................................20

Federal Rule of Civil Procedure 56(a) .........................................................................10

New York Executive Law § 296.............................................................................26, 28

New York Labor Law § 190 ...........................................................................................28

New York Labor Law § 194 ................................................................................. *passim*

**Regulations**

29 C.F.R. § 1601.............................................................................................................25

29 C.F.R. § 1604.............................................................................................................23

29 C.F.R. § 1620.........................................................................................13, 14, 15, 16, 18

84077291_3

Defendant John Varvatos Enterprises, Inc. ("Varvatos") respectfully submits this memorandum of law in support of its motion for summary judgment on each of the four claims in Plaintiffs' Complaint, both with respect to Tessa Knox individually and the collective and class action Plaintiffs.

## INTRODUCTION

Varvatos designs and sells expensive men's clothing. Varvatos employs salespeople, which it refers to as sales professionals, at retail locations throughout the United States. Varvatos requires its male sales professionals, and *only* its male sales professionals, to purchase and wear/model Varvatos clothing while at work. In contrast, Varvatos female sales professionals can wear any clothing to work as long as it complies with general style and color guidelines.

Because Varvatos requires only its male sales professionals to wear/model Varvatos clothing at work, Varvatos provides only its male sales professionals with a clothing allowance for them to purchase that clothing, which would otherwise be prohibitively expensive. It provides no such clothing allowance to female sales professionals because they are not required to purchase Varvatos clothing to wear/model at work – and can inexpensively comply with their general dress code.

The expensive clothing requirement applicable only to male sales professionals justifies Varvatos giving a clothing allowance to male but not female sales professionals. Varvatos is a men's clothing designer so it requires male sales professionals to model Varvatos clothing while they work. Varvatos's clothing allowance is based on a legitimate business requirement applicable to a subset of sales professionals because only they are capable of modeling Varvatos clothing as it is intended to be worn.

1

Many years ago, Varvatos also made women's clothing and then required its female sales professionals to wear that clothing while they worked.  At that time, Varvatos provided all sales professionals with a clothing allowance because they all were required to wear Varvatos clothing at work.  Varvatos discontinued its women's clothing line and continued the clothing allowance for only its male sales professionals – who were still required to wear Varvatos clothing at work. Significantly, when Varvatos discontinued the clothing allowance to female sales professionals, Varvatos increased the base pay of its female sales professionals.

Although Varvatos does not distinguish between its male and female sales professionals by title, it is readily apparent that male and female sales professionals have distinct roles in Varvatos stores.  Male sales professionals are required to wear Varvatos clothing and serve as in-store models to increase the visibility of the clothing, demonstrating how a particular piece fits, and how it can be paired with other Varvatos items.  When new seasonal lines are released, male sales professionals, in addition to wearing the new clothing lines at work, model the new Varvatos clothing during meetings with the sales staff in order to provide knowledge about the new products and demonstrate how various items fit on men with different builds.  Customers also ask about items being worn by male sales professionals and ask the male sales professionals to model items to see how they fit someone of a similar build who is not present in the store. Female sales professionals do not have these job duties. These additional duties of the male sales professionals help increase sales across the board. Thus, the female sales professionals benefit from the added job duties of their male colleagues.

The different job duties of male and female sales professionals, coupled with the fact that the clothing allowance is tied directly to a job requirement applicable to only male sales

professionals and serving a legitimate business reason, prevents Plaintiffs from establishing the requisite elements of any of their claims.

## SUMMARY OF UNDISPUTED FACTS

Varvatos is a high-end men's clothing line designed by John Varvatos.  (Declaration of Gerard Mayorga ("Mayorga Decl.") ¶ 2.)  Varvatos has 26 retail stores, 24 of which are located throughout the United States, that sell its clothes.  (Declaration of Benjamin Harris ("Harris Decl.") ¶ 4.)  In addition to store management, Varvatos employs sales professionals at its retail stores.  (Harris Decl. ¶ 32.)  Varvatos sales professionals work on the sales floor of the stores and, among other things, are generally responsible for interacting with customers, handling sales, maintaining the stores' appearance, and stocking merchandise.  (*Id*.)  Varvatos employs both men and women as sales professionals.  (*Id*. ¶ 30; Declaration of Nicole Chang ("Chang Decl.") ¶ 6.)

Varvatos designs high-end, high-quality men's clothing.  (Mayorga Decl. ¶ 2.) Accordingly, Varvatos shows its clothing being worn by male models in print advertisements and on its website.  (Harris Decl. ¶ 11.)  Varvatos clothing is generally sold at a high price point – a single pair of jeans can cost hundreds of dollars, and a single jacket or suit more than a thousand dollars.  (Declaration of Brett Collings ("Collings Decl."), Ex. 1 (Varvatos Website Printouts).)

*I.*      *Dress Code for Sales Professionals*

Varvatos imposes a dress code on its sales professionals – and has done so throughout the time period relevant to this lawsuit.  (Mayorga Decl. ¶ 8; Declaration of Steven Shears ("Shears Decl."), ¶ 13.)  When a new in-store employee is hired, Varvatos distributes hard copies of its dress code during the onboarding process.  (Chang Decl. ¶ 8.)  Although Varvatos's written dress code policy for in-store employees has changed slightly over the years, the major parameters –

and those relevant to this lawsuit – have remained the same.  (Collings Decl., Ex. 2 (Dress Code).)

Since as far back as March 2013, Varvatos has formally documented its dress code in its "Appearance and Dress Standards – Retail Locations" (the "Dress Code").  (*Id*., at JVE-000080.)  The Dress Code specifies that "[i]n the case of a <u>male employee</u>, the employee should be dressed in John Varvatos and adhere by the 3 piece rule (a jacket, shirt and pants, or a sweater shirt and pants, etc.)."  (*Id.* (emphasis added).)  Additionally, the Dress Code provides that "[s]ince all male retail employees receive a clothing allowance, it is essential that John Varvatos clothes be worn every day and those worn represent the current season."  (*Id*.)  Accordingly, once Varvatos clothing is out-of-season and no longer being sold in Varvatos stores, it does not comply with the Dress Code.  (*Id.*; Mayorga Decl. ¶ 9.)  The requirements that male sales professionals wear Varvatos clothing to work and that the clothing must be from the current seasonal collection being sold in the store have not changed at any point in the period relevant to this lawsuit.  (Collings Decl. Ex. 2; Mayorga Decl. ¶ 8.)

The March 2013 version of the Dress Code imposed limited requirements on female sales professionals, saying only that their "outfits should be appropriate for the work environment and representative of the brand."  (Collings Decl., Ex. 2, at JVE-000080.)  The only remaining requirements in the March 2013 version of the Dress Code that applied to female sales professionals were contained in a general list of items that sales professionals (both male and female) could not wear to work, including bright colors, flip-flops, shorts and cutoffs, and sheer fabrics.  (*Id.*)

The Dress Code was revised in July 2014.  (*Id.* at JVE-000081.)  That updated version added a new sentence to clarify how female sales professionals should dress at work:

"Appearance and attire must be aligned with brand aesthetics and color palette (dark and/or neutral colors, for example, beige, black, gray, white, navy blue, etc.)." (*Id.*)[1]

The Dress Code was again revised in September 2015. (*Id.* at JVE-000078.)  That revision added that the fabric worn by female sales professionals "should be appropriate" and changed the description of the Varvatos color palette that had been added in July 2014 to read "black, white, beige, grey, navy, olive, brown." (*Id.*)  It also added skorts and culottes to the list of items that sales professionals were generally prohibited from wearing. (*Id.*)

The most recent revision of the Dress Code took place in September 2016, and simply added a note at the bottom instructing employees to "[p]lease contact the Human Resources Department to request accommodations based on disability, gender identity, and sincerely held religious beliefs." (*Id.* at JVE-000079.)

Nowhere, in any of its iterations since 2013, does the Dress Code specify any particular brands of clothing for female sales professionals to wear or otherwise provide that they have to purchase new clothing to wear to work at Varvatos. (*Id.*)  The Dress Code does not require female sales professionals to wear Varvatos clothing to work, and female employees are in fact discouraged from doing so because Varvatos is a menswear brand and does not want to be confused as unisex. (Chang Decl. ¶ 13; Mayorga Decl. ¶¶ 12, 26.)

Despite the slight changes to the Dress Code over the years, male sales professionals always have been required to buy current season Varvatos clothing to wear at work and female sales professionals have never had to do so during the period relevant to this case. (*Id.*)  Female

---

1.      The July 2014 revision to the Dress Code also removed the word "male" from the sentence, "[s]ince all male retail employees receive a clothing allowance, it is essential that John Varvatos clothes be worn every day and those worn represent the current season." (Collings Decl. Ex. 2, at JVE-000081.)  Despite that change in the text of the Dress Code, however, Varvatos continued limiting its clothing allowance to male sales professionals since only they were required to wear Varvatos clothing to work.

84077291_3

sales professionals always have been free to choose clothing from any brand that fits the general parameters of the Dress Code as it applies to them – including clothing owned prior to working at Varvatos.  (Chang Decl. ¶ 14; Harris Decl. ¶ 11.)

II.     *Varvatos Employee Discounts & Clothing Allowance for Male Sales Professionals*

Varvatos provides all of its employees with a 65% discount that can be applied towards purchases of clothing at its full price retail stores.[2]  (Chang Decl. ¶ 20.)  In addition, Varvatos provides its female sales professionals with a 50% discount at AllSaints, a womenswear brand affiliated with Varvatos, and aligned with the Varvatos "brand aesthetics" referenced in the Dress Code.  (*Id.*) Varvatos does not provide its male sales professionals with an AllSaints discount.  (*Id.*)

In addition to the employee discounts it provides its sales professionals, Varvatos also provides its male sales professionals with a clothing allowance.  (*Id.* ¶ 21-22; Shears Decl. ¶¶ 4-10; Mayorga Decl. ¶ 13.)  The male sales professionals' clothing allowance is based on the fact that male sales professionals (and <u>only</u> male sales professionals) are required to wear/model current season Varvatos clothing at work, and hence must buy that clothing as indicated in the Dress Code.  (*Id.*; Collings Decl. Ex. 2.)  Each season, when Varvatos releases a new line of clothing, male sales professionals are provided a $3,000 clothing allowance that they can apply to "pull" clothing from the new line.  (Harris Decl. ¶ 17; Shears Decl. ¶ 4-6; Mayorga Decl. ¶ 14.)  Male sales professionals must count the full retail value of the clothing they pull against their $3,000 limit.  (Mayorga Decl. ¶ 14; Shears Decl. ¶ 6; Harris Decl. ¶ 18.)  Given the price point of much of Varvatos's clothing – and the requirement that male sales professionals wear three pieces of Varvatos clothing to work, including jackets and sweaters which cost hundreds of

---

2.      Employees receive a 70% discount off of the full retail price of clothing sold at Varvatos's outlet locations.

dollars – the number of items that each male sales professional can "pull" each quarter using his clothing allowance is limited.  (Harris Decl. ¶ 18; Mayorga Decl. ¶¶ 16-17; Shears Decl. ¶ 6.)

Indeed, many male sales professionals need to spend their own money beyond the clothing allowance in order to fill out a complete wardrobe that allows them to comply with the Dress Code on a daily basis.  (Shears Decl. ¶ 8; Mayorga Decl. ¶ 17; Harris Decl. ¶ 18.)  Male sales professionals also have to spend their own money to dry clean much of the Varvatos clothing they wear to work in order to extend the lifespan of the items they obtain using the clothing allowance (and purchase on their own) to ensure those items stay in pristine condition for an entire season.  (Harris Decl. ¶ 20; Shears Decl. ¶ 12; Mayorga Decl. ¶ 18.)

The $3,000 seasonal clothing allowance can be used only as a credit towards Varvatos clothing a male sales professional "pulls" – any unused portion of the allowance is lost.  (Harris Decl. ¶ 17.)  Male sales professionals cannot receive any portion of the $3,000 in cash or roll it over to future periods.  (*Id.*)  Male sales professionals are also taxed on the clothing they receive through the clothing allowance program at a reduced rate to reflect the cost of the merchandise to Varvatos (roughly 20% of the retail value).  Use of the clothing allowance imposes a tax burden on the male sales professionals that is not applicable to female sales professionals, who are not subjected to any additional tax burden by virtue of the employee discounts they receive at Varvatos or AllSaints.  (Harris Decl. ¶ 19; Mayorga Decl. ¶ 14; Shears Decl. ¶ 11.)

Varvatos's female sales professionals can wear clothing they owned prior to working at Varvatos, or shop at any number of stores to find clothing that complies with the Dress Code – many with price points well below that of Varvatos.  (*Id.* ¶¶ 25-26.)  Indeed, many Plaintiffs indicated in response to Varvatos's interrogatories that they spend much less than $12,000 per year on clothing to wear to work at Varvatos.  (Collings Decl. Ex. 3 (A. Hickey Interrogatory

7

Responses), at 2 (spent roughly $1,250 on work clothing during the six months she worked at Varvatos); Collings Decl. Ex. 4 (J. Tobak Interrogatory Responses), at 2 (spent "about $1,500" in the 10 months she worked at Varvatos); Collings Decl. Ex. 5 (A. Tossetti Interrogatory Responses), at 2 (spent "approximately $1,574.08" on clothing to wear to work over the nearly two years she worked at Varvatos).)  A number of Plaintiffs responded that they spent a few thousand dollars annually on work clothing and some indicated that they spent under $1,000. (*Id.*; Collings Decl. Ex. 6 (Hillary Crandle Interrogatory Responses), at 2 (spent "about $600" on clothing to wear to work during her first year with Varvatos); Collings Decl. Ex. 7 (Michelle Ortiz Interrogatory Responses), at 2 (spent "between $500 and $600" on work clothing during the 10 months she worked at Varvatos).)  They also responded that they purchased work clothing from stores like Zara, Gap, Forever 21, and H&M – all of which have price points substantially lower than Varvatos.  (Collings Decl. Ex. 3, at 2 (A. Hickey shopped for work clothing at Forever 21, American Eagle, and H&M); Collings Decl. Ex. 4, at 2 (J. Tobak shopped for work clothing at Zara and H&M); Collings Decl. Ex. 5, at 2 (A. Tossetti shopped for work clothing at H&M, Gap, and Hot Topic); Collings Decl. Ex. 7, at 2 (M. Ortiz shopped for work clothing at Gap).)

 Both because Varvatos does not make women's clothing and because its female sales professionals can comply with the Dress Code by wearing clothing they already own or purchasing much less expensive clothing than their male counterparts, Varvatos does not provide female sales professionals with a clothing allowance.  (Chang Decl. ¶¶ 24-26; Mayorga Decl. ¶ 12; Collings Decl. Ex. 2.)

III. *Impact of Male Sales Professionals Wearing/Modeling Varvatos Clothing*

 Requiring its male sales professionals wear current season Varvatos clothing serves a number of purposes for Varvatos.  (Harris Decl. ¶ 34; Shears Decl. ¶ 17; Mayorga Decl. ¶ 20;

8

Chang Decl. ¶ 11.)  First, by having male sales professionals dressed in Varvatos, they act as live, in-store models, and enhance the visibility and desirability of the items that they wear. (Harris Decl. ¶ 32; Chang Decl. ¶ 11.)  Seeing the clothing for sale in a store actually being worn by store employees makes that clothing more noticeable than if it was simply sitting folded on a shelf or displayed on a mannequin.  (Harris Decl. ¶ 32; Mayorga Decl. ¶ 24.)

Moreover, because male sales professionals tend to have different body types (unlike mannequins), having them wear the clothing demonstrates how it fits on men with different builds as well as how certain pieces can be paired together to create full outfits.  (Harris Decl. ¶ 33; Mayorga Decl. ¶¶ 22-23.)  The fact that having store employees dressed in the brand they are selling boosts sales is evidenced by the widespread practice of clothing retailers having their employees dressed in the stores' brand.  (Harris Decl. ¶ 34.)  Having male sales professionals dressed in Varvatos at all times at work also prevents them from wearing other, competing brands and implicitly endorsing those while working in Varvatos stores.  (*Id*.)

Male sales professionals often have customers approach them and ask about the Varvatos clothing they are wearing while on the sales floor, which in many instances leads to the customers purchasing the items being discussed.  (Mayorga Decl. ¶ 25; Harris Decl. ¶¶ 35-38; Shears Decl. ¶¶ 18-20.)  Male sales professionals also serve as references for their colleagues (both male and female), providing additional insight about the clothing they are wearing, including how it fits, how they pair it with other items, how it gets broken in, and so on.  (Shears Decl. ¶¶ 21-22; Mayorga Decl. ¶ 24; Harris Decl. ¶ 41.)

IV.    *The Historical Varvatos Women's Line & Female Clothing Allowance*

Varvatos launched a line of women's clothing (the "Women's Line") late in 2004 and discontinued it roughly a year later.  (Collings Decl. Ex 8, Kassen Tr. at 38:16-39:5; Collings Decl. Ex. 9, Fusaro Tr. at 44:17-24.)  The Women's Line was distinct from the standard

9

Varvatos line, which always has been designed exclusively for men, and was sold in separate sections of Varvatos stores.  (Collings Decl. Ex. 8, Kassen Tr. at 39:8-22; Collings Decl. Ex. 9, Fusaro Tr. at 44:4-16.)  While the Women's Line was being sold, female Varvatos sales professionals were required to wear items from the Women's Line at work, just as male sales professionals were – and still are – required to wear items from the main Varvatos men's line at work.  (Collings Decl. Ex. 9, Fusaro Tr. at 62:16-63:2; Collings Decl. Ex. 8, Kassen Tr. at 40:10-41:6, 53:20-24.)

When they were required to wear Varvatos clothing from the Women's Line at work, Varvatos provided its female sales professionals with a clothing allowance subject to the same terms as their male colleagues at the time.  (Collings Decl. Ex. 9, Fusaro Tr. at 9:2-10:6, 62:16-64:6, 96:9-18.)  Once the Women's Line was discontinued, and female sales professionals were no longer required to wear Varvatos clothing at work, Varvatos stopped providing its female sales professionals with a clothing allowance.  (Collings Decl. Ex. 8, Kassen Tr. at 54:11-55:7; Collings Decl. Ex. 9, Fusaro Tr. at 72:22-73:5, 99:17-100:7.)  In lieu of the clothing allowance, Varvatos added $200 per month to its female sales professionals' pay.  (Collings Decl. Ex. 9, Fusaro Tr. at 100:8-101:12; Collings Decl. Ex. 8, Kassen Tr. at 130:23-133:14.)

## ARGUMENT

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases. . . . '[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation.' . . .  [T]he Supreme Court 'reiterated that trial courts should not treat discrimination differently from other

10

ultimate questions of fact.'" *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

As a preliminary matter, Plaintiffs make no allegations that Varvatos discriminated against women in any way with respect to its hiring practices. To the contrary, their Second Amended Complaint concedes that roughly half of the sales professionals that Varvatos employs are women. (Second Am. Compl. ¶ 69 (ECF No. 69).) Plaintiffs also do not allege that Varvatos failed to pay its female sales professionals the same as its male sales professionals with respect to their hourly wages or the commissions they received.[3]

The sole basis for the allegations in Plaintiffs' Complaint is the $3,000 seasonal clothing allowance that male sales professionals receive, but female sales professionals do not. At the outset, it is worth noting that female sales professionals can purchase $3,000 worth of Varvatos clothing for $1,050, using the 65% employee discount that applies at full price Varvatos stores. Or, put another way, the actual value of what the male sales professionals receive from Varvatos if they "pull" the full $3,000 of clothing in a given season at its retail price is only $1,050 because that is how much they would pay out-of-pocket for the same items if the clothing allowance did not exist and they used their employee discount. Thus, Plaintiffs' claims that they should receive $3,000 per season are based on a fictional number – any female sales professional could obtain the exact same items a male sales professional "pulls" using his clothing allowance for $1,050 by using her 65% employee discount.

The Equal Pay Act ("EPA") prohibits paying unequal wages to employees on the basis of sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. §

---

3.    In fact, currently the average hourly wage for female sales professionals is $18.11 per hour, compared to just $16.88 for male sales professionals. (Chang Decl. ¶ 19.)

206(d)(1); *Chiaramonte v. Animal Med. Ctr.*, 677 Fed. App'x 689, 690-91 (2d Cir. 2017);

*E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254-55 (2d Cir. 2014).  Even if Plaintiffs

could satisfy their burden of demonstrating a *prima facie* violation of the EPA – which they

cannot – the clothing allowance that Varvatos provides is based on a factor other than sex, which

constitutes an affirmative defense to Plaintiffs' EPA claims.  The same reasons that prevent

Plaintiffs from being able to establish an EPA claim similarly prevent them from establishing the

requisite elements of their claims under Title VII and New York state law.

I.      *Varvatos is Entitled to Summary Judgment on Plaintiffs' Equal Pay Act Claims.*

        A.      *Plaintiffs' Equal Pay Act Claim Fails Because They Cannot Demonstrate That
                Male and Female Sales Professionals Receive Unequal Wages.*

        Assuming *arguendo* that the clothing allowance constitutes "wages" under the EPA,

Plaintiffs must demonstrate that they received disparate pay.  Varvatos's clothing allowance

policy permits male sales professionals to "pull" up to $3,000 worth of clothing per quarter,

based on the full retail price of that clothing.  (Harris Decl. ¶ 17; Mayorga Decl. ¶ 16.)  However,

the actual value of that clothing to Varvatos is roughly $600 because the average margin on

Varvatos clothing is 80% – as is typical in the fashion industry.  (Harris Decl. ¶ 19.)  Two

Plaintiffs deposed in this case admitted that, after Varvatos stopped making its Women's Line,

and female sales professionals were thus no longer required to wear Varvatos clothing to work,

Varvatos added $200 per month to their base pay.  (Collings Decl. Ex. 8, Kassen Tr. at 131:6-

133:14; Collings Decl. Ex. 9, Fusaro Tr. at 99:24-101:12.)  Based on Plaintiffs' own testimony,

they receive an addition $2,400 per year – that exceeds what many Plaintiffs indicated they

spend on work clothing annually, and also approximates the value to Varvatos of the clothing

that male sales professionals are allowed to "pull," after accounting for Varvatos's standard 80%

margin, because one-fifth of the $12,000 annual clothing allowance given to male sales

12

professionals equals $2,400.  (Collings Decl. Ex. 3, at 2 ($1,250 spent in six months); Collings

Decl. Ex. 4, at 2 ("about $1,500" spent in 10 months); Collings Decl. Ex. 5, at 2 ("approximately

$1,574.08" spent in nearly two years); Collings Decl. Ex. 6, at 2 ("about $600" spent during one

year); Collings Decl. Ex. 7, at 2 ("between $500 and $600" spent in 10 months); Harris Decl.

¶19.).  Furthermore, female sales professionals also receive a 50% discount at AllSaints that is

not provided to male sales professionals.

By their own testimony, Plaintiffs receive additional pay in an amount that equals the

value to Varvatos of the clothing provided to male sales professionals.  Accordingly, Plaintiffs

cannot establish that the wages would be disparate.

B.    *Plaintiffs' Equal Pay Act Claim Fails Because Female Sales Professionals do not Perform Equal Work as Male Sales Professionals.*

Plaintiffs also bear the burden of demonstrating that they performed "equal work" as their

male comparators.  That is a "demanding" standard.  *E.E.O.C v. Port Auth.*, 768 F.3d at 254-55.

Although the work performed by Plaintiffs does not have to be identical to that required of the

male sales professionals, it does have to be substantially equal in order for Plaintiffs to be able to

maintain an EPA claim.  29 C.F.R. § 1620.13(a).  Here, it is undisputed that male sales

professionals are required to dress in (at least three pieces of) current season Varvatos clothing

when they work in order to serve as in-store models.  It is also undisputed that female sales

professionals are not required to wear Varvatos clothing or serve as models.

Plaintiffs themselves testified that, when new clothing lines are released each season and

sent to Varvatos stores, the sales team at the store meets to learn about the new items.  (Collings

Decl. Ex. 10, Romero Tr. at 42:19-43:14; Collings Decl. Ex. 8, Kassen Tr. at 44:18-25; Mayorga

Decl. ¶23.)  As part of those meetings, male sales professionals try on new items, model them,

and describe how they fit and feel so that the entire sales team can see how the clothing fits on

13

men of different builds and build up knowledge about the new items they can use to help make sales when interacting with customers.  (Collings Decl. Ex. 10, Romero Tr. at 54:21-56:6; Collings Decl. Ex. 8, Kassen Tr. at 44:18-45:17; Collings Decl. Ex. 9, Fusaro Tr. at 78:3-79:16.) Plaintiffs also testified that they asked male sales professionals to try on clothing for customers purchasing gifts for men not present in the store so that the customer could see how the clothing fit someone with a build similar to the gift's recipient.  (Collings Decl. Ex. 10, Romero Tr. at 82:11-24; Collings Decl. Ex. 9, Fusaro Tr. at 77:7-78:2.)  Female sales professionals are not required to act as in-store models and do not have any of the additional responsibilities placed on male sales professionals.

Thus, while some of the more general tasks – keeping merchandise stocked, ringing up customers, opening and closing the stores – are common to both male and female sales professionals, female sales professionals do not share the significant responsibilities related to brand promotion that fall exclusively to their male colleagues.  Having to purchase, style, and wear Varvatos clothing to work in order to act as an in-store model, trying on clothing to help the sales force acquire product knowledge, and serving as a stand-in to try on items being purchased as gifts are substantial elements of the job unique to male sales professionals.  Those duties render the work of male and female sales professionals unequal.

Whether male and female sales professionals perform equal work is not dependent on job classifications or titles, but rather their actual job requirements and performance.  29 C.F.R. § 1620.13(e).  "Job titles are frequently of such a general nature as to provide very little guidance in determining the application of the equal pay standard." *Id*.  "For purposes of an equal pay claim . . . a plaintiff must show more than identical job titles; a finding of substantial equality must be based on actual job content." *Byrne v. Telesector Res. Group, Inc.*, 339 Fed. App'x 13,

14

16 (2d Cir. 2009); *E.E.O.C. v. Port Auth.*, 768 F.3d at 254-55.  Thus, whether Varvatos differentiated between male sales professionals and female sales professionals by giving them separate titles, or referred to its male sales professionals as models (or some other title reflecting their added responsibilities) is immaterial.

There are undeniably tasks that male sales professionals have to perform that female sales professionals do not.  Adherence to a far stricter and more expensive dress code, modeling clothing for customers, and modeling clothing for, and teaching co-workers about, new lines of clothing are all functions that Plaintiffs concede are carried out solely by male sales professionals on a regular basis.  The undisputed fact that the male sales professionals in Varvatos stores fulfill these roles prevents Plaintiffs from carrying their demanding burden of establishing that the content of the jobs performed by male and female sales professionals are substantially equal.

C.      *Plaintiffs' Equal Pay Act Claim Fails Because the Role of Male Sales Professionals Requires Different Skills, Effort, and Responsibility Than Female Sales Professionals.*

Separate and apart from the requirement that Plaintiffs demonstrate equal work in order to state a *prima facie* violation of the EPA, they must also establish that the performance of the jobs of male and female sales professionals require equal skill, effort, and responsibility.  29 U.S.C. § 206(d)(1).  Given the respective roles that male and female sales professionals actually play at Varvatos, and the demands placed on each of them, Plaintiffs also cannot establish that their jobs require equal skill, effort, and responsibility as male sales professionals who receive a clothing allowance.

\*      \*      \*

**SKILL**:  Equal skill "includes consideration of such factors as experience, training, education, and ability."  29 C.F.R. § 1620.15.  Although male and female sales professionals both need similar experience, training, and education, the abilities required of each differ.

15

Varvatos designs and sells clothing for men.  (Mayorga Decl. ¶ 2; Harris Decl. ¶ 9.)
Accordingly, female sales professionals lack the fundamental ability to act as live models and
demonstrate how the clothing fits and can be styled on men.  Indeed, one of the most important
reasons for having male sales professionals wear Varvatos clothing while they are working is
because customers can get a sense of how the clothing fits – male customers would not be able to
glean any such information from seeing female sales professionals wearing men's clothing.

Female sales professionals similarly cannot serve as references for customers who are
purchasing gifts for men in Varvatos stores and trying to determine how certain items are sized.
Since Varvatos is a menswear line, the vast majority of customers purchasing clothing in
Varvatos stores are buying items to be worn by men.  It necessarily follows that, to get an
accurate sense of how an item would fit on a man, the customer would ask to have one of the
male sales professionals try it on.  For the same reasons, female sales professionals also lack the
ability to serve as models when new seasonal lines are released and the sales staff holds meetings
to learn about the new items and how they fit – hence why they are not asked to try on clothing
in connection with those meetings.

\*        \*        \*

**EFFORT**:  Effort "encompasses the total requirements of a job" and "is concerned with
the measurement of the physical or mental exertion needed for the performance of a job."  29
C.F.R. § 1620.16(a).  The requirement that male sales professionals wear Varvatos clothing from
the current season to work at all times imposes a substantial cost on them.  Varvatos clothing is
expensive, and complying with the three-piece rule and current-season requirement necessitates
purchasing a substantial amount of Varvatos clothing at regular intervals.  That financial burden
– which is dramatically greater than the corresponding burden placed on female sales

16

professionals by the Dress Code – creates a stressor unique to male sales professionals (and one that is intended to be addressed by the clothing allowance).

Male sales professionals also have a more restrictive dress code in terms of the variety of items they can wear to work, which imposes a mental burden on them.  Male sales professionals need to mix and match outfits from a relatively small set of expensive items in order to comply with the Dress Code – or face the increased burden that would come with spending additional money to purchase more Varvatos clothing at its high price point.  If male sales professionals have a relatively smaller set of clothing that complies with the Dress Code, they also encounter the burden of having to maintain the clothing, including dry cleaning it, so that it can last for an entire season without showing significant wear and tear.

Female sales professionals, on the other hand, are free to wear clothing from any number of stores, including many that are far less expensive than Varvatos.  They can also wear clothing they owned prior to working at Varvatos and clothing that may not be from the current season. The fact that female sales professionals have much more flexibility in how to comply with the Dress Code, and can do so with inexpensive items, immunizes them against the mental challenges faced by male sales professionals regarding how to style complete outfits with limited pieces and how to afford expensive Varvatos clothing required by the Dress Code.

Varvatos clothing also tends to be tailored and fit quite tightly.  Male sales professionals therefore have little choice but to wear restrictive clothing that makes it more difficult to perform their job duties, including retrieving and restocking merchandise.  (Mayorga Decl. ¶ 19.)  There is no similar requirement that female sales professionals wear clothing that fits tightly or otherwise restricts their movement.

*       *       *

17

**RESPONSIBILITY**:  "Differences in the degree of responsibility required in the performance of otherwise equal jobs cover a wide variety of situations."  29 C.F.R. § 1620.17(a). As discussed above, male sales professionals are required to wear Varvatos clothing to work and act as in-store models to increase the visibility of the items they are wearing.  (Harris Decl. ¶ 32; Chang Decl. ¶ 11.)  In doing so, they demonstrate and/or actively explain to customers how those items fit and can be styled with other Varvatos clothing.  (Shears Decl. ¶¶ 21-22; Mayorga Decl. ¶ 24; Harris Decl. ¶ 41.)  Male sales professionals also try on clothing in connection with meetings that coincide with the release of new seasonal lines so that their colleagues can learn how the clothes fit on people with different body types – and then use that information with customers to help make sales.  (Collings Decl. Ex. 10, Romero Tr. at 54:21-55:10; Collings Decl. Ex. 8, Kassen Tr. at 44:18-45:24; Mayorga Decl. ¶ 23.)  And male sales professionals try on clothing for customers who ask to see how it fits on someone with a particular build as a comparison to someone for whom they are purchasing the clothing.  Female sales professionals do not have any of these responsibilities.

Regulations applying the EPA specifically acknowledge that "[s]ales clerks, for example, who are engaged primarily in selling identical or similar merchandise may be given different responsibilities.  Suppose that one employee . . . is authorized and required to determine whether or not to accept payment for purchases by personal checks of customers.  The person having this authority . . . may have a considerable, additional degree of responsibility."  29 C.F.R. § 1620.17(b)(2).  If determining whether to accept checks as payment constitutes a difference in responsibilities under the EPA, surely a drastically different dress code (which imposes substantially different burdens) and different requirements with respect to serving as a model for co-workers and customers prevents Plaintiffs from establishing equal responsibility in this case.

18

II.   *The Clothing Allowance is Based on a Factor Other Than Sex.*

Even if Plaintiffs could meet their *prima facie* burden under the EPA – which they cannot – Varvatos should still not be liable because the clothing allowance is based on "any factor other than sex." 29 U.S.C. § 206(d)(1)(iv).  Congress intended that the "any other factor other than sex" defense to EPA claims be a "broad general exception" to such allegations and did not require that the factor other than sex be a "written or otherwise well-defined system."  H.R. Rep. No. 309, at 44, 86 (1963).  The Second Circuit has interpreted the "factor other than sex" rationale to require a "legitimate business reason."  *Belfi v. Prendergast*, 191 F.3d 129, 136 (2d. Cir 1999).

Here, Varvatos's clothing allowance is given to any sales professional who is required to wear Varvatos to work – as evidenced by the fact that, when the Women's Line was being sold and female sales professionals had to wear Varvatos to work, they qualified for a clothing allowance.  Which sales professionals are currently required to wear Varvatos to work is determined not by a sales professional's biological sex, but rather whether they identify as male or female.  Accordingly, the clothing allowance is based on a factor other than sex.

Varvatos requires its sales professionals who identify as male to wear Varvatos clothing because Varvatos is a menswear brand.  The purpose of having those sales professionals dress in Varvatos is to increase visibility, show how certain items can be paired together, and ultimately drive sales.  (Harris Decl. ¶¶ 32-34; Shears Decl. ¶ 17; Mayorga Decl. ¶¶ 20, 24; Chang Decl. ¶ 11.)  The raison d'être of a clothing retailer is to sell clothes and it can hardly be disputed that Varvatos's motivation for requiring male sales professionals to wear its clothing is to further that goal.  *See Hodgson v. Robert Hall Clothes, Inc.*, 473 F.2d 589, 594 (3rd Cir. 1973) ("economic benefits to an employer can justify a wage differential").  The Varvatos clothing that male sales professionals are required to wear is expensive.  (Mayorga Decl. ¶¶ 2,29.)  The price point of that

19

clothing renders the clothing allowance necessary because otherwise constantly maintaining a wardrobe of current season Varvatos clothing would be prohibitively expensive.  (*See* Collings Decl. Ex. 10, Romero Tr. at 109:9-13.)

*       *       *

Plaintiffs cannot state a valid claim under the EPA for a number of reasons.  First, Plaintiffs conceded that they receive additional compensation that male sales professionals do not, in order to compensate them for the lack of a clothing allowance.  Second, Plaintiffs also cannot demonstrate that the clothing allowance male sales professionals receive constitutes "wages" as defined by the EPA.  Lastly, Plaintiffs  cannot demonstrate that they perform equal work that requires equal skill, effort, and responsibility as their male colleagues because, among other things, male sales professionals are required to wear Varvatos clothing and model it in a number of settings – something not required of female sales professionals.[4]

III.   *Varvatos is Entitled to Summary Judgment on Plaintiffs' Title VII Claims Because Plaintiffs' Cannot Establish Prerequisites for, or the Elements of, Those Claims.*

To establish a *prima facie* case of disparate pay under Title VII, Plaintiffs must demonstrate (1) that they were members of a protected class; (2) that they were paid less than similarly situated non-members of their protected class; and (3) evidence of discriminatory animus.  *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d 419, 426 (S.D.N.Y. 2010).  Even if Plaintiffs could meet that burden, Varvatos would only need to "articulate a legitimate

---

4.      Even if Plaintiffs could articulate a viable EPA claim, the damages for such a claim would have to be limited to two years.  EPA violations only entitle plaintiffs to two years' worth of damages unless they can demonstrate that a violation was "willful."  29 U.S.C. § 255(a).  Willfulness requires proof "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute."  *Parada v. Banco Indus. de Venez., CA.*, 753 F.3d 62, 71 (2d Cir. 2014) (internal quotation marks omitted).  Here, there is no basis to argue – and Plaintiffs offer no proof – that Varvatos knew its conduct violated the EPA or showed reckless disregard for such a possibility.  To the contrary, Varvatos made a reasonable business decision to reimburse its male sales professionals for a cost that Varvatos imposed on them, and only them.

20

nondiscriminatory reason" for the clothing allowance.  *Id*.  Varvatos's burden is "one of production, not persuasion, and thus 'does not involve any determination of credibility.'  The defendant must meet this burden by articulating a reason for the challenged conduct that 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'"  *Id*. (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  The burden would then shift back to Plaintiffs to show, "without the benefit of the presumption, that the employer's action was in fact the result of racial discrimination."  *Id*.  Plaintiffs can only meet that burden by producing evidence "sufficient to allow a rational factfinder to infer that the employer was <u>actually motivated</u> in whole or in part by . . . discrimination."  *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).

   A.    <u>Plaintiffs Cannot Meet Their Burden of Establishing a Prima Facie Title VII Claim.</u>

   Many cases equate a plaintiff's burden of proof in a Title VII pay discrimination case based on sex to the burden a plaintiff must demonstrate in order to establish a claim under the EPA, albeit with additional requirements imposed on plaintiffs by Title VII.  *Belfi*, 191 F.3d at 139 ("In addition to the requirements that are generally the same as those under the EPA, a Title VII plaintiff must also produce evidence of discriminatory animus.") (internal quotation marks omitted); *Liang v. Café Spice SB, Inc.*, 911 F. Supp. 2d 184, 206-07 (E.D.N.Y. 2012) ("[I]n addition to establishing the first two elements of the prima facie [Title VII] case, which are generally the same requirements as those under the EPA, a Title VII plaintiff must also produce evidence of discriminatory animus.") (internal quotation marks omitted).  Plaintiffs' inability to establish the basic elements of an EPA claim, discussed above, prevent them from stating a valid claim under Title VII.

21

Under either the EPA or Title VII, Plaintiffs here must demonstrate that they were paid less than "similarly situated" male employees.  Even setting aside the question of whether providing clothing to male sales professionals, which essentially amounts to a uniform, constitutes a form of payment, Plaintiffs cannot do so.  "[I]ndividuals with whom [a] plaintiff attempts to compare herself must be similarly situated in 'all material respects,' including holding the same position, reporting to the same supervisor, and being subject to the same workplace standards."  *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 70 (S.D.N.Y. 2002) (internal citation omitted).  To prove pay discrimination under Title VII, Plaintiffs "must satisfy the 'demanding' standard of the 'equal work inquiry . . . [which] require[es] evidence that the jobs compared are substantially equal.'"  *Martinez v. Davis Polk & Wardell LLP*, 713 Fed. App'x 53, 55 (2d Cir. 2017) (applying EPA standard to Title VII pay discrimination inquiry).[5] Clearly, Plaintiffs here are not subject to the same standards as their male colleagues, nor do they hold positions that satisfy the demanding standard of showing substantial equality.

Plaintiffs do not dispute that male sales professionals were required to wear Varvatos clothing to work.  Plaintiffs do not dispute that they were not held to any such requirement.  Nor do Plaintiffs dispute that male sales professionals were used as references and resources in various situations to demonstrate how clothing fit, felt, and could be paired with other items – something that helped both male and female sales professionals make sales in Varvatos stores.

    B.    <u>*Varvatos has a Legitimate Nondiscriminatory Reason for its Clothing Allowance.*</u>

Even if Plaintiffs could establish a *prima facie* case, Varvatos can clearly demonstrate a "legitimate, nondiscriminatory reason" for the clothing allowance.  A defendant's burden at this

---

5.    Even courts that do not equate the requirements for a pay discrimination claims under Title VII with the EPA still hold that a Title VII plaintiff must demonstrate a *prima facie* case "by showing that she occupies a job similar to that of higher paid males."  *See, e.g.*, *Sprague v. Thorn Ams.*, 129 F.3d 1355, 1363 (10th Cir. 1997).  Once again, this is a burden that Plaintiffs here cannot meet.

22

step in the analysis is light. *Pierre v. Air Serv Sec.*, No 14-CV-5915 (MKB) (ST), 2016 U.S. Dist. LEXIS 128891, at *9 (E.D.N.Y. Sept. 21, 2016) (citing *Risco v. McHugh*, 868 F. Supp. 2d 75, 99 (S.D.N.Y. 2012). Varvatos designs men's clothing and, accordingly, requires only its male sales professionals to wear that clothing while at work. Female sales professionals, by comparison, can purchase clothing from a wide variety of stores – or wear clothing they already owned before working at Varvatos – and still comply with the dress code. Because of the disparate requirements placed on male and female sales professionals under the Varvatos Dress Code, Varvatos provides its male sales professionals with a clothing allowance. There is nothing discriminatory about designing clothes for men and thus requiring only male employees to wear that clothing. Varvatos's clothing allowance is directly tied to that unique burden placed solely on male sales professionals and designed to alleviate what would otherwise be a substantial cost they alone would have to bear.

Furthermore, sex can constitute a bona fide occupational qualification, and a defense to a Title VII claim, where it is "necessary for the purpose of authenticity or genuineness." 29 C.F.R. § 1604.2(a)(2). Here, Varvatos designs clothing specifically for men and having just its male sales professionals wear its clothing in its stores maintains the authenticity and genuineness of the brand's image. Having female sales professionals wear Varvatos clothing would detract from the brand's authenticity and genuineness by creating confusion about who the brand is designed for and could discourage men from purchasing what they would mistake as a unisex, or certainly less masculine, brand. Accordingly, Varvatos is justified under Title VII in distinguishing between its male and female sales professionals in its Dress Code, and in the allotment of clothing it provides to male sales professionals so that they can comply with what would otherwise be the tremendously expensive demands placed on them by that Dress Code.

C.    *Plaintiffs Cannot Demonstrate That Varvatos's Clothing Allowance Policy Is Motivated by Discriminatory Animus.*

Even if Plaintiffs could establish a *prima facie* case, in light of Varvatos's legitimate nondiscriminatory reason for the clothing allowance, Plaintiffs can only survive summary judgment by "proving that a discriminatory motive, more likely than not, motivated the defendant or by proving both that the reasons given by the defendant[] are not true and that discrimination is the real reason for the actions." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). "Although intermediate evidentiary burdens shift back and forth under [the Title VII] framework, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). Plaintiffs can only meet that burden by producing evidence "sufficient to allow a rational factfinder to infer that the employer was <u>actually motivated</u> in whole or in part by . . . discrimination." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (emphasis added).

Plaintiffs have not adduced any evidence that Varvatos crafted its clothing allowance policy due to some intent to discriminate against women.  There is simply no evidence that Varvatos was motivated by a desire to pay female employees less.  To the contrary, Varvatos hires roughly as many female sales professionals as it does male sales professionals and currently pays its female sales professionals a higher average hourly wage than it does to its male sales professionals.  Both male and female sales professionals are compensated using the same commission structure.  The <u>only</u> way in which Plaintiffs allege that female sales professionals (or females in general) are treated differently by Varvatos is in connection with the clothing allowance.  But Varvatos merely provides its male sales professionals with a clothing allowance

24

specifically tied to Dress Codes responsibilities they have to comply with, that female sales professionals do not.  To imbue a discriminatory animus to such a policy defies logic, particularly in light of the wholly equal treatment female employees receive otherwise.

> D.  *Plaintiffs Did Not Meet the Prerequisite for a Title VII Claim of Filing a Verified Charge with the EEOC.*

In addition to their inability to establish a *prima facie* Title VII claim or overcome Varvatos's legitimate nondiscriminatory reason for the clothing allowance by demonstrating discriminatory motivation, Plaintiffs also fail to establish that they exhausted all administrative remedies with the Equal Employment Opportunity Commission ("EEOC"), which is "an essential element of the Title VII statutory scheme" and "a precondition to bringing a Title VII claim in federal court."  *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000).  No Plaintiff in this case asserts that she filed a charge with the EEOC except for Tessa Knox.  Thus, for the entire set of Plaintiffs, whether they meet the exhaustion prerequisite for bringing their Title VII claim rests on the validity and completeness of Ms. Knox's EEOC charge.

In order to be valid, an EEOC charge needs to be verified.  29 C.F.R. § 1601.9. Verification means "sworn to or affirmed before a notary public, designated representative of the Commission, or other person duly authorized by law to administer oaths and take acknowledgements, or supported by an unsworn declaration in writing under penalty of perjury." 29 C.F.R. §1601.3(a).  "Verification can be asserted as a defense to a [Title VII] claim by the defendant."  *Gad v. Kansas State Univ.* 787 F.3d 1032, 1034 (10th Cir. 2015).  *Gad* held that, although verification was not a jurisdictional bar to the plaintiff's suit, it did "not imply any diminution in the need for plaintiffs to comply with this Title VIII requirement."  *Id*. at 1040.

Ms. Knox's initial letter to the EEOC, which she sent on February 2, 2017 (after she had retained counsel), did not qualify as a valid charge.  When the EEOC informed her of the

deficiency, Ms. Knox subsequently submitted an EEOC Form 5 on June 15, 2017.  Ms. Knox

simply cut and pasted an electronic version of her signature into that Form 5 electronically (at a

time when the EEOC was not accepting electronic signatures), and failed to have the form

notarized.  (Collings Decl. Ex. 11.)  Her failure to properly sign her Form 5 and have it notarized

renders Ms. Knox's EEOC charge deficient.  As the only Plaintiff to pursue any administrative

remedy, Ms. Knox's failure to file a proper charge with the EEOC constitutes yet another bar to

Plaintiffs' Title VII claims.

IV.    *Plaintiffs' New York State Law Claims Fail for the Same Reasons as Their EPA and Title
       VII Claims.*

      With limited exceptions, none of which inure to Plaintiffs' benefit – and some of which

place additional burdens on them – the elements of claims under New York Labor Law § 194

mirror the elements of a federal EPA and the elements of claims under New York Executive Law

§ 296 are the same as those of a Title VII claim.  Accordingly, for the reasons discussed above

with respect to the federal analogs of the New York statutes under which Plaintiffs bring their

claims, those claims fail and Varvatos should be awarded summary judgment.

     A.    *NYLL § 194 Requires the Same Elements as a Federal EPA Claim, Plus
       Additional Requirements, None of Which Plaintiffs Can Establish.*

      "An equal pay claim under New York Labor Law § 194 is analyzed under the same

standards applicable to the federal Equal Pay Act."  *Chiaramonte*, 677 Fed. App'x at 690 n.1

(citing *Talwar v. Staten Island Univ. Hosp.*, 610 Fed. App'x 28, 29 n.2 (2d Cir. 2015).  However,

to state a claim under New York Labor Law § 194, "in addition to establishing the elements of

an Equal Pay Act claim, a plaintiff must produce evidence of discriminatory animus."  *Talwar*,

610 Fed App'x at 29 n.2 (citing *Belfi*, 191 F.3d at 139).  As discussed in more detail above, with

respect to Plaintiffs' Title VII claim, there is no basis to find discriminatory animus here.

Varvatos employs roughly the same number of female sales professionals as male sales

26

professionals, pays them using the same commission structure, and gives them on average a higher hourly wage.  Whatever arguments Plaintiffs make about Varvatos's clothing allowance – which is clearly tied directly to a burden placed only on male sales professionals – Varvatos's pattern of behavior reflects anything but a discriminatory animus.

Two additional, and relatively minor, differences between a New York equal pay claim and a federal EPA claim do nothing to strengthen Plaintiffs' claims here.  First, amendments to NYLL § 194 in 2016 changed what a defendant must demonstrate for an affirmative defense from the language used in the EPA, "any factor other than sex," to "a bona fide factor other than sex."  However, Varvatos's rationale for its clothing allowance policy constitutes a bona fide factor other than sex.  New York Department of Labor Guidance related to the change in language explains that a bona fide factor is one that is not based upon or derived from a sex-based differential in compensation and is job-related with respect to the particular position, and consistent with business necessity.[6]

The same reasons that render the clothing allowance based upon a factor other than sex for the EPA apply equally to render it based upon a "bona fide" factor other than sex.  As discussed above, it is directly tied to a necessary job function that only certain individuals can perform.  And, consistent with the Guidance, Varvatos did not reject any existing alternative practice that could have served the same business purpose without producing any sort of disparate impact.

If anything, the analysis need not even reach the stage where Varvatos articulates an affirmative defense because Plaintiffs would have an even harder time meeting their *prima facie* burden under New York law than they do under the EPA.  Specifically, the definition of "wages"

---

6.    *Available at* https://labor.ny.gov/formsdocs/factsheets/pdfs/p828.pdf.

under New York law is narrower than under federal law; it includes "earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission, or other basis."  New York Labor Law § 190(1); *Truelove v. Northeast Capital*, 95 N.Y.2d 220, 224 (N.Y. 2000) (applying "restrictive" statutory definition of wages). Plaintiffs cannot shoehorn the clothing allowance into that definition, which focuses on remuneration for actual services that have already been performed.[7]

Thus, Plaintiffs claims under NYLL § 194 fail for the same reasons as their federal EPA claims, including the inability to establish disparate wages, equal work, or equal skill, effort, and responsibility.  Even more problematic for Plaintiffs under NYLL § 194 is their inability to demonstrate discriminatory animus.

B. *Plaintiffs Cannot State a Valid Claim Under New York Executive Law § 296 for the Same Reasons That Their Title VII Claim Fails.*

Plaintiffs' claim based on N.Y. Executive Law § 296 is also deficient.  "[A] plaintiff's discrimination claims under [the NY Human Rights Law] are subject to the burden-shifting analysis applied to discrimination claims under Title VII."  *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010); *Hyek v. Field Support Servs.*, 461 Fed. App'x 59, 60 (2d Cir. 2012) (claims under New York's Human Rights Law are "analyzed identically" to Title VII claims and "the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII").  The deficiencies in Plaintiffs' federal Title VII claim similarly entitle Varvatos to summary judgment on Plaintiffs' New York's Human Rights Law claim.

---

7. NYLL § 190 also incorporates by reference § 198, which defines "benefits or wage supplements" to include "reimbursement for expenses; health, welfare, and retirement benefits; and vacation, separation or holiday pay."  Plaintiffs do not allege, nor could they establish, that the clothing allowance falls within any of these definitions.  The closest arguable option would be reimbursement for expenses, but the clothing allowance simply involves Varvatos providing a certain amount of free clothing to male sales professionals, not reimbursing them for any expenses that they previously incurred in connection with the performance of their job duties.

28

Moreover, just as is the case with respect to Title VII, sex can be a bona fide occupational qualification under New York's Human Rights Law as well. *See, e.g.*, *Ferrara v. City of Yonkers*, No. 13 Civ. 1221 (KBF), 2015 U.S. Dist. LEXIS 66906, at *10-12 (S.D.N.Y. May 21, 2105) (granting defendant summary judgment on plaintiff's Title VII and New York Human Rights Law claims because sex was a bona fide occupational qualification for certain detention officer positions).  For the same reasons discussed above with respect to Title VII, only male sales professionals can wear Varvatos clothing – which is designed for men – and maintain the authenticity of the brand.  Thus, sex is a bona fide occupational qualification for male sales professionals, who then receive a clothing allowance to account for the fact that they alone must bear the burden of obtaining expensive Varvatos clothing.

## CONCLUSION

The various statutory bases for Plaintiffs' claims are interrelated – and none provides a valid basis for recovery.  Plaintiffs are unable to demonstrate fundamental elements of a *prima facie* claim under either the EPA or Title VII, which mirror their New York counterparts under which Plaintiffs also bring suit.  Accordingly, and for the reasons set forth in detail above, Varvatos requests that the Court grant summary judgment in its favor on all of Plaintiffs' claims.

84077291_3

DATED:  May 24, 2018

                HUGHES HUBBARD & REED LLP


                By:       /s/ Ned H. Bassen
                    Ned H. Bassen
                    Brett M. Collings
                One Battery Park Plaza
                New York, New York 10004
                Tel:  (212) 837-6000
                Fax:  (212) 299-4726
                ned.bassen@hugheshubbard.com
                brett.collings@hugheshubbard.com

                *Attorneys for Defendant John Varvatos*
                *Enterprises, Inc.*

84077291_3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on May 24, 2018, I caused to be electronically filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOHN VARVATOS ENTERPRISES, INC.'S MOTION FOR SUMMARY JUDGMENT by using the CM/ECF system, which sends a notice of electronic filing to all counsel of record who have registered to receive notices from the Court under the CM/ECF system.

_____
Brett M. Collings