UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TESSA KNOX,                      :

                Plaintiff,   :

         -against-             :        17 Civ. 772 (GWG)

JOHN VARVATOS ENTERPRISES, INC.,   :        ECF Case

               Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MEMORANDUM OF THE PLAINTIFF, THE 13 OPT-IN PLAINTIFFS
AND THE CLASS IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

DUNNEGAN & SCILEPPI LLC
Attorneys for the Plaintiff, the 13
  Opt-In Plaintiffs and the Class
350 Fifth Avenue
New York, New York 10118
(212) 332-8300

Table of Contents

Table of Authorities .................................................................................................. iii

Preliminary Statement ................................................................................................ 1

Argument ..................................................................................................................... 3

    I.        JV IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE
             TITLE VII CLAIMS ................................................................................ 3

          A.      The Facially Discriminatory Nature Of The Clothing
                 Allowance Proves A <u>Prima</u> <u>Facie</u> Case Of Discriminatory
                 Conduct Under Title VII ................................................................ 3

          B.      The Facially Discriminatory Nature Of JV's Clothing
                 Allowance Provides The Necessary Evidence Of
                 Discriminatory Animus ................................................................. 5

          C.      JV Has No Affirmative Defense To The Title VII Violation .......... 7

          D.      Knox Properly Filed A Verified Charge With The EEOC ............ 14

    II.      JV IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE
             NYHRL CLAIMS ................................................................................ 15

    III.     JV IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE
             EPA CLAIMS ...................................................................................... 16

          A.      The Clothing Allowance Results In JV Paying Male Sales
                 Professionals More "Wages" Than Female Sales Professionals ... 17

               1.      JV's Employees Admit That JV Does Not
                     Compensate Female Sales Professionals For The
                     Lack Of A Clothing Allowance ......................................... 17

                2.      Evidence That JV Currently Compensates Any
                     Female Sales Professionals For The Lack Of
                     A Clothing Allowance Is Noticeably Missing ................... 19

                3.      The Testimony Of Kassen And Fusaro Impacts Their
                     Damages, Not JV's Liability .............................................. 20

          B.      Knox And The Opt-In Plaintiffs Have Demonstrated That
                   Male And Female Sales Professionals Perform Substantially
                   Equal Work ................................................................................... 20

1.  Wearing JV Clothing Does Not Create Different Work ....20

2.  Trying On The JV Clothing Does Not Create Different Work .....................................................................................21

C.  Knox And The Opt-In Plaintiffs Have Demonstrated As A Matter Of Law That The Performance Of The Work Of Male And Female Sales Professionals Requires Substantially The Same Skill, Effort And Responsibility............................................23

D.  JV Cannot Create A Question Of Fact Based Upon The "Factor Other Than Sex" Defense .................................................29

E.  JV Cannot Obtain Summary Judgment Based Upon The Lack Of Willfulness Of Its EPA Violation..................29

IV.   JV IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE NYEPA CLAIMS .....................................................................................30

A.  The NYEPA Claims Do Not Require Proof Of Discriminatory Animus.................................................................30

B.  The Clothing Allowance Is A Wage Under The NYEPA .............31

Conclusion .......................................................................................................33

Table of Authorities

**Cases**

Abdu-Brisson v. Delta Air Lines, Inc.,
239 F.3d 456 (2d Cir. 2001)............................................................................4

Aldrich v. Randolph Cent. Sch. Dist.,
963 F.2d 520 (2d Cir.1992).............................................................................8

Am. Fed'n of State, Cty. & Mun. Employees, AFL-CIO (AFSCME) v. Cty. of Nassau,
799 F. Supp. 1370 (E.D.N.Y. 1992) ..............................................................24

Am. Fed'n of State, Cty. & Mun. Employees, AFL-CIO (AFSCME) v. Nassau Cty.,
609 F. Supp. 695 (E.D.N.Y. 1985) .............................................................. 3-4

Am. Nurses' Ass'n v. State of Ill.,
783 F.2d 716 (7th Cir. 1986) ..........................................................................4

Bangerter v. Orem City Corp.,
46 F.3d 1491 (10th Cir. 1995) ........................................................................6

Barrett v. Forest Labs., Inc.,
39 F. Supp.3d 407 (S.D.N.Y. 2014).................................................................4

Belfi v. Prendergast,
191 F.3d 129 (2d Cir. 1999).................................................................8, 9, 31

Chiaramonte v. Animal Med. Ctr.,
677 Fed. App'x 689 (2d Cir. 2017).........................................................30, 32

City of Los Angeles Dep't of Water & Power v. Manhart,
435 U.S. 702 (1978)........................................................................................7

Cmty. Servs., Inc. v. Wind Gap Mun. Auth.,
421 F.3d 170 (3d Cir. 2005).......................................................................5-6

Crane v. Vision Quest Nat.,
2000 WL 1230465 (E.D. Pa. Aug. 23, 2000) .................................................6

E.E.O.C. v. Borden's, Inc.,
724 F.2d 1390 (9th Cir. 1984)
overruled on other grounds,
Public Employees Retirement System of Ohio v. Betts,
492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989)................................5

E.E.O.C. v. Fremont Christian Sch.,
781 F.2d 1362 (9th Cir. 1986) ........................................................................................11

EEOC v. J.C. Penney Co., Inc.,
843 F.2d 249 (6th Cir.1988) ............................................................................................8

E.E.O.C. v. Johnson & Higgins, Inc.,
887 F. Supp. 682, 685 (S.D.N.Y. 1995)
aff'd and remanded,
91 F.3d 1529 (2d Cir. 1996).............................................................................................6

E.E.O.C. v. Port Auth. of New York & New Jersey,
768 F.3d 247 (2d Cir. 2014)...................................................................................... 23-24

Hodgson v. City of New York,
2013 WL 840874 (S.D.N.Y. Mar. 7, 2013) ..................................................................30

Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v.
    Johnson Controls, Inc.,
499 U.S. 187 (1991).............................................................................................5, 6, 7, 13

Jamilik v. Yale Univ.,
362 F. App'x 148 (2d Cir. 2009) ...................................................................................29

Johnson v. State of New York,
49 F.3d 75 (2d Cir. 1995)......................................................................................... 4-5, 5

Lavin-McEleney v. Marist Coll.,
239 F.3d 476 (2d Cir. 2001)...........................................................................................29

McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973)....................................................................................................4, 5

McGuinness v. Lincoln Hall,
263 F.3d 49 (2d Cir. 2001)...............................................................................................4

Pfeiffer v. Lewis Cnty.,
308 F. Supp.2d 88 (N.D.N.Y.2004) ..............................................................................31

Phillips v. Martin Marietta Corp.,
400 U.S. 542 (1971)........................................................................................................13

Pollis v. New Sch. for Soc. Research,
132 F.3d 115 (2d Cir. 1997)...........................................................................................29

Shumway v. United Parcel Service, Inc.,
118 F.3d 60 (2d Cir. 1997)...........................................................................4

Talwar v. Staten Island Univ. Hosp.,
610 F. App'x 28 (2d Cir. 2015) ................................................ 30-31, 31, 32

Trans World Airlines, Inc. v. Thurston,
469 U.S. 111 (1985).......................................................................................4

U.S. E.E.O.C. v. Catholic Healthcare W.,
530 F. Supp.2d 1096 (C.D. Cal. 2008) ..........................................................6

Usery v. Columbia Univ.,
568 F.2d 953 (2d Cir. 1977)........................................................ 22-23, 24, 27

Virgona v. Tufenkian Imp.-Exp. Ventures, Inc.,
2008 WL 4356219 (S.D.N.Y. Sept. 23, 2008).........................................29-30

Washington Cty. v. Gunther,
452 U.S. 161 (1981).................................................................................3, 4

Westchester Cty. Corr. v. Cty. of Westchester,
346 F. Supp.2d 527 (S.D.N.Y. 2004)..........................................................11

Western Air Lines, Inc. v. Criswell,
472 U.S. 400 (1985)...................................................................................11

White v. Dep't of Corr. Servs.,
814 F. Supp.2d 374 (S.D.N.Y. 2011).................................................... 11-12

**Statutes**

15 U.S.C. § 7001.....................................................................................15

28 U.S.C. § 1746.....................................................................................14

29 U.S.C. § 206...................................................................................1, 7

42 U.S.C. § 2000e-2...............................................................1, 10, 11, 13

N.Y. Lab. Law § 190 .................................................................................31

N.Y. Lab. Law § 194 .............................................................1, 30, 31, 32

N.Y. Lab. Law § 198 .................................................................................30

N.Y. Exec. Law § 296.................................................................................................1

**Regulations**

29 C.F.R. § 1601.3...............................................................................................14

29 C.F.R. § 1601.12.............................................................................................15

29 C.F.R. § 1601.16.............................................................................................21

29 C.F.R. § 1620.17.............................................................................................24

29 C.F.R. § 1620.20.........................................................................................21, 22

**Other**

1 L. Larson, <u>Employment Discrimination</u> § 13.00 (1985)................................................11

<u>Whose Motive Matters?: Discrimination in Multi-Actor
    Employment Decision Making</u>, 61 LA. L. REV. 495 (2001)...........................................7

Plaintiff Tessa Knox ("Knox"), the 13 opt-in plaintiffs,[1] and the members of the class that the Court certified in an order entered February 21, 2018 (the "Class") respectfully submit this memorandum in opposition to the motion of defendant John Varvatos Enterprises, Inc. ("JV") for summary judgment on each of the four claims asserted in this action: (i) Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2 ("Title VII"), (ii) the New York Human Rights Law, N.Y. Exec. Law § 296 (the "NYHRL"), (iii) the Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA"), and (iv) the New York Equal Pay Act, N.Y. Lab. Law § 194 (the "NYEPA").

<u>Preliminary Statement</u>

There is no dispute that JV has a facially discriminatory policy that gives its male, but not its female, sales professionals a $12,000 per year clothing allowance ("Clothing Allowance"). After JV refers to the Clothing Allowance both as a "reimbursement" ("[JV] made a reasonable business decision to reimburse its male sales professionals for a cost that [JV] imposed on them…" Dkt. 184 at 25/36 n. 4), and as a "uniform" ("providing clothing to male sales professionals, which essentially amounts to a uniform…" Dkt. 184 at 27/36), JV admits that the Clothing Allowance is "free clothing" for male sales professionals. (Dkt. 184 at 33/36 n. 7) The Clothing Allowance is therefore additional compensation for male, but not female, sales professionals.

JV's fundamental defense to this facially discriminatory policy is that JV has no alternative but to give the $12,000 per year Clothing Allowance to its male sales

---

[1] The opt-in plaintiffs are Laurentina Chaparro, Hillary Crandle, Joy Fusaro, Alyssa Hickey, Margret Holcomb, Pamela Kassen, Michelle Ortiz, Tripti Pandey, Ruby Romero, Wijdan Shoubaki, Jena Tobak, Christina Torres, and Arissia Tossetti.

professionals because it needs them to wear and "model" the JV clothes to promote sales. (Dkt. 184 at 7/36 "Male sales professionals are required to wear [JV] clothing and serve as in store models to increase the visibility of the clothing…")

However, JV's purported business need is to have male sales professionals **wear** the JV clothes, not to have male sales professionals **own** the JV clothes.  JV writes "Requiring its male sales professionals [to] wear current season [JV] clothing serves a number of purposes for Varvatos." (Dkt. 184 at 13/36)  JV has not identified any business need for male sales professionals to own the clothes.

**For example, JV could have achieved its purported business need, in a non-discriminatory manner, by (i) issuing JV clothing to male sales professionals to wear to work, (ii) issuing brand appropriate clothing to female sales professionals (perhaps from JV's sister store) to wear to work, and (iii) taking back that clothing after the sales professionals no longer need to wear it for work, or JV could have given the female sales professionals a benefit of equal value.**

This obvious variation to JV's Clothing Allowance would, in a non-discriminatory manner, meet JV's purported business need of having its male sales professionals wear the JV Clothing while working.  While this would shift to JV the cost of providing work clothing for its female sales professionals, JV represents that this can be done "inexpensively." (Dkt. 184 at 6/36)  In addition, that cost could be less than the revenue JV could realize from monetizing the JV clothing its male sales professionals return at the end of the season.  The only apparent reason that JV has not adopted this obvious variation to its Clothing Allowance policy is that it would prevent JV from providing additional compensation to its male sales professionals.

<u>Argument</u>

On May 24, 2018, Knox, the 13 opt-in plaintiffs and the Class moved for summary judgment on liability on each of the four claims in this action. (Dkts. 185-188) JV has also filed its own summary judgment motion, making (i) legal arguments, that have no merit, and (ii) factual arguments, that are almost certainly insufficient to create a genuine issue of fact sufficient to avoid summary judgment against JV, and are certainly insufficient for the Court to grant summary judgment in favor of JV.

I.

### JV IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE TITLE VII CLAIMS

In their motion for summary judgment, Knox and the Class demonstrated that they were entitled to summary judgment on liability against JV for their Title VII claims. (Dkt. 187 at 30-40/59)  At worst for Knox and the Class, there is a question of fact on the Title VII claims.

A.      The Facially Discriminatory Nature Of The Clothing Allowance
         <u>Proves A Prima Facie Case Of Discriminatory Conduct Under Title VII.</u>

JV's argument that Knox and the Class cannot prove their Title VII claims, because Knox cannot prove an EPA claim (Dkt. 184 at 26/36), is incorrect.  To the contrary, Knox and the Class need not prove the elements of an EPA claim to prove discrimination under Title VII. They may prove discrimination under Title VII based upon JV's intent to discriminate between men and women in providing compensation. <u>Washington Cty. v. Gunther</u>, 452 U.S. 161, 180-81 (1981); <u>Am. Fed'n of State, Cty. & Mun. Employees, AFL-CIO (AFSCME) v. Nassau Cty.</u>, 609 F. Supp. 695, 709 (E.D.N.Y. 1985)("The Supreme Court has also recognized that Title VII wage claims are not limited

3

to only those claims that could be brought under the EPA."); McGuinness v. Lincoln Hall, 263 F.3d 49, 54 n. 2 (2d Cir. 2001)("We have already noted that because a Title VII plaintiff may establish a prima facie case of discrimination in a number of different ways depending on the specific facts of a given case, Shumway [v. United Parcel Service, Inc., 118 F.3d 60 (2d Cir. 1997)] does not require that a plaintiff always be able to show disparate treatment of an otherwise similarly situated employee as a necessary prerequisite to a prima facie case under Title VII.")(citing Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001)); Barrett v. Forest Labs., Inc., 39 F. Supp.3d 407, 452 (S.D.N.Y. 2014)("Put differently, a Title VII plaintiff could succeed by showing that her employer intentionally depressed her wages, even if the employer did not employ any similarly-situated males."); Am. Nurses' Ass'n v. State of Ill., 783 F.2d 716, 721 (7th Cir. 1986)("All that this seems to mean, as the dissenting Justices pointed out, is 'that even absent a showing of equal work, there is a cause of action under Title VII when there is direct evidence that an employer has *intentionally* depressed a woman's salary because she is a woman.'")(quoting Washington Cty. v. Gunther, 452 U.S. 161, 204 (Rehnquist, J., dissenting)(Emphasis in original.).  Knox can conclusively prove that intent because the Clothing Allowance is facially discriminatory. (Dkt. 187 at 34-36/59)

JV's argument that the Court must apply the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny is incorrect because JV's Clothing Allowance policy is facially discriminatory. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985)("...the McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination."); Johnson v. State of New York, 49 F.3d 75, 79 (2d Cir. 1995)("In cases such as this, where there is direct evidence

that the disparate treatment (here, discharge) is age-dependent, the <u>McDonnell Douglas</u>

search for a motive is unnecessary and therefore inapplicable.").  JV's argument based

upon that inapplicable burden shifting analysis (Dkt. 184 at 25-26/36) should therefore

fail.

In any event, in addition to liability based upon the facially discriminatory nature

of the Clothing Allowance policy, Knox and the Class can also prove Title VII liability

by proving, as set forth in Point III below, the elements of an EPA violation. (Dkt. 187 at

43-54/59)

B.      The Facially Discriminatory Nature Of JV's Clothing
        <u>Allowance Provides The Necessary Evidence Of Discriminatory Animus.</u>

As a matter of law, a facially discriminatory policy provides sufficient evidence

of discriminatory animus to prove a Title VII claim. <u>Int'l Union, United Auto., Aerospace</u>

<u>& Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.</u>, 499 U.S. 187, 199

(1991)("Moreover, the absence of a malevolent motive does not convert a facially

discriminatory policy into a neutral policy with a discriminatory effect. Whether an

employment practice involves disparate treatment through explicit facial discrimination

does not depend on why the employer discriminates but rather on the explicit terms of the

discrimination."); <u>Johnson v. State of N.Y.</u>, 49 F.3d 75, 78 (2d Cir. 1995)("Where an

employment practice is facially discriminatory, the plaintiff need not prove the

employer's animus or ill will toward older people.")(citing <u>E.E.O.C. v. Borden's,</u>

<u>Inc.</u>, 724 F.2d 1390, 1393 (9th Cir. 1984), <u>overruled on other grounds</u>, <u>Public Employees</u>

<u>Retirement System of Ohio v. Betts</u>, 492 U.S. 158, 173 (1989); <u>Cmty. Servs., Inc. v.</u>

<u>Wind Gap Mun. Auth.</u>, 421 F.3d 170, 177 (3d Cir. 2005)("Hence, where a plaintiff

demonstrates that the challenged action involves disparate treatment through explicit

facial discrimination, or a facially discriminatory classification, 'a plaintiff need not prove the malice or discriminatory animus of a defendant.' Bangerter v. Orem City Corp., 46 F.3d 1491, 1501 (10th Cir. 1995). Rather, the focus is on the 'explicit terms of the discrimination.' Int'l Union, United Auto. Aerospace & Agric. Implement Workers v. Johnson Controls, Inc., 499 U.S. 187, 199, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991)."

The Clothing Allowance, which expressly provides a benefit to males and not to females, is discriminatory on its face. See e.g. E.E.O.C. v. Johnson & Higgins, Inc., 887 F. Supp. 682, 685 (S.D.N.Y. 1995), aff'd and remanded, 91 F.3d 1529 (2d Cir. 1996) ("[W]e find that there are no material facts in dispute in this case and that plaintiff is entitled to judgment as a matter of law…. We find that J & H's retirement policy, which requires those of its employees sitting on J & H's Board of Directors to retire when they reach the age of 60 or 62, violates the clear language of the ADEA."); U.S. E.E.O.C. v. Catholic Healthcare W., 530 F. Supp.2d 1096, 1108 (C.D. Cal. 2008); Crane v. Vision Quest Nat., 2000 WL 1230465, at *3 (E.D. Pa. Aug. 23, 2000).

JV's argument that it lacks the requisite discriminatory intent because, aside from the Clothing Allowance, JV treats its male and female employees equally (Dkt. 184 at 29-30/36), conflates discriminatory intent (sometimes known as "discriminatory animus") with hostility towards members of a protected class.  However, "[f]or years, it has (or should have) been clear that discriminatory intent or motive is not coextensive with hostile animus. While an employer's hostility, hatred or ill will toward plaintiff's race, sex, etc. will provide powerful evidence that the protected factor motivated the employer's decision, such hostility, hatred or ill will is not a required element of a disparate treatment claim. Instead, what must be shown is that a plaintiff's race, sex, etc.

motivated the decision, even if the employer lacked any ill will." Rebecca Hanner White & Linda Hamilton Krieger, Whose Motive Matters?: Discrimination in Multi-Actor Employment Decision Making, 61 LA. L. REV. 495, 501 (2001).  Thus, whether JV hires more female sales professionals than male sales professionals, whether JV pays them, on average, a higher hourly wage, or whether JV bears ill will towards women is irrelevant to the issue of discriminatory animus.

C.    JV Has No Affirmative Defense To The Title VII Violation.

Once Knox demonstrates that JV has adopted a facially discriminatory policy, JV should be held liable unless JV can prove an affirmative defense. City of Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 711 (1978)("[Requiring women to make a higher rate of contribution to their pension] constitutes discrimination and is unlawful unless exempted by the Equal Pay Act of 1963 or some other affirmative justification."); Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc., 499 U.S. 187, 199-200 (1991)("We hold that Johnson Controls' fetal-protection policy [that applies to women and not men] is sex discrimination forbidden under Title VII unless respondent can establish that sex is a 'bona fide occupational qualification.'").

JV offers three affirmative defenses, none of which have any merit.

Factor other than sex.  While Title VII authorizes JV to rely upon the defense that the facially discriminatory policy is "based upon a factor other than sex" within the meaning of § 206(d) of the EPA, JV cannot establish that defense.

As a matter of law, the Clothing Allowance is based upon sex.  There is a 100 percent correlation between being a male, being subject to the Male Dress Code and receiving the Clothing Allowance. (Dkt. 187 at 37-38/59)

JV's argument that "[t]he Second Circuit has interpreted the 'factor other than sex' rationale to require a 'legitimate business reason' Belfi v. Pendergast, 191 F.3d 129, 136 (2d. Cir [sic] 1999)" (Dkt. 184 at 24/36) is misleading to the extent it implies that JV only needs to prove that it had a legitimate business reason for the Clothing Allowance. The complete quote from Belfi provides:

> "Further, to successfully establish the 'factor other than sex' defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential. See Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 526–27 & n. 1 (2d Cir.1992); EEOC v. J.C. Penney Co., Inc., 843 F.2d 249, 253 (6th Cir.1988)('[T]he 'factor other than sex' defense does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason.')." Belfi v. Prendergast, 191 F.3d 129, 136 (2d Cir. 1999).

Thus, a "factor other than sex" must be *both* "gender-neutral" and a "legitimate business reason," in addition to being the factor that actually "brought about the wage differential." Id.  A business or economic justification alone will not provide a defense.

Apparently recognizing that it cannot rely upon the Male Dress Code as a "factor other than sex" to justify the Clothing Allowance, JV has, for the first time in this litigation, shifted to the argument that the Clothing Allowance is based upon "a factor other than sex" because it is based, not upon the biological sex of the sales professional, but upon the gender identity of the sales professional.  JV writes:

> "Which sales professionals are currently required to wear Varvatos to work is determined not by a sales professional's biological sex, but rather whether they identify as male or female.  Accordingly, the clothing allowance is based on a factor other than sex." (Dkt. 184 at 24/36)

JV's argument fails as a matter of law for at least two reasons.

First, gender identity cannot be "a factor other than sex." The award of the Clothing Allowance is based upon "sex" within the meaning of the EPA regardless of whether it is based upon biological sex or gender identity. Any other interpretation would render the EPA meaningless. One's gender identity cannot be "gender-neutral" as required by Belfi, 191 F.3d at 136. If courts accepted gender identity as a "factor other than sex," then any employer could justify any disparity in wages by claiming that it is based not upon biology, but upon identity.

Second, JV has presented no evidence that gender identity is the actual reason Knox and the opt-in plaintiffs (or anyone else) did not receive the Clothing Allowance. The Clothing Allowance policy provides:

> "In the case of a male employee, the employee should be dressed in John Varvatos and adhere by the 3 piece rule (a jacket, shirt and pants or a sweater, shirt and pants, etc.). Since all male retail employees receive a clothing allowance, it is essential that John Varvatos clothes be worn every day and those worn represent the current season." (Dkt. 188-8 at JVE-000079)

The Clothing Allowance is therefore based upon sex. JV has offered no evidence that it has ever interpreted this policy to mean gender identity rather than biological gender. When Knox e-mailed Chang on January 2, 2017, asking whether she was entitled to receive the Clothing Allowance, Chang responded "[u]nfortunately, at this time, we do not provide a clothing allowance for female employees....Clothing allowances are provided to male employees only. Similarly, to compare against one of our peers, Stuart Weitzman does not provide allowances to male employees since they only produce women's footwear. I understand that this may be disappointing, however,

that is our policy at this time." (Dkt. 69-1 at 2/6)  Chang did not ask whether Knox identified, or was transitioning to identify, as a man, or suggest that Knox would be able to obtain the Clothing Allowance if Knox identified as a man or transitioned to being a man.  Indeed, JV contradicts this gender identity argument in its memorandum, stating that "[JV] does not provide female sales professionals with a clothing allowance." (Dkt. 184 at 13/36)

While the latest version of the JV Dress Code, revised in September 2016, allows employees to "contact the Human Resources Department to request accommodations based on disability, gender identity and sincerely held religious beliefs" (Dkt. 188-8 at 3/5), JV offers no admissible evidence that JV gave, or would give, the Clothing Allowance to a biological female who told JV that she identified as a man.  Moreover, the fact that JV is just discovering this purportedly gender-neutral factor now, after 15 months of litigation, concerning a policy that goes back to at least 2002, is a strong indication that it is not in fact the actual reason for the wage disparity, but an excuse created for the purposes of this litigation.

BFOQ.  JV argues that it can rely on sex as a bona fide occupational qualification ("BFOQ") because "having female sales professionals wear Varvatos clothing would detract from the brand's authenticity and genuineness by creating confusion about who the brand is designed for and could discourage men from purchasing what they would mistake as a unisex, or certainly less masculine, brand." (Dkt. 184 at 28/36)  JV is incorrect for two reasons.

First, the BFOQ defense applies only to claims involving discrimination in "hir[ing] and employ[ing] employees," 42 U.S.C. § 2000e-2(e), not to claims, such as the

present claims, involving discrimination in compensation. (Dkt. 187 at 38-39/59)  See also E.E.O.C. v. Fremont Christian Sch., 781 F.2d 1362, 1366–67 (9th Cir. 1986)("See 1 L. Larson, Employment Discrimination § 13.00 (1985). '[Section 2000e-2(e)] uses only the words 'to hire and employ,' while the earlier section [§ 2000e-2(a)] detailing unlawful employment practices lists, in addition, such specific acts as 'to discharge' and ... includes a catchall phrase, 'or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment.'' Id. at 4-1 to 4-2. 'While this disparity between the description of the offense and the defense has caused little litigation, it should not be overlooked, since the oversight might tempt a defendant *mistakenly to invoke the BFOQ exception in a case involving, say, discrimination in pay.*' Id. at 4-2 (emphasis added.)." (Alteration in original.).  JV has admitted that it does not distinguish between men and women in hiring sales professionals. (Dkt. 178 ¶ 6; Dkt. 188-1 at 71:10-14; 72:15-73:5; Dkt. 188-2 at 109:1-11; Dkt. 188-6 at 99:2-6)

Second, even if the BFOQ defense were available in this case, JV cannot meet the elements of that defense. "[T]o sustain a BFOQ defense, the Defendants must show 1. the job qualifications that the employer invokes to justify his discrimination must relate to the essence or central function of his business, and 2. they must be 'reasonably necessary' to the particular business. See Western Air Lines, Inc. v. Criswell, 472 U.S. 400, 414–415 [] (1985).  In applying the defense, it is important to recognize that the BFOQ defense is intended to be an 'extremely narrow exception' to the general prohibition of discrimination of the basis of sex." Westchester Cty. Corr. v. Cty. of Westchester, 346 F. Supp.2d 527, 533 (S.D.N.Y. 2004).  "In the face of potential alternatives, gender-based

11

hiring is only permissible if the defendant makes a strong showing that such alternatives are not reasonable." <u>White v. Dep't of Corr. Servs.</u>, 814 F. Supp.2d 374, 386 (S.D.N.Y. 2011).

Even JV does not believe that having male sales professionals wear the JV clothing in the store is essential to its business. JV does not hire for the position of "male" or "female" sales professionals. (Dkt. 188-1 at 71:10-14; Dkt. 188-6 at 98:23-99:1) Rather JV hires for the position of sales professional and hires the best person for the job. (Dkt. 188-1 at 72:15-73:5; Dkt. 188-2 at 109:1-11; Dkt. 188-6 at 99:2-6) JV makes no effort to ensure that there is a male sales professional in each of its stores. Thus, JV could operate stores without any male sales professionals at a given time.

In fact, it is not unusual for JV to operate stores that do not employ male sales professionals at a given time. During her entire employment at JV, Knox worked in the East Hampton Store without a male sales professional. (Dkt. 10 at 2/3; Dkt. 188-2 at 110:12-18) During her entire employment with JV, female sales professional Jessica Sgandurra worked at the Woodbury Commons Store without a male sales professional. (Dkt. 188-32 at 7/8) From April 10, 2011 until July 5, 2013, female sales professional Acacia Feldman worked at the East Hampton Store without a male sales professional. (Dkt. 188-32 at 2/8) From September 30, 2004, until May 4, 2009, opt-in plaintiff Joy Fusaro ("Fusaro") worked at the Forum Store in Las Vegas without any male sales professional. (Dkt. 188-31 at 4/5) If, as JV argues, it was essential to JV's business that male sales professionals wear the JV clothing, then JV would always have a male sales professional at each store. The fact that JV did not do so demonstrates that having male sales professionals wear the JV clothing was not essential to JV's business.

Moreover, JV cannot prove that discriminating in compensation on the basis of gender is "reasonably necessary" to its business.  JV has not offered any evidence that it has considered any reasonable alternatives.  Even if JV needed its male sales professionals to "model" the clothing, JV could accomplish that need by providing the JV clothing to the male sales professionals to wear during the season, but not to own, or by equally compensating its female sales professionals.

Business necessity.  JV's argument that providing the Clothing Allowance only to male sales professionals is a business necessity has no merit.  The defense of business necessity does not apply to facially discriminatory policies. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc., 499 U.S. 187, 199-200 (1991)("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination. In [Phillips v. Martin Marietta Corp., 400 U.S. 542 (1971)] the motives underlying the employers' express exclusion of women did not alter the intentionally discriminatory character of the policy. Nor did the arguably benign motives lead to consideration of a business necessity defense. The question in that case was whether the discrimination in question could be justified under § [2000e-2(e)] as a BFOQ. The beneficence of an employer's purpose does not undermine the conclusion that an explicit gender-based policy is sex discrimination under § [2000e-2(a)] and thus may be defended only as a BFOQ.").

In any event, as with the BFOQ defense, giving male sales professionals free clothing is not a business necessity.  JV could accomplish its purported business purpose by providing the JV clothes to the male sales professionals to wear during the season, but

13

not to own, or by equally compensating its female sales professionals.  Rather than adopt

this obvious modification to its facially discriminatory Clothing Allowance policy, JV

chooses to pay discriminatory wages, and to take its chances in this case.

D.      Knox Properly Filed A Verified Charge With The EEOC.

JV argues that Knox did not exhaust her administrative remedies because, and

only because, Knox's charge to the EEOC was not properly verified. (Dkt. 184 at 30-

31/36)  JV argues:

> "Ms. Knox simply cut and pasted an electronic version of her signature into that
> Form 5 and electronically (at a time when the EEOC was not accepting electronic
> signatures), and failed to have the form notarized." (Dkt. 184 at 31/36)

JV's argument has no merit, for at least two reasons.

First, Knox's charge was properly verified.  Although Knox initially submitted an

unverified charge that the EEOC received on February 10, 2017, the EEOC considered

this February 10, 2017, document a "charge" and notified JV that Knox had filed a

charge. (Weiss Dec. Ex. E at Knox000140)  On June 22, 2017, Knox submitted a charge

on a form the EEOC provided. (Dkt. 179-11)  Knox properly verified this form by

signing it under penalty of perjury.  Under 28 U.S.C. § 1746, statements signed under

penalty of perjury do not need to be notarized to have the same effect as an affidavit.  For

EEOC charges, 29 C.F.R. § 1601.3(a) provides that, "the term *verified* shall mean sworn

to or affirmed before a notary public, designated representative of the Commission, or

other person duly authorized by law to administer oaths and take acknowledgements, or

supported by an unsworn declaration in writing under penalty of perjury." (Emphasis in

original.)  The EEOC's Form 5 itself provides a box for a notary to authenticate the

signature, but only "When necessary for State and Local Agency Requirements." (Dkt.

179-11 at 1-2/3)  The third page of Form 5 provides that "Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed." (Dkt. 179-11 at 3/3))

Under 29 C.F.R. § 1601.12(b), this verification related back to the filing of the original charge. ("...A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received. A charge that has been so amended shall not be required to be redeferred.").

Second, the fact that Knox applied her electronic, rather than ink, signature to the document is irrelevant.  JV offers no authority for its argument that the "EEOC was not accepting electronic signatures" at that time (Dkt. 184 at 31/36), and we know of no such authority.  In any event, the EEOC accepted Knox's electronic signature on the charge, and issued a right-to-sue letter based upon it. (Dkt. 51-3)  Federal law probably required the EEOC to accept Knox's electronic signature. 15 U.S.C. § 7001(a)(1) and (b)(2).

At worst for Knox and the Class, there is a question of fact on whether they can succeed on their Title VII claims.

## II.

### JV IS NOT ENTITLED TO SUMMARY JUDGMENT
### ON THE NYHRL CLAIMS

In their motion for summary judgment, Knox and the Class demonstrated that they were entitled to summary judgment against JV for liability on their NYHRL claims.

(Dkt. 187 at 40-41/59)  On its motion for summary judgment on the NYHRL claim, JV acknowledges that the NYHRL is the state analogue to Title VII, and repeats its arguments concerning Title VII. (Dkt. 184 at 33-34/36)  For the same reasons that Knox and the Class can prove their claims as a matter of law under Title VII, Knox and the Class can prove their claims as a matter of law under the NYHRL.

At worst for Knox and the Class, there is a question of fact as to whether they can succeed on their NYHRL claims.

### III.

### JV IS NOT ENTITLED TO SUMMARY JUDGMENT
### ON THE EPA CLAIMS

In support of its motion for summary judgment on the EPA Claims, JV argues that (i) there is no disparity in "wages" between male sales professionals and female sales professionals, (ii) male and female sales professionals do not perform substantially equal work, (iii) the performance of that work does not require substantially equal skill, effort and responsibility, and (iv) the basis for the Clothing Allowance is gender identity, which JV argues is a "factor other than sex."

A.   The Clothing Allowance Results In JV Paying Male Sales
     Professionals More "Wages" Than Female Sales Professionals.

In their initial memorandum, Knox and the opt-in plaintiffs demonstrated as a matter law that the Clothing Allowance results in JV paying male sales professionals more wages than female sales professionals. (Dkt. 187 at 43-44/59)

JV now argues, for the first time in this litigation and based solely upon the testimony of two opt-in plaintiffs, that the Clothing Allowance does not result in any greater wages for male sales professionals because "[i]n lieu of the clothing allowance,

16

Varvatos added $200 per month to its female sales professionals' pay." (Dkt. 184 at 15/36)  JV then argues that Knox and the opt-in plaintiffs therefore cannot prove that JV pays male sales professionals more than female sales professionals.

JV's argument cannot even create a genuine issue of material fact for at least three reasons.

1.     JV's Employees Admit That JV Does Not Compensate
         Female Sales Professionals For The Lack Of A Clothing Allowance.

JV's contention that female sales professionals are compensated differently than male sales professionals, in terms of hourly wages, contradicts evidence that JV has offered in support of JV's present motion.  Indeed, the Harris and the Chang declarations prove that JV does not use gender as a basis upon which to determine the hourly wages of sales professionals.  Harris declared:

> "31.    Once someone is hired as a sales professional, his or her compensation consists of an hourly wage, plus a commission on all sales credited to them, as well as health insurance and other benefits like flexible spending accounts. The commission structure is the same for all sales professionals in all full-price stores and the percentage commission they receive is determined by their sales volume. A sales professional's hourly wage is set by the General Manager when the sales professional is hired. The General Manager of each store has a payroll budget that he or she is responsible for and makes decisions regarding wages according to how that budget has been managed, combined with the experience and qualifications of a given applicant." (Emphasis added.) (Dkt. 182 at ¶ 31)

Similarly, Chang declared:

> "19.    The hourly rate that a sales professional receives differs based on the location in which they work, and their experience and qualifications – **gender plays no role in our hiring decisions or in setting a sales professional's commission structure or hourly wage**. The current average hourly wage for our female sales professionals is $18.11, compared to $16.88 for our male sales professionals. A sales professional's gender also plays no role in the health insurance, vacation days, sick days, or perks like discounted movie tickets and gym memberships that they receive." (Emphasis added.) (Dkt. 181 at ¶ 19)

Chang, testified in JV's Rule 30(b)(6) deposition that JV compensated male and female sales professionals the same, but for the Clothing Allowance and the AllSaints Discount.

> "Q.     Does JV pay a higher salary or wage to male sales associates as opposed to female sales associates?
>
> > Mr. PACE:     Objection
>
> A.     No. Compensation is based on geographical location, experience, scope of responsibilities, actual position, standard industry market value.
>
> Q.     Gender is not a factor in how John Varvatos compensates its sales associates via salary or wage, correct?
>
> A.     Gender is never a factor when compensation is being considered for any employee." (Dkt. 188-6 at 99:7-18)

This was not a slip of the tongue, as Chang previously testified at her Rule 30(b)(1) deposition:

> "Q.     Does gender play a factor in either the base hourly rate or the commission rate?
>
> A.     No.
>
> Q.     Is there any difference in compensation between male and female sales professionals?
>
> A.     No." (Dkt. 188-1 at 68:23-69:4)

Based upon this evidence, no reasonable person could accept JV's current argument that JV paid female sales professionals a higher hourly wage to compensate them for the lack of a Clothing Allowance.

2.     Evidence That JV Currently Compensates
       Any Female Sales Professionals For The Lack
       <u>Of A Clothing Allowance Is Noticeably Missing.</u>

JV has no documents reflecting a policy to pay female sales professionals

additional hourly wages to compensate them for the lack of a Clothing Allowance.  If JV

actually paid its female sales professionals an extra $200 a month, documentary evidence

of this policy would exist, and JV would produce it.  This absence of this documentation

should prove that no such policy exists, and that the only female sales professionals that

received the payments were Fusaro and Pamela Kassen ("Kassen").

Knox and the opt-in plaintiffs have provided declarations from sales professionals

in the stores where Knox and each of the opt-in plaintiffs worked.  Each of these sales

professionals declares that she was never informed of a policy that compensates female

sales professionals for lack of a Clothing Allowing. (Knox Dec. ¶ 9; Romero Dec. ¶ 9;

Pandey Dec. ¶ 9; Chaparro Dec. ¶ 12; Hickey Dec. ¶ 9; Shoubaki Dec. ¶ 12; Tobak Dec.

¶ 9)

JV has passed up opportunities to explain this supposed policy to its employees.

For example, when Knox asked if she was eligible for a Clothing Allowance, Chang

responded that female employees did not receive a Clothing Allowance and that female

sales professionals did receive a discount from AllSaints, but Chang did not mention any

extra hourly wage Knox received that male sales professionals did not. (Dkt. 69-1 at 2/6)

When female sales professional Tanya Sergei ("Sergei") asked if JV was working on

introducing a clothing allowance for female sales professionals, Harris responded that JV

was working on it, but did not mention any extra hourly wage Sergei received that male

sales professionals did not. (Dkt. 188-20 at 2/3)  When opt-in plaintiff Laurentina

Chaparro ("Chaparro") asked Chang whether JV would be instituting a clothing allowance for female sales professionals, Chang responded that she hoped JV would begin rolling out a female clothing allowance next year, but did not mention any hourly wage that Chaparro received that male sales professionals did not. (Dkt. 188-29 at 2/7)

        3.     The Testimony Of Kassen And Fusaro
                  Impacts Their Damages, Not JV's Liability.

In any event, this testimony of Fusaro and Kassen does not affect the liability of JV because it would not, as a matter of law, equal the value of the Clothing Allowance. The Clothing Allowance has a retail value of $12,000 per year. (Dkt. 188-10 at JVE-000141; Dkt. 188-4 at 30:10-12; Dkt. 188-6 at 42:13-17; Dkt. 188-7 at 67:21-68:8)  At best for JV, the $200 per month increase in hourly wages would offset the damages those two opt-in plaintiffs could recover in this action.  We are not seeking summary judgment on any issue of damages.

**B.**     Knox And The Opt-In Plaintiffs Have Demonstrated That Male
          And Female Sales Professionals Perform Substantially Equal Work.

After arguing that "when [JV] discontinued the clothing allowance to female sales professionals, [JV] increased the base pay of its female sales professionals" (Dkt. 184 at 7/36), JV argues that male sales professionals, as a matter of law, perform a more demanding job than female sales professionals because male sales professionals have to (i) wear the JV clothing while working, and (ii) try on the clothing, both for customers and for sales meetings. (Dkt. 184 at 18/36)

        1.     Wearing JV Clothing Does Not Create Different Work.

In its memorandum in support of its motion for summary judgment, Knox and the opt-in plaintiffs demonstrated that male sales professionals, who must comply with the

Male Dress Code, do not have a job different than female sales professionals, who must comply with the Female Dress Code. (Dkt. 187 at 50-53/59)  Nothing in JV's motion changes the analysis set forth in our initial memorandum.

> 2.        Trying On The JV Clothing Does Not Create Different Work.

The additional task of trying on the JV clothing – whether for customers or at a sales meeting – does not make the job of male sales professionals substantially different from the job of female sales professionals.

For JV to prove that the obligation of male sales professionals to try on clothing creates a different job than female sales professionals, JV must at least prove that JV regularly requires all male sales professionals to try on clothes for customers or for JV staff meetings.  See 29 C.F.R. § 1620.16(b) ("In general, a wage rate differential based on differences in the degree or amount of effort required for performance of jobs must be applied uniformly to men and women. For example, if all women and some men performing a particular type of job never perform heavy lifting, but some men do, payment of a higher wage rate to all of the men would constitute a prohibited wage rate differential if the equal pay provisions otherwise apply."); 29 C.F.R. § 1620.20(c) ("Additional duties may not be a defense to the payment of higher wages to one sex where the higher pay is not related to the extra duties. The Commission will scrutinize such a defense to determine whether it is bona fide. For example, an employer cannot successfully assert an extra duties defense where:... (c) The proffered extra duties do not in fact exist...").

While some male sales professionals spend some time trying on JV clothes for customers or at sales meetings, JV has no evidence that all (as opposed to some) male

sales professionals try on JV clothing for customers or for sales meetings.  To the contrary, evidence from Knox and the opt-in plaintiffs demonstrates that the activities of male sales professionals in trying on JV clothing for customers or at JV staff meetings is erratic.  (Knox Dec. ¶ 7; Romero Dec. ¶ 7; Pandey Dec. ¶ 7; Chaparro Dec. ¶ 10; Hickey Dec. ¶ 7; Fusaro Dec. ¶ 8; Kassen Dec. ¶ 8; Shoubaki Dec. ¶ 10; Tobak Dec. ¶ 7) Thus, some male sales professionals, just like some female sales professionals, never try on any JV clothing for customers or for JV staff meetings.

The evidence from Knox and the opt-in plaintiffs also indicates that trying on the JV clothing for customers consumes a few minutes of time per month, and that trying on clothing at meetings consumes at most, about five hours per year. (Knox Dec. ¶¶ 5-6; Romero Dec. ¶¶ 5-6; Pandey Dec. ¶¶ 5-6; Chaparro Dec. ¶¶ 7-8; Hickey Dec. ¶¶ 5-6; Fusaro Dec. ¶¶ 5-6; Kassen Dec. ¶¶ 5-6; Shoubaki Dec. ¶¶ 8-9; Tobak Dec. ¶¶ 5-6)

Such limited time does not create a material difference between the duties of male and female sales professionals.  "[A]n employer cannot successfully assert an extra duties defense where:...(d) The extra task consumes a minimal amount of time and is of peripheral importance..." 29 C.F.R. § 1620.20(d).

Some female sales professionals also try on JV clothing at the request of customers. (Chaparro Dec. ¶ 9, Fusaro Dec. ¶ 7; Kassen Dec. ¶ 7)  Accordingly, JV's argument that "serving as a stand-in to try on items being purchased as gifts are substantial elements of the job unique to male sales professionals" (Dkt. 184 at 19/36) is incorrect.  The fact that female sales professionals also try on JV clothing for customers suggests that their jobs are not substantially different than the jobs of male sales professionals. Usery v. Columbia Univ., 568 F.2d 953, 959 (2d Cir. 1977)("[I]f female

22

employees also perform duties which require additional effort…the additional effort is insufficient to differentiate the male positions under the Act.").

Accordingly, because there is no dispute that trying on JV clothes does not depend on whether the sales professional is male or female, JV cannot reasonably argue that male and female sales professionals have substantially different jobs.

C.    Knox And The Opt-In Plaintiffs Have Demonstrated As A Matter
      Of Law That The Performance Of The Work Of Male And Female Sales
      Professionals Requires Substantially The Same Skill, Effort And Responsibility.

Skill.  JV argues that female sales professionals "lack the fundamental ability to act as live models and demonstrate how the clothing fits and can be styled on men." (Dkt. 184 at 21/36)  Essentially, JV is arguing that the ability to wear men's clothing is a skill only a man can possess.  No matter how much expertise a female sales professional gains, no matter how hard she works, she can never be a man.  Being a man, however, cannot be a skill.

And, as Knox has proven, it requires no greater skill for male sales professionals to wear JV clothing to comply with the Male Dress Code than it does for female sales professionals to wear brand appropriate clothing to comply with the Female Dress Code. (Dkt. 188-1 at 85:15-23 and 86:7-16; Dkt. 188-2 at 122:14-18; Dkt. 188-6 at 100:21-101:5)

Responsibility.  JV has failed to offer any evidence that male sales professionals have any additional responsibility, that results from wearing or trying on JV clothing while working or otherwise.

Under the EPA, "responsibility" refers to the degree of accountability the job requires. EEOC v. Port Auth. of N.Y. & New Jersey, 768 F.3d 247, 255 (2d Cir. 2014)

("And equal responsibility turns on 'the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation.'") (Emphasis omitted.)(quoting 29 C.F.R. § 1620.17(a)); <u>Am. Fed'n of State, Cty. & Mun. Employees, AFL-CIO (AFSCME) v. Cty. of Nassau</u>, 799 F. Supp. 1370, 1415 (E.D.N.Y. 1992) ("'responsibility' denotes accountability, 29 C.F.R. § 1620.17(a)").

JV has not offered any evidence that wearing or trying on the JV clothes creates any greater accountability.  Male sales professionals are accountable for complying with the Male Dress Code.  Female sales professionals are accountable for complying with the Female Dress Code.  The accountability is the same.  JV has no evidence to the contrary.

JV's citation to 29 C.F.R. § 1620.17(b)(2) does not demonstrate that the jobs have different levels of responsibility.  The reason the employee who "is authorized and required to determine whether or not to accept payment for purchases by personal checks of customers" may have greater responsibility than his otherwise equal colleague, is because that employee has greater authority, and thus responsibility. It is not the burden (physical or mental) of looking at a check and deciding whether to accept it, that creates the different job.  Here, the difference in complying with the Male as opposed to the Female Dress Code are akin to an employee being given the minor responsibility of turning out the lights. <u>See</u> 29 C.F.R. § 1620.17(b)(3).

<u>Effort.</u>  "Under the [EPA], 'effort' is the physical or mental exertion required in performing a job. So long as the ultimate degree of exertion remains comparable, the mere fact that two jobs call for effort different in kind will not render them unequal." <u>Usery v. Columbia Univ.</u>, 568 F.2d 953, 959 (2d Cir. 1977).

JV argues that the job of male sales professionals requires greater effort than the job of female sales professionals because: (i) wearing uncomfortable, restrictive clothes requires greater physical effort for male sales professionals (Dkt. 184 at 22/36); (ii) trying on clothes for customers or for sales meetings requires greater physical effort (Dkt. 184 at 19-20/36); (iii) wearing expensive JV clothing creates stress for male sales professionals (Dkt. 184 at 21/36); (iv) paying to dry clean the JV clothing requires money (Dkt. 184 at 22/36); and (v) being forced to choose a wardrobe from a limited set of JV clothing requires greater mental effort. (Dkt. 184 at 21-22/36)

Wearing JV Clothing. This evidence that JV has offered from Harris and Mayorga concerning the uncomfortable, restrictive nature of the JV clothing is subjective to those individuals.  Their opinion testimony depends on the clothes each selects to wear; does not consider the uncomfortable, restrictive nature of the clothes that male sales professionals would need to wear to be consistent with the JV brand in the absence of the Male Dress Code; and does not consider the corresponding uncomfortable, restrictive nature of the clothes that the female sales professionals would wear.  Accordingly, the testimony of Harris and Mayorga that their JV clothes are uncomfortable and restrictive should not create a question of fact as to whether male sales professionals have different jobs than female sales professionals.

In any event, the testimony of Harris and Mayorga concerning the uncomfortable and restrictive nature of the JV clothes is inconsistent with JV's representations to its employees and its customers.  JV, as a company, represents that its clothing is "comfortable."  The JV employee handbook provides.

"With a unique brand position that unites a rock n' roll sensibility, old world craftsmanship and modern innovation, Varvatos has become one of the most well-

25

known menswear designers in the world. His designs often draw inspiration from the past only to repurpose these ideas into something entirely new. The resulting collections reflect quality and attention to detail while creating luxurious, **comfortable** clothing for a modern lifestyle. 'I have a great reverence for the craft of old world tailoring, but a big part of what I love designing is functional, timeless clothing that is created to be lived in.'" (Dkt. 188-28 at 8/42)(Emphasis added.)

Additionally, Chaparro testified that she was instructed by JV to sell the clothing to customers by getting them to feel the clothing and realize "how comfortable it is." (Weiss Dec. Ex. B at 73:22–74:4)  Fusaro testified that the comfort of JV clothing was part of her sales pitch to customers. (Weiss Dec. Ex. C at 23:15-22)  Knox and most of the opt-in plaintiffs have declared that they have never heard a male customer or male sales professional complain that JV clothing is uncomfortable. (Knox Dec. ¶ 8; Romero Dec. ¶ 8; Pandey Dec. ¶ 8; Chaparro Dec. ¶ 11; Hickey Dec. ¶ 8; Fusaro Dec. ¶ 8; Kassen Dec. ¶ 9; Shoubaki Dec. ¶ 11; Tobak Dec. ¶ 8)  Fusaro, who has worked at JV for almost 14 years, testified that she can only recall hearing male sales professionals complain a handful of times. (Fusaro Dec. ¶ 9)

Accordingly, JV has not presented enough evidence to allow a reasonable jury to find that JV clothes are uncomfortable given the fact that JV represents to its own employees, and to its customers, that the JV clothes are comfortable.

Trying on JV Clothes.  Even if trying on the JV clothes differentiated the work of a male sales professional from the work of a female sales professional, the time male sales professionals spend trying on JV Clothing, either for customers or for sales meetings, is not significant enough to create a distinct job for male sales professionals.

Unless the additional duties of trying on clothing consume a substantial amount of time of all male sales professionals, those duties do not transform the job of male sales

26

professional into a substantially different job than a female sales professional. Usery v. Columbia Univ., 568 F.2d 953, 959 (2d Cir. 1977)("If the additional tasks do not consume a significant total amount of all of the employees' time…the additional effort is insufficient to differentiate the male positions under the Act.").

Based upon this standard, JV cannot create a question of fact as to whether male and female sales professionals exert different amounts of effort. JV does not attempt to quantify the amount of time that male sales professionals spend trying on JV clothes for customers or for sales meeting. (Dkt. 182, ¶¶ 32-33; Dkt. 183, ¶¶ 22-23) In contrast, the declarations of Knox and the opt-in plaintiffs demonstrate that the amount of time male sales professionals spend trying on clothes is a few hours per year. (Knox Dec. ¶ 7; Romero Dec. ¶ 7; Pandey Dec. ¶ 7; Chaparro Dec. ¶ 10; Hickey Dec. ¶ 7; Fusaro Dec. ¶ 8; Kassen Dec. ¶ 8; Shoubaki Dec. ¶ 10; Tobak Dec. ¶ 7)

Expense of JV Clothing. JV does not cite any authority for the proposition that the financial cost of complying with a job responsibility can create a difference in the jobs of male and female sales professionals.

Even if the financial cost of a job responsibility could, in some case, differentiate between two jobs, it cannot do so here. JV pays, up front, for the JV clothing that male sales professionals wear. (Dkt. 188-2 at 102:12-21; Dkt. 188-9) Therefore, no male sales professional actually experiences any increased mental stress from the cost of complying with the Male Dress Code, because no male sales professional has to spend a penny of his own money. Neither the Male Dress Code (Dkt. 188-8) nor any other JV policy require a male sales professional to spend more than the $12,000 he receives from the Clothing

Allowance.  JV's website demonstrates that $3,000 per season is sufficient to buy enough JV clothing for more than one outfit. (Weiss Dec. Ex. G)

Requirement to Dry Clean JV Clothing.  The Male Dress Code does not require that male sales professionals dry clean any JV clothing. (Dkt. 188-8)  The Dress Code states, in reference to employees of both genders, that "[a]s representatives of the Company, the appearance of clothing we wear (whether or not it is clean, ironed and properly fits) along with personal grooming and hygiene sets the tone and conveys to our customers the John Varvatos image." (Dkt. 188-8 at JVE-000079)  Moreover, to the extent that JV attempts to read into its policies an implied requirement for male sales professionals to dry clean their clothing, many female sales professionals dry clean their work clothing as well. (Dkt. 179-3 at 3/13; Dkt. 179-5 at 3/13; Dkt. 179-6 at 3/13; Ex. I at 4-5/14; Ex. J at 4/14; Ex. K at 5/15; Ex. L at 4/14; Ex. N at 4/14)  Fusaro, in particular, testified that 75% of her work wardrobe requires dry cleaning. (Weiss Dec. Ex. C at 90:17-20)

Choosing From a Limited Wardrobe.  No reasonable juror could conclude that it requires greater mental effort for male sales professionals to pick what they are going to wear from a limited set of work-appropriate clothing, which is provided to them for free, than it does for female sales professionals to identify, buy, and select work-appropriate clothing from an infinite variety of both work-appropriate and work-inappropriate clothing.

Accordingly, JV cannot create a question of fact on the issue of whether male and female sales professionals perform their job with substantially equal amounts of skill, effort and responsibility.

In any event, JV has no plausible basis for summary judgment in its favor on the ground that the jobs are not substantially equal as a matter of law. Jamilik v. Yale Univ., 362 F. App'x 148, 150 (2d Cir. 2009)("On more than one occasion this Court has indicated that questions regarding the equivalence of two positions pursuant to an EPA claim are best left to the trier of fact."); Lavin-McEleney v. Marist Coll., 239 F.3d 476, 480 (2d Cir. 2001)("Whether two positions are 'substantially equivalent' for Equal Pay Act purposes is a question for the jury.").

D.     JV Cannot Create A Question Of Fact Based
       Upon The "Factor Other Than Sex" Defense.

As argued above in Section I.C., JV cannot, as a matter of law, establish the "factor other than sex" defense, because there is a 100 percent correlation between being a male, being subject to the Male Dress Code and receiving the Clothing Allowance.

E.     JV Cannot Obtain Summary Judgment Based
       Upon The Lack Of Willfulness Of Its EPA Violation.

JV argues, in a footnote, that Knox and the opt-in plaintiffs cannot prove that JV "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute." (Dkt. 184 at 25/36 n. 4)  JV is incorrect.  As set forth in the memorandum in support of the plaintiffs' motion for summary judgment (Dkt. 187 at 26-28/59), there is ample evidence in the record that demonstrates that JV knew that the Clothing Allowance violated the EPA, or at least recklessly disregarded that possibility. See e.g. Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 120 (2d Cir. 1997)("This evidence—that the New School knew that Pollis was paid less than comparable males, but did not rectify the situation—is sufficient to support the jury's finding of reckless or willful violation of the Equal Pay."); Virgona v. Tufenkian Imp.-Exp. Ventures, Inc.,

2008 WL 4356219, at *8 (S.D.N.Y. Sept. 23, 2008)("As held by other courts, granting summary judgment on statute of limitations grounds is inappropriate where there is an issue of fact as to whether defendant, although not directly informed of inequity in pay by the plaintiff, had access to payroll records demonstrating 'pay disparities between male and female employees in seemingly similar positions'")(Internal citations omitted.); Hodgson v. City of New York, 2013 WL 840874, at *4 (S.D.N.Y. Mar. 7, 2013)("Here the record again demonstrates that Defendants were aware of the disparity between Plaintiff's pay and that of similarly situated men, yet did not act. While willfulness seems clear on these facts, I leave it to the jury to make the final determination.").

At worst for Knox and the opt-in plaintiffs, there is a question of fact as to whether they can succeed on their EPA claims.

IV.

## JV IS NOT ENTITLED TO SUMMARY JUDGMENT
## ON THE NYEPA CLAIMS

In their motion, Knox and the Class demonstrated that they were entitled to summary judgment on liability against JV under the NYEPA.

JV concedes the claims of Knox and the Class under the NYEPA are analogous to the claims under the EPA.  JV nevertheless argues that Knox and the Class cannot recover under the NYEPA even if JV has liability to Knox and the opt-in plaintiffs under the EPA.  JV's arguments concerning the NYEPA therefore have no merit.

A.      The NYEPA Claims Do Not Require Proof Of Discriminatory Animus.

JV argues:

"An equal pay claim under New York Labor Law § 194 is analyzed under the same standards applicable to the federal Equal Pay Act." Chiaramonte [v. Animal Medical Center], 677 Fed. App'x [689] at 690 n.1 [(2d Cir. 2017)] (citing Talwar

v. Staten Island Univ. Hosp., 610 Fed. App'x 28, 29 n.2 (2d Cir. 2015). However, to state a claim under New York Labor Law § 194, 'in addition to establishing the elements of an Equal Pay Act claim, a plaintiff must produce evidence of discriminatory animus.' Talwar, 610 Fed App'x at 29 n.2 (citing Belfi, 191 F.3d at 139)."  (Dkt. 184 at 31/36)

JV has misread Talwar v. Staten Island Univ. Hosp., 610 F. App'x 28, 30 (2d Cir. 2015), which provides in applicable part at note 2:

"An equal pay claim under New York Labor Law § 194 "is analyzed under the same standards applicable to the federal Equal Pay Act." Pfeiffer v. Lewis Cnty., 308 F.Supp.2d 88, 98 n. 8 (N.D.N.Y. 2004). An equal pay claim under Title VII is analyzed under the same standards as an Equal Pay Act claim, except that, in addition to establishing the elements of an Equal Pay Act claim, a plaintiff must produce evidence of discriminatory animus. Belfi v. Prendergast, 191 F.3d 129, 139 (2d Cir. 1999). Talwar's three equal pay claims will thus be analyzed under the same approach." (Emphasis added.)

It is the Title VII claim, and not the EPA claim, that requires proof of discriminatory animus.  Accordingly, JV's statement that "[e]ven more problematic for Plaintiffs under NYLL § 194 is their inability to demonstrate discriminatory animus" (Dkt. 184 at 33/36) is baseless.

B.      The Clothing Allowance Is A Wage Under the NYEPA.

In addition, JV asserts that the Clothing Allowance does not fall within the meaning of "benefits or wage supplements" under the NYEPA.  JV provides no case law indicating that the Clothing Allowance does not qualify as wages under the NYEPA, but instead relies on its reading of Section 190 of the New York Labor Law.  Section 190(1) provides:

"'Wages' means the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis. The term 'wages' also includes benefits or wage supplements as defined in section one hundred ninety-eight-c of this article, except for the purposes of sections one hundred ninety-one and one hundred ninety-two of this article."

In turn, § 198-c provides that "[a]s used in this section, the term 'benefits or wage supplements' includes, but is not limited to, reimbursement for expenses; health, welfare and retirement benefits; and vacation, separation or holiday pay." N.Y. Lab. Law § 198-c(2).

The Clothing Allowance fits neatly within the plain meaning of "benefits or wage supplements." The phrase "includes, but is not limited to" also demonstrates that "benefits and wage supplements" are not limited to the specific categories listed in this section. Most clearly, the Clothing Allowance is within the definition of "wage supplements" because the male sales professionals pay tax on the clothing that they receive as a result of the Clothing Allowance. (Dkt. 188-6 at 43:11-24)

In any case, there is no reason to interpret the term "wages" in the NYEPA more narrowly than its definition in the EPA. <u>Chiaramonte v. Animal Med. Ctr.</u>, 677 F. App'x 689, 690 n. 1 (2d Cir. 2017)("'An equal pay claim under New York Labor Law § 194 is analyzed under the same standards applicable to the federal Equal Pay Act.'")(quoting <u>Talwar v. Staten Island Univ. Hosp.</u>, 610 Fed. Appx. 28, 29 n.2 (2d Cir. 2015)).

At worst for Knox and the Class, there is a question of fact as to whether they can succeed on their NYEPA claims.

<u>Conclusion</u>

For the reasons set forth above, Knox, the 13 opt-in plaintiffs, and the Class respectfully request that the Court deny the motion of JV for summary judgment in its entirety.

Dated:  New York, New York
       June 13, 2018

DUNNEGAN & SCILEPPI LLC

By<u>  s/William Dunnegan       </u>
   William Dunnegan (WD9316)
   wd@dunnegan.com
   Richard Weiss (RW4039)
   rw@dunnegan.com
Attorneys for the Plaintiff, the 13
   Opt-In Plaintiffs and the Class
350 Fifth Avenue
New York, New York 10118
(212) 332-8300

33