**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TESSA KNOX,

                    Plaintiff,

          v.

JOHN VARVATOS ENTERPRISES, INC.

                    Defendants.

No. 17-CV-00772 (GWG)

## VARVATOS' MEMORANDUM OF LAW IN SUPPORT OF ITS
## POST-TRIAL MOTIONS UNDER RULES 50 AND 59 OF THE FEDERAL RULES OF
## CIVIL PROCEDURE

Ned H. Bassen
Amina Hassan
Joanne Liu
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726
ned.bassen@hugheshubbard.com
amina.hassan@hugheshubbard.com
joanne.liu@hugheshubbard.com

*Attorneys for Defendant John Varvatos*
*Enterprises, Inc.*

96633951

## TABLE OF CONTENTS

Page

BACKGROUND ...................................................................................................1

TRIAL EVIDENCE.............................................................................................1

STANDARD OF REVIEW ..................................................................................2

    A.    Standard for a Renewed Motion for Judgment as a Matter of Law.............2

    B.    Standard for a Motion for a New Trial. .....................................................3

    C.    Standard for a Motion for Remittitur. .........................................................4

ARGUMENT.......................................................................................................5

    I.    VARVATOS IS ENTITLED TO JUDGMENT AS A MATTER
    OF LAW, OR A NEW TRIAL IN THE ALTERNATIVE, ON
    PLAINTIFFS' FEDERAL AND NEW YORK STATE EQUAL
    PAY ACT CLAIMS. ...............................................................................5

        A.    The Evidence Does Not Support the Jury's Finding that the Jobs of Male
        and Female Sales Professionals Required Substantially Equal Effort and
        Responsibility. ...............................................................................6

        B.    The Evidence Does Not Support the Jury's Finding that Female Sales
        Professionals Were Paid Less Wages than Male Sales Professionals. ......17

    II.    VARVATOS IS ENTITLED TO JUDGMENT AS A MATTER
    OF LAW, OR A NEW TRIAL IN THE ALTERNATIVE, ON
    PLAINTIFFS' TITLE VII AND NYSHRL CLAIMS.........................................21

        A.    The Evidence Does Not Support the Jury's Finding that Female Sales
        Professionals Were Paid Less Wages than Male Sales Professionals. ......22

        B.    The Evidence Does Not Support the Jury's Finding of Intentional
        Discrimination...............................................................................22

    III.    VARVATOS IS ENTITLED TO JUDGMENT AS A MATTER
    OF LAW ON ITS AFFIRMATIVE DEFENSES, OR A NEW
    TRIAL IN THE ALTERNATIVE, WITH AFFIRMATIVE
    DEFENSES.......................................................................................27

        A.    Varvatos Is Entitled Judgment as a Matter of Law on the Affirmative
        Defense of Factor Other than Sex, or a New Trial in the Alternative. ......27

B.      Varvatos Is Entitled Judgment as a Matter of Law on the Affirmative Defense of Bona Fide Occupations Qualification, or a New Trial in the Alternative................................................................................31

IV.     VARVATOS IS ENTITLED TO A REDUCTION OF DAMAGES................................................................................35

A.      Plaintiffs Are Not Entitled to the Full Retail Value of the Clothing Allowance as Compensatory Back Pay Damages. ...................................36

     1.     The Back Pay Award is Incorrect and Excessive as a Matter of Law. ......................................................................38

          (a)     Male Sales Professionals Did Not Receive $3,000 or $1,500 of Cash or Unencumbered Clothing. ...................38

          (b)     Male Sales Professionals Did Not Receive Additional Income of $3,000 or $1,500, but 20% of that Amount.......40

          (c)     Plaintiffs Did Not Have an Out-of-Pocket Expense in the Amounts Awarded. ............................................41

          (d)     Male Sales Professionals Did Not Receive a Benefit of $3,000 or $1,500 Per Quarter.............................................44

          (e)     The Back Pay Award Does Not Take Into Account the AllSaints Discount. ..........................................46

          (f)     Plaintiffs' Arguments Are Unavailing. ..............................47

B.      Varvatos is Entitled to a New Trial on the Issue of Good Faith. ..............49

     1.     The Issue of Good Faith Should Have Been Determined by the Court. ...........................................................................49

     2.     Varvatos Is Entitled to Judgment as a Matter of Law on the Issue of Good Faith, a New Trial in the Alternative, or a Remittur........51

C.      The Evidence Does Not Support a Finding of Willfulness.......................56

D.      The Evidence Does Not Support the Jury's Finding that Plaintiffs Are Entitled to Punitive Damages.....................................................63

E.      The Jury's Punitive Damages Award Is Excessive.....................................65

CONCLUSION..........................................................................................69

96633951

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bick v. City of New York*, No. 95CIV.8781, 1998 WL 190283 (S.D.N.Y. Apr. 21, 1998) ............................................................................................................................4

*Belfi v. Prendergast*, 191 F.3d 129 (2d Cir. 1999) ...............................................22, 27

*Birdsall v. Coolidge*, 93 U.S. 64 (1876) .......................................................................36

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) .....................................................66

*Bradley v. Jusino*, No. 04 CIV. 8411, 2009 WL 1181617 (S.D.N.Y. May 4, 2009), *aff'd*, 374 F. App'x 144 (2d Cir. 2010) ......................................................................3

*Butler v. New York Health & Racquet Club*, 768 F. Supp. 2d 516 (S.D.N.Y. 2011) ...................34

*Capaldo v. Pan Am. Fed. Credit Union*, No. 86 CV 1944, 1987 WL 9687 (E.D.N.Y. Mar. 30, 1987), *aff'd sub nom. Capaldo v. Pan Am Fed. Credit Union*, 837 F.2d 1086 (2d Cir. 1987) ......................................................................28

*Chepak v. New York City Health & Hosps. Corp.*, No. 11-CV-9698 KBF, 2015 WL 509279 (S.D.N.Y. Feb. 5, 2015), *aff'd*, 643 F. App'x 62 (2d Cir. 2016) ........16

*Chiaramonte v. Animal Med. Ctr.*, 677 Fed. App'x 689 (2d Cir. 2017) .........................5

*Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573 (S.D.N.Y. 2011) ...............................................................................................................66, 68

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424 (2001) ....................36

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998) .......................3

*E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110 (2d Cir. 1999) .........................................................................................42

*E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247 (2d Cir. 2014) .............................5

*Earl v. Bouchard Transportation Co.*, 917 F.2d 1320 (2d Cir. 1990) ...........................4

*Farias v. Instructional Sys., Inc.,* 259 F.3d 91 (2d Cir. 2001) ................................54, 64

*Farias v. Instructional Sys., Inc.*, No. 00-9045(L), 00-9135(XAP) (2d Cir.), 2001 WL 34106885 (Jan. 22, 2001) ...............................................................................55

iii

*Fernandez v. North Shore Orthopedic Surgery & Sports Med., P.C.,* 79 F. Supp. 2d 197 (E.D.N.Y. 2000)........................................................................................67

*Ferrara v. City of Yonkers*, No. 13 Civ. 1221 (KBF), 2015 U.S. Dist. LEXIS 66906 (S.D.N.Y. May 21, 2015)...........................................................................31

*Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415 (1996) ........................................4

*Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228 (S.D.N.Y. 1999) ...........................37

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 96 CIV. 8414, 2016 WL 11485633 (S.D.N.Y. June 13, 2016) ...................................................36

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, No. 96-CV-8414 (KMW), 2018 WL 6583844 (S.D.N.Y. Dec. 14, 2018) ........................................41

*Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250 (S.D.N.Y. 2015).......................57

*Holness v. Nat'l Mobile Television, Inc.*, No. 09 CV 2601 KAM RML, 2012 WL 1744847 (E.D.N.Y. Feb. 14, 2012)........................................................................67

*Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123 (2d Cir. 1996)....................................................27

*Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403 (S.D.N.Y. 1996) .........................47, 66, 67

*Ingram v. Madison Square Garden Ctr., Inc.*, 709 F.2d 807 (2d Cir. 1983)..................39

*Kemezy v. Peters*, 79 F.3d 33 (7th Cir.1996) ................................................................67

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999)...............................................................................................................64

*Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996).........................................................65, 66

*Longo v. Carlisle DeCoppet & Co.*, 537 F.2d 685 (2d Cir. 1976)................................28

*MacEdward v. N. Elec. Co.*, 595 F.2d 105 (2d Cir. 1979).......................................31, 33

*MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546 (S.D.N.Y. 2012) ....................67

*Manley v. AmBase Corp.*, 337 F.3d 237 (2d Cir. 2003) .................................................3

*Meling v. St. Francis Coll.*, 3 F. Supp. 2d 267 (E.D.N.Y. 1998)...................................37

*Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113 (2d Cir. 1998) .................2, 3

*Mittl v. New York State Div. of Human Rights*, 307 A.D.2d 881 (1st Dep't. 2003) ....................37

*Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127 (2d Cir. 1986)........................3

*Osofsky v. Zipf*, 645 F.2d 107 (2d Cir. 1981) ............................................................36

*Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) ...........................................32

*Pollis v. New Sch. for Soc. Research*, 132 F.3d 115 (2d Cir. 1997) ...........................57

*R&R adopted*, No. 11 Civ. 5788 (ARR), 2012 WL 3877963 (E.D.N.Y. Sept. 4, 2012) ......................................................................................................................37

*Reich v. S. New England Telecommunications Corp.*, 121 F.3d 58 (2d Cir. 1997) ......................51

*Rios v. Enter. Ass'n Steamfitters Local Union 638 of U.A.*, 860 F.2d 1168 (2d Cir. 1988) .................................................................................................................37, 38

*Ruffin v. Fuller*, 125 F. Supp. 2d 105 (S.D.N.Y. 2000) ................................................4

*Ruggles v. Wellpoint, Inc.*, No. 108CV201LEKRFT, 2010 WL 11579429 (N.D.N.Y. May 28, 2010) ......................................................................................52

*Sands v. Runyon*, 28 F.3d 1323 (2d Cir. 1994) ...........................................................37

*Santillan v. Henao*, 822 F. Supp. 2d 284 (E.D.N.Y. 2011) .........................................37

*Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45 (2d Cir. 1984) ........................4

*Siegel v. Bd. of Educ. of City Sch. Dist. of City of New York*, 713 F. Supp. 54 (E.D.N.Y. 1989) ..................................................................................................29

*Talwar v. Staten Island Univ. Hosp.,* 610 Fed. App'x 28 (2d Cir. 2015) ........................5

*Tavora v. New York Mercantile Exch.*, 101 F.3d 907 (2d Cir. 1996) ...........................28

*U.S. v. City of New York*, No. 07–CV–2067 (NGG)(RLM), 2015 WL 1063403 (E.D.N.Y. Mar. 11, 2015) ....................................................................................41

*United States v. Landau*, 155 F.3d 93 (2d Cir. 1998) ...................................................4

*United States v. Space Hunters, Inc.*, 429 F.3d 416 (2d Cir. 2005) .............................63

*Vasbinder v. Scott*, 976 F.2d 118 (2d Cir. 1992) ....................................................65, 67

*Waits v. City of Chicago*, No. 01 C 4010, 2003 WL 21310277 (N.D. Ill. June 6, 2003) ......................................................................................................................67

*Washington Cty. v. Gunther*, 452 U.S. 161 (1981) ......................................................29

*Westchester Cty. Corr. v. Cty. of Westchester*, 346 F. Supp. 2d 527 (S.D.N.Y. 2004) ......................................................................................................................31

v

**Statutes and Rules**

29 U.S.C. § 206(d)(1) ...........................................................................................................5

29 U.S.C. § 206(d)(1)(iv) ....................................................................................................27

29 U.S.C. § 255(a) ..................................................................................................50, 56, 57

29 U.S.C. § 260 ...............................................................................................49, 51, 55, 62

42 U.S.C. § 2000e-2 ...................................................................................................1, 28, 31

N.Y. Lab. Law § 198(1-a) .........................................................................................50, 55, 56

N.Y. Lab. Law § 194 ..................................................................................................1, 55, 56

N.Y. Lab. Law § 198 ...........................................................................................................50

N.Y. Exec. Law § 296 ...........................................................................................................1

Fed. R. Civ. P. 50 .............................................................................................................2, 3

Fed. R. Civ. P. 50(a) ..............................................................................................................2

Fed. R. Civ. P. 50(b) ...........................................................................................................2, 3

Fed. R. Civ. P. 59 ..............................................................................................................1, 4

Fed. R. Civ. P. 59(a) ..............................................................................................................3

**Regulations**

29 C.F.R. § 1604.2(a)(2) .....................................................................................................32

29 C.F.R. § 1620.16(a) ...........................................................................................................6

29 C.F.R. § 1620.17(a) ...........................................................................................................6

**Legislative and Administrative Proceedings**

109 Cong. Rec. 9203 (1963) ...............................................................................................29

96633951

Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure (the "Rules"), Defendant John Varvatos Enterprises, Inc. ("Varvatos") respectfully submits this memorandum of law in support of Varvatos' motion for judgment as a matter of law, a new trial, or a new trial in the alternative, and a remittitur, in the alternative (the "Relief").

## BACKGROUND

This class and collective action concerns Varvatos' clothing assistance policy.  Varvatos is a menswear company.  It designs, markets and sells high-end clothing for men.  Varvatos does not design, market or sell clothes for women.  Directly tied to the nature of its business, Varvatos imposes different dress code requirements on its male and female sales professionals, and provides both with clothing assistance corresponding to these respective requirements.

Plaintiffs challenged Varvatos' clothing assistance policy under the Equal Pay Act, 29 U.S.C. § 206 ("EPA"), New York Equal Pay Act, New York Lab. Law § 194 ("NYEPA"), Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2 and the New York State Human Rights Law, New York Exec. Law § 296 ("NYSHRL").  In 2018, both parties moved for summary judgment. (*See* ECF 177, 185.)  The Court denied both parties' motions.  (*See* ECF 219.)  A jury trial was held between February 24 and March 2, 2020.  On February 26, 2020, after the close of Plaintiffs' case, Varvatos moved for a directed verdict on the same grounds as its motion for summary judgment.  The Court reserved judgment on the motion.  (*See* Trial Tr. at 343:3-15.) The jury returned a verdict in favor of Plaintiffs on all counts.  (ECF 334 & 335.)  A judgment was entered in favor of Plaintiffs in the amount of $3,516,051.23 on March 23, 2020.  (ECF 362.)  For the reasons set forth below, Varvatos submits that it is entitled to the requested Relief.

## TRIAL EVIDENCE

The following witnesses testified at trial:  both parties called (1) Nicole Chang, Human Resources professional at Varvatos (August 2012 to December 2017); (2) Ben Harris, Varvatos'

96633951

Director of Retail Operations, then Director of Retail Operations and East Coast Stores and finally Vice President of Retail (May 2014 to August 2018); (3) Plaintiffs called Ruby Romero, a former Varvatos sales professional, and an Opt-in Plaintiff; and Varvatos called (4) Cheryl Somekh-Crouchen, a former Varvatos sales professional and a Class Member; (5) Ann Byron, Varvatos' Vice President of Human Resources (2012 to 2017); and (6) Steven Shears, a sales professional at various Varvatos stores since 2009 and now a Varvatos store manager.  In the phase of the trial to determine the amount of punitive (and certain liquidated) damages, Joseph Zorda, Varvatos' current Chief Financial Officer, testified.  In addition to moving into evidence various trial exhibits,[1] Plaintiffs also submitted into evidence the deposition testimony of Gerard Mayorga, a current Varvatos employee, who joined Varvatos in 2002 as a sales professional, and was promoted to a sales specialist in 2012, and Varvatos submitted into evidence the deposition testimony of Pamela Kassen, a Varvatos sales professional since 2004 and an Opt-in Plaintiff.[2]

## STANDARD OF REVIEW

### A.     Standard for a Renewed Motion for Judgment as a Matter of Law.

"Under Rule 50, judgment as matter of law is appropriate where 'there is no legally sufficient evidentiary basis for a reasonable jury to find for' a party." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120 (2d Cir. 1998) (quoting Fed. R. Civ. P. 50(a)).[3]

---

1.  The trial exhibits referenced herein are attached to the Hassan Declaration, accompanying this memorandum of law.  Trial exhibits are referenced here as follows:  "Exhibit __" (reflecting the exhibit letter as included in the Hassan Declaration) / "Tr. Exhibit __" (reflecting the Trial Exhibit letter or number assigned to this document at trial).  At trial, Plaintiffs' exhibits were assigned numbers, and Varvatos' exhibits were assigned letters.

2.  *See* Trial Tr. at 64:25-196:20 (Chang); *id*. at 305:3-338:17 (Harris); *id*. at 196:23-244:9 (Plaintiff Romero); *id*. at 244:11-272:6 (Plaintiff Crouchen); *id*. at 346:1-405:19 (Byron); *id*. at 405:22-461:10 (Shears); Hassan Decl., Ex. Q (Mayorga Dep. Tr.) at 7:1-15; Hassan Decl., Ex. P (Plaintiff Kassen Dep. Tr.) at 25:24-26:1).

3.  The standards for a renewed motion for judgment as a matter of law under Rule 50(b) (after a jury verdict is rendered) and judgment as a matter of law under Rule 50(a) (prior to the submission of the case to the jury) are

96633951

A Rule 50 motion must be granted where "(1) [t]here is such a complete absence of evidence supporting the verdict that the jury's findings could only be the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [or women] could not arrive at a verdict against [the defendant]." *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 132 (2d Cir. 1986). In ruling on a Rule 50 motion, the court views the evidence in the light most favorable to the non-movant and grants that party every reasonable inference that a jury might have drawn in its favor. *See Merrill Lynch Interfunding, Inc.*, 155 F.3d at 120.

> **B.** **Standard for a Motion for a New Trial.**

Rule 59(a) permits the court to grant a new trial on all or some issues in a case after a jury trial. *See* Fed. R. Civ. P. 59(a). Rule 50(b) also permits the court to grant a new trial as an alternative to judgment as a matter of law. *See* Fed. R. Civ. P. 50(b). A district court must order a new trial where it concludes that (1) "the jury has reached a seriously erroneous result," or (2) "the verdict is a miscarriage of justice," *i.e.*, it views "the jury's verdict as against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)) (quotation marks omitted). The standard for granting a new trial is less stringent than that for granting judgment as a matter of law. *See Manley*, 337 F.3d at 245. First, unlike a motion for judgment as a matter of law, a "new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict." *Id.*, 337 F.3d at 245 (citation and quotation marks omitted). Second, on a motion for a new trial, the court "is free to weigh the evidence [it]self, and need not view it in the

---

the same. *See Bradley v. Jusino*, No. 04 CIV. 8411, 2009 WL 1181617, at *4 n.5 (S.D.N.Y. May 4, 2009), *aff'd*, 374 F. App'x 144 (2d Cir. 2010).

light most favorable to the verdict winner." *Id*. (citation and quotation marks omitted). Although a jury's credibility assessments are generally entitled to deference, on a motion for a new trial, "these principles of deference to the jury do not override the trial judge's duty to see that there is no miscarriage of justice." *United States v. Landau*, 155 F.3d 93, 105 (2d Cir. 1998) (citation and quotation marks omitted); *see also Ruffin v. Fuller*, 125 F. Supp. 2d 105, 109 (S.D.N.Y. 2000) (citation and quotation marks omitted).

      C.     **Standard for a Motion for Remittitur.**

      Rule 59 grants a trial court discretion to "overturn[] verdicts for excessiveness and order[] a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 433 (1996). Remittitur is "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial*." Bick v. City of New York*, No. 95CIV.8781, 1998 WL 190283, at *20 (S.D.N.Y. Apr. 21, 1998) (citing *Earl v. Bouchard Transportation Co.*, 917 F.2d 1320, 1327 (2d Cir. 1990)).  Remittitur is appropriate "(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken," or "(2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error[.]" *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984).

**ARGUMENT**

I.   **VARVATOS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW, OR A NEW TRIAL IN THE ALTERNATIVE, ON PLAINTIFFS' FEDERAL AND NEW YORK STATE EQUAL PAY ACT CLAIMS.**

The Equal Pay Act ("EPA") prohibits paying unequal wages to employees on the basis of sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d)(1); *Chiaramonte v. Animal Med. Ctr.*, 677 Fed. App'x 689, 690-91 (2d Cir. 2017); *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254-55 (2d Cir. 2014).  "An equal pay claim under New York Labor Law § 194 is analyzed under the same standards applicable to the federal Equal Pay Act."  *Chiaramonte*, 677 Fed. App'x at 690 n.1 (citing *Talwar v. Staten Island Univ. Hosp.,* 610 Fed. App'x 28, 29 n.2 (2d Cir. 2015)).  Accordingly, the Court instructed the jury in this case that under the EPA and NYEPA, "it is unlawful for an employer to pay different wages to employees who are performing substantially equal work under similar working conditions because of an employee's sex."  (Hassan Decl., Ex. R / Jury Instructions at 10.)

At trial, the parties agreed that male and female sales professionals performed work under similar working conditions, and that their jobs require equal skill.  At dispute was whether:  (1) the jobs of male and female sales professionals require equal effort and responsibility, and (2) female sales professionals were paid less wages than male sales professionals.  (*See id*.)[4]  The jury returned a verdict against Varvatos on both issues.  (*See* ECF 334 (verdict sheet).)

---

4.   Varvatos sought summary judgment on the grounds that the jobs of male and female sales professionals at Varvatos are not substantially equal and that female sales professionals were paid less wages than male sales professionals.  (*See* ECF 184 at 12-19.)  Varvatos moved for a directed verdict on the same grounds as its summary judgment papers after the close of Plaintiffs' case, on which the Court reserved judgment (*see* Trial Tr. at 343:3-15).  Varvatos is now renewing its motion for judgment as a matter of law on these grounds.

5

A.   **The Evidence Does Not Support the Jury's Finding that the Jobs of Male and Female Sales Professionals Required Substantially Equal Effort and Responsibility.**

A reasonable jury could not have determined that the jobs of male and female sales professionals require substantially equal effort and responsibility because there was a lack of legally sufficient evidence to support that determination.  Rather, there was overwhelming and clear evidence to the contrary.

The Court instructed the jury as follows with regard to "Effort" and "Responsibility":

> (B). To show substantially equal <u>effort</u>, the plaintiffs have to prove that the jobs of female sales professionals and the male sales professionals require substantially equal effort. **"Effort" is concerned with the measurement of the physical or mental exertion needed for the performance of a job**.  Jobs may require equal effort in their performance even though the effort may be exerted in different ways. Occasional or sporadic performance of an activity which may require extra physical or mental exertion is not alone sufficient to justify a finding of unequal effort. **"Effort" encompasses the total requirements of a job**.

> (C). For purposes of determining if plaintiffs have shown the jobs have substantially equal <u>responsibilities</u>, **you should examine the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation. Employees who perform generally similar jobs may have differences in responsibilities that make the jobs unequal under the Equal Pay Act**. Two jobs that have minor differences in responsibilities may still be substantially equal in terms of responsibilities. **Other differences in job responsibilities or obligations, such as those that materially affect the business operations of the employer, will result in the jobs not having substantially equal responsibilities**.  It is for you the jury to determine if the female and male sales professional jobs had substantially equal responsibilities.

(Hassan Decl., Exhibit R / Jury Instructions at 12 (emphasis added).); *see also* 29 C.F.R. § 1620.16(a), 1620.17(a).)

The evidence at trial showed, *inter alia*, the following:

6

While both male and female sales professionals had a responsibility to comply with the Varvatos Dress Code Policy, these responsibilities were different.  As Plaintiffs stipulated:

> The Varvatos dress code provides: "In the case of a male employee, the employee should be dressed in John Varvatos and adhere to the three-piece rule -- a jacket, shirt and pants or sweater[,] shirt and pants, etc. … it is essential that John Varvatos clothes be worn every day and those worn represent the current season."

(Trial Tr. at 46:12-18 (Stipulated Facts) (quoting Hassan Decl., Exhibit A / Tr. Exhibit A (Varvatos' "Dress Code Policy")).)  It is undisputed, therefore, that <u>only</u> male sales professionals, and not female sales professionals, at Varvatos were required to wear Varvatos-only clothes while at work,[5] and that they also were required to comply with the three-piece rule. (*See id*.; *see also, e.g.*, Trial Tr. at 206:7-16 (Plaintiff Romero), 251:22-25 (Plaintiff Crouchen).) In addition, other than some timeless pieces that are always in-store, male sales professionals were required to wear in-season Varvatos clothing only while at work.  (*See* Trial Tr. at 46:19-21 (Stipulated Facts) ("Once Varvatos clothing is out of season and no longer being sold in Varvatos' stores, it does not comply with Varvatos dress code for its male sales professionals."); *see also, e.g.*, Hassan Decl., Exhibit A / Tr. Exhibit A; Trial Tr. at 206:7-10 (Plaintiff Romero), 409:9-23 (Shears).)  It also is undisputed that female sales professionals were not required to wear Varvatos clothing while at work.  (*See, e.g.*, Trial Tr. at 47:22-23 (Stipulated Facts).) Rather, female sales professionals "are required to dress in professional clothing that is representative of the brand and consistent with the brand's color pallet and of appearance and of

---

5.   As Shears explained, this included male sales professionals wearing Varvatos-only shoes as well.  (*See* Trial Tr. at 445:14-19 ("Q. But Varvatos doesn't require you to wear Varvatos shoes as part of its dress code, correct?  A. Actually, I believe it is part of the dress code.  Q. Well, doesn't the three-piece rule apply?  A. But the dress code, it is my understanding is we are required to wear Varvatos footwear.").)

appropriate fabric." (*See id*. at 47:24-48:2.)[6]   It is undisputed that female sales professionals

were not required to wear clothes to work of any particular brand, from any particular store, or to

wear in-season clothing.  (*See id*. at 48:15-21 (Stipulated Facts) ("The Varvatos dress code does

not require female sales professionals to wear clothes from the current season.  The Varvatos

dress code does not require sales for the female sales professionals to purchase clothes to wear to

work from any particular retail store.  Nor does it r[equire female] sales professionals to wear

clothes [from] any particular brand to work."); *see also* Trial Tr. at 240:6-13 (Plaintiff Romero),

*id*. at 252:7-11 (Plaintiff Crouchen); Hassan Decl., Exhibit P (Plaintiff Kassen Dep. Tr.) at

58:21-59:6.)

   The trial evidence shows that these differences in dress code meant that the responsibility

and effort required for the jobs of male and female sales professionals are not substantially equal.

The highlights of this evidence are as follows:

---

6.   *See* Hassan Decl., Exhibit A / Tr. Exhibit A at JVE-000079 (2016 version of the Dress Code Policy states, "In the case of a female employee, outfits should be appropriate for the work environment and representative of the brand.  Appearance and attire must be aligned with brand aesthetics and color palette (black, white, beige, grey, navy, olive, brown) and fabric should be appropriate.")  The 2013-15 versions of the Dress Code Policy have similar language.  (*See* Hassan Decl., Exhibit A / Tr. Exhibit A at JVE-000078, JVE-000080-81.)

At trial, Plaintiffs argued that the dress code for female sales professionals was "more complicated" because they had to comply with a "checklist" of clothing that could not be worn, including, shorts, cutoffs, and skorts; culottes, excessively short hemlines, reveling necklines and midriffs, backless tops and dresses, sheer fabrics, bright colors, large prints and patterns, branded clothing that is not Varvatos clothing, evening attire (except for Varvatos tuxedo jackets, flip-flops and "[e]xtreme and unusual hairstyles." (*See* Trial Tr. at 79:24-80:3 & 80:25-83:13 (Chang); Hassan Decl., Exhibit A / Tr. Exhibit A (Varvatos dress code) at JVE-000078.)  Other than the fact that some of these restrictions apply, on their face, to both male and female sales professionals (*see also, e.g.*, Trial Tr. at 82:5-10 & 82:22-23 (Chang) and id. at 418:11-13 (Shears)), a jury could not reasonably have found that not being able to wear "excessively short hemlines" or even bright color makes the dress code for female sales professionals more "complicated" than the three-piece, Varvatos clothing requirement for male sales professionals.  Byron, with over three decades of experience as a human resources professional, also testified that the Varvatos dress code for female sales professionals was identical to the appearance and dress standards policy at other jobs.  (Trial Tr. at 380:11-18.)

8

First, the different dress code requirements impose significantly different financial responsibilities on male and female sales professionals.  It is undisputed that Varvatos clothing is expensive.  (*See, e.g.*, Trial Tr. at 44:6-9 (Stipulated Facts) ("Varvatos clothes are generally sold at high price points.  For example, a single pair of jeans typically costs hundreds of dollars, and a single jacket can cost more than a thousand dollars."); *see also* Hassan Decl., Exhibit B / Tr. Exhibit B at 1-6 (showing that Varvatos jackets typically cost over $1,000 and even close to $3,000).)  As Shears, a long-time sales professional at Varvatos and now a store manager, testified at trial, without the Clothing Allowance, in order to comply with the Varvatos-only, three-piece, in-season requirement, a male sales professional in a Varvatos retail store, even using the Varvatos employee discount, would need to spend approximately $4,000 to $5,000 a year on work clothes.  (*See* Trial Tr. at 431:5-14.)  With that mandatory annual cost of simply complying with the dress code, had it not been for the Clothing Allowance, Shears testified that he would not have accepted a job as a sales professional at Varvatos.  (*See id*. at 431:15-18.)  Indeed, the evidence shows that male sales professionals routinely had to spend out-of-pocket, over and above the Clothing Allowance, to supplement the limited number of clothes they can pull under the quarterly Clothing Allowance.  (*See, e.g.*, Trial Tr. at 456:5-457:8 (Shears testifying that back in 2017, he spent on average $500 a year on Varvatos clothes in addition to the Clothing Allowance; now he spends on average approximately $1,500 a year on Varvatos clothes in addition to the Clothing Allowance, $800-$1000 of which he needs to spend to have enough clothes to comply with the Varvatos dress code for male employees in the stores); *see also id.* at 387:23-389:2 (Byron, Varvatos' former Vice President of Human Resources testifying that male sales professional spent money on Varvatos clothing in addition to the Clothing

Allowance to have enough clothes to wear at work).)[7, 8]  Female sales professionals, on the other

hand, could have complied with the Varvatos dress code using clothes that already existed in

their wardrobes, as long as those clothes complied with the broad, general requirements of the

Varvatos dress code.  (*See, e.g.*, Trial Tr. at 49:3-5 (Stipulated Facts) ("Female sales

professionals can wear clothing that they own prior to working at Varvatos as long as it is

consistent with the Varvatos dress code."); *id.* at 240:10-13 (Plaintiff Romero) (same); Hassan

Decl., Exhibit P (Plaintiff Kassen Dep. Tr.) at 55:22-56:10 (stating that she already owned "a

lot" of clothing that complied with the Varvatos dress code at the time she started at Varvatos).)

It is undisputed that female sales professionals could also comply with the Varvatos dress code

by shopping for clothes at stores with much lower price points than Varvatos.  (*See, e.g.*, *id.* at

48:22-49:2 (Stipulated Facts) ("A number of plaintiffs have represented that they shopped for

work clothing at stores like Zara, H & M, GAP, Forever 21, Uniq[lo], Urban Outfitters, and

American Apparel."); *id.* at 241:3-10 (Plaintiff Romero testifying that she purchased work

---

7.   Byron explained that she knew this for two reasons:  "One was seeing the employees since they weren't provided with accessories, et cetera, the male associates often bought belts, shoes, additional shoes, other products that we had, additional shirts so that they would have enough to wear and be able to change on a consistent basis on when they were working their shifts.  In addition, we also did a report to look at what was the spend and we were doing that for a number of reasons."  (Trial Tr. at 387:23-389:11.)

8.   Shears testified about the limited number of clothes pulled using the Clothing Allowance.  (*See, e.g.*, Trial Tr. at 424:5-19 & 457:10-458: 6 (testifying that the quarterly Clothing Allowance of up to $3,000 in clothing, generally means for him, "an outfit and probably four or five pieces;" "[u]sually it is a jacket, a couple of shirts, a pair of jeans and a pair of sneakers or something like that"; and that although he may pull a few more items sometimes, that is not representative of his pulls, which are "closer to four or five pieces" each quarter).)  For example, referencing Hassan Decl., Exhibit B / Tr. Exhibit B, Shears testified that for Spring 2019, he was able to pull a pink jacket (retail price $1,198), a couple of button-up shirts ($188 and $248), a STAR USA Collection jacket ($700 or $800) and a pair of sneakers ($400); another season he pulled a jacket ($2,400) and a pair of jeans and a shirt.  (*See id.* at 424:20-426:20.)

*See also id.* at 183:12-18 (Chang) ("Q. Now, I may have touched on this already, but is it correct that the male sales professionals at John Varvatos got only one pull of clothing per season?  A. It was typical, yes.  One pull, you mean one outfit?  Q. Correct.  A. Yes.").

96633951

clothes from Zara, which is a lower price point store than Varvatos).)  In fact, "[a] number of plaintiffs have represented that they have spent less than a thousand dollars annually on their work clothes."  (Trial Tr. at 49:6-8 (Stipulated Facts).)  Indeed, the undisputed trial evidence shows that one Opt-in Plaintiff, Hillary Crandle, spent $600 on work clothes for the one year that she had worked at Varvatos, while another Opt-in Plaintiff, Michelle Ortiz, spent $500 to $600 on clothes to wear to work for the 10 months that she worked at Varvatos.  (*See* Hassan Decl., Exhibit F / Tr. Exhibit U at 1; Hassan Decl., Exhibit G / Tr. Exhibit V at 1; Hassan Decl., Exhibit O / Tr. Exhibit 45.)  Thus, there is overwhelming evidence that, but for the Clothing Allowance, the financial responsibility of complying with the Varvatos dress code for male and female sales professionals is not substantially equal.[9]

Second, the trial evidence shows that even with the Clothing Allowance, male sales professionals had a mandatory financial obligation that female sales professionals did not.  In particular, male sales professionals have income tax withheld from their pay on the value of the clothes pulled under the Clothing Allowance.  (*See, e.g.*, Trial Tr. at 251:2-6 (Plaintiff Crouchen) ("it was clothing that they were given but it was basically compensation that they were taxed on to their income"); *id*. at 258:12-18 (similar); *see also id*. at 382:22-383:1 (Byron) (confirming that male sales professionals have to pay income tax on the clothing that they get under the Clothing Allowance).)  Byron testified that, on average, $600 of federal income tax (i.e., not accounting for any state taxes) would be withheld, per year, for a male sales professional

---

9.   Chang also testified that Varvatos "doesn't produce a type of apparel that can be easily machine washed.  A lot of it has to be sent to the cleaners," a cost that the male sales professionals pay out of pocket, whereas female sales professionals were not obligated to wear or purchase clothes that required dry cleaning.  (*See* Trial Tr. at 187:8-19; 187:24-188:3.)  For example, an Opt-in Plaintiff, Michelle Ortiz, stated in her interrogatory responses that she "does not believe she dry-cleaned her work clothing" while she worked at Varvatos.  (Hassan Decl., Exhibit G / Tr. Exhibit V at 2.)

11

working in a Varvatos retail store.  (*See* Trial Tr. at 384:20-386:10.)[10]  Shears testified that he

pays, on average, approximately $1,000 a year in income tax as a result of the Clothing

Allowance.  (*See id*. at 446:19-446:25.)  It is also undisputed that male sales professionals could

not avoid having the income tax deducted from their pay by refusing the Clothing Allowance.

Shears testified that when he once asked whether he could stop pulling clothes to avoid the tax

burden, he was told by Varvatos that he could not.  (*See id.* at 429:21-430:14.)  Similarly, when

another employee requested that he did not "care to receive a clothing allowance anymore due to

the taxation issue," Varvatos' Human Resource department told him that was not possible.  (*See*

Hassan Decl., Exhibit E / Tr. Exhibit F; *see also* Trial Tr. at 386:11-387:21 (Byron).)  On the

other hand, Plaintiffs have not denied that female sales professionals had no mandatory income

tax burden as a result of the Varvatos dress code policy as applied to them.[11]

Third, while male sales professionals were restricted to wearing only Varvatos clothing –

whether they liked some or any of it – female sales professionals had the freedom to choose and

wear the clothing that they like.  Shears testified that he sometimes has to pull clothes (on which

he is taxed) although he does not like them, *e.g.*, a pink jacket and a pink shirt he recently pulled.

(*See* Trial Tr. at 430:15-24.)  As he explained, "The pink jacket. I didn't pull it because I liked it.

I pulled it because we needed to sell the pink jacket."  (*See id*. at 430:23-24.)  Female sales

---

10.  Byron testified that she was knowledgeable about the taxation issue because Varvatos payroll department
reported to her; also "In almost every one of my jobs I had the payroll department reporting in to me. So, I was
familiar with taxation."  (*See* Trial Tr. at 383:2-5; 386:3-5.)

11.  At trial, Plaintiffs argued that the amount of tax paid by the male sales professionals would depend on their
"individual situation."  (*See* Trial Tr. at 598:6 (Plaintiffs' Closing Argument).)  However, that is irrelevant to
the undisputed evidence that male sales professionals did have an income tax burden that female sales
professionals did not.  (*See, e.g.,* Trial Tr. at 251:2-6 (in response to the question, "Would you call the clothing
that the male sales professionals got at Varvatos, free clothing?, Plaintiff Crouchen testifying that "It was -- I
don't know that -- it was clothing that they were given but it was basically compensation that they were taxed
on to their income.").

professional did not have that responsibility.  In fact, there is no evidence in the record that Plaintiffs in this case have had to wear any clothing to work at Varvatos other than what they liked.  Indeed, Plaintiff Crouchen admitted to the value of not *having* to wear only the employer's clothing at work.  In testifying about a prior job, where she was required to wear her employer's clothes only while at work, Crouchen stated that, "I was forced to wear the clothes. So, it was better to be given clothes that I had to wear than have to buy clothes that I didn't want to wear."  (Trial Tr. at 251:17-19.)  Here, neither Crouchen, nor any of the other Plaintiffs were "forced" or required to wear Varvatos-only clothing or clothing from any specific store or brand. (*See supra* at 7-8.)

Fourth, there is no evidence in the record that Plaintiffs in this case have had to wear any clothing to work at Varvatos other than what they were comfortable in.  On the other hand, male sales professionals were required to perform all the jobs of a sales professional, including running around and stocking and de-stocking, while complying with the Varvatos three-piece dress code requirement.  (*See, e.g.,* Hassan Decl., Exhibit Q (Mayorga Dep. Tr.) at 132:2-21 (Mayorga, with over 14 years of experience at Varvatos as a sales professional, testifying that he believed that complying with the Varvatos dress code required more effort for male sales professionals "Because it's a physical store.  We're running up and down stairs all day.  We have to represent the brand, but at the same time, it needs to be comfortable.  So sometimes things don't fit well, but we have to represent the brand.  Sometimes shoes will hurt and there's nothing you can do about it, because you need to be wearing it.  And I do think it is harder, whereas women can tailor what they wear based on definitely comfort. They have a little bit more autonomy dressing to perform more physical aspects of what we do.").  Plaintiff Crouchen also admitted that she had previously testified at her deposition that she believed it was "harder" for

13

male sales professionals to fulfill their dress code responsibility as compared to female sales professionals.  (Trial Tr. at 253:6-18.)[12]

Fifth, the evidence shows that male sales professionals, and not female sales professionals, tried on Varvatos clothes in order to help sell them.  Plaintiff Romero testified that she had seen male sales professionals try on clothes for customers and that she also had asked a male sales professional to try on clothes for one of her customers so that she could make a sale. (*See* Trial Tr. at 211:6-212:9.)  Plaintiff Romero also testified that at least some male sales professionals tried on clothes at product knowledge meetings.  (*See id*. at 212:18-25.)  Relatedly, Shears testified that at one of the Varvatos stores he used to manage, Tripti Pandey (one of the Plaintiffs in this case) used to have a male sales professional wear and model the new shipment of clothes for her, and she would take photographs, send them to one of her big clients who did not visit the store in person, make her sales and earn a commission.  (*See id*. at 415:9-416:7; *see also id*. at 414:9-414:18 (female sales professionals use their male sales professionals to showcase the Varvatos looks "all the time").)  Although Plaintiffs attempted to minimize this evidence at trial (*see, e.g.*, *id*. at 211:13-20, 212:14-17 (Plaintiff Romero testifying that it took her male colleague only three to five minutes to try on the clothes for one of Romero's customers, or that *if* a male colleague had asked her to try on a piece of clothing, she would have said yes)), the undisputed fact is that there are multiple examples of male sales professionals trying on Varvatos clothing to help sell them, including for their female colleagues, and there are no instances of females sales professionals doing so.

---

12.  At her deposition, Crouchen testified this was the case "Because they [the male sales professionals] could only have one pot to pick from.  I have a hundred."  (*See id*. at 253:9-18.)  At trial, she changed her testimony, stating that she did not know whether it was harder for male sales professional to comply with the Varvatos dress code and that at her deposition, she had "misunderstood the word 'harder'."  (*See id*. at 253:24-254:3.)

Finally, Varvatos also presented ample evidence that male sales professionals have the responsibility of acting as in-store models, and the female sales professional do not. (*See, e.g.*, Trial Tr. at 154:20-24 (Chang testifying that male sales professionals are supposed to "model the merchandise and act as walking billboards"); *id.* at 325:17-20 & 326:16-327:12 (Harris testifying that male sales professionals have to attest to "how [a clothing item] feels, how it moves, how it wears, how it feels on the body, etc."); 411:20-412:2 (Shears testifying that male sales professionals act as "live mannequins"); *see also id.* at 237:7-13 (Plaintiff Romero admitting that at a prior job, when she wore the women's clothes being sold in the store, it helped her sell the clothes and created visibility for the brand); 254:8-10 (Plaintiff Crouchen admitting that it did help her "[a]t times" to sell clothes when the men were wearing the Varvatos clothes); 254:11-16 (Plaintiff Crouchen explaining that it was helpful "[b]ecause if say I had a client that was trying on a pair of shoes and they maybe felt they were a little tight or whatever, I could turn to a colleague and say do you have those shoes? Do they stretch? How do they feel? So, that is always helpful."); 258:25-259:15 (Plaintiff Crouchen admitting that having her male colleagues dressed in Varvatos clothing, "absolutely" helped her sales).)

As set forth above, there is overwhelming evidence that the jobs of male and female sales professionals were not substantially equal in terms of responsibility and/or effort. Plaintiffs, on the other hand, did not present evidence based on which a reasonable jury could have determined otherwise. Other than try to minimize the evidence that supports Varvatos (*see, e.g.*, *supra* at 14 (Trial Tr. at 211:13-20, 212:14-17)), Plaintiffs did not present affirmative evidence to carry their burden to show by a preponderance of evidence that the jobs of male and female sales professionals are substantially equal.

15

96633951

- Hassan Decl., Exhibit N / Tr. Exhibit 35A, on which the Plaintiffs relied heavily, is a job description for the job of a sales professional.  Plaintiffs asked the jury to infer that the jobs of male and female sales professionals were the same because there was only one job description for the job of a sales professional and there was no "separate job description" stating that the jobs are different. (*See* Trial Tr. at 485:23-486:2 (Plaintiffs' Closing Argument).)  However, this "evidence" is legally insufficient. *See Chepak v. New York City Health & Hosps. Corp.*, No. 11-CV-9698 KBF, 2015 WL 509279, at *8 (S.D.N.Y. Feb. 5, 2015), *aff'd*, 643 F. App'x 62 (2d Cir. 2016) (application of the EPA hinges on actual job content rather than the employer's job descriptions).[13]

- Plaintiffs also argued at trial that the jobs of male and female sales professionals are the same because the jobs share many responsibilities and characteristics.  (*See, e.g.*, Trial Tr. at 585:8-11 (Plaintiffs' Closing Argument ("Both men and women sell the same Varvatos clothes in the same Varvatos stores to the same customer, same training, same managers, same meeting.").)  However, as the Court instructed the jury, "Employees who perform generally similar jobs may have differences in responsibilities that make the jobs unequal under the Equal Pay Act."  (Hassan Decl., Ex. R / Jury Instructions at 12.)  Plaintiffs' argument also ignores the clear weight of evidence that there was in fact, at least, a difference in the dress codes for male and female sales professionals.[14]

- Plaintiffs rely on their own testimony that the jobs of male and female sales professionals were the same as evidence that the jobs are in fact substantially equally under the EPA and NYEPA.  (*See, e.g.*, Trial Tr. at 586:11-15 (Plaintiffs' Closing Argument).)  Putting aside that these are, at best, self-serving statements by Plaintiffs,[15] there is no evidence in the record that in making these statements, the testifying Plaintiffs understood the legal standard for "substantially equal" jobs.

- Plaintiffs similarly relied on purported testimony by Varvatos witnesses that the jobs of male and female sales professionals are the same.  *See, e.g.*, Trial Tr. at 586:15-17 (Plaintiffs' Closing Argument:  "Harris … testified that all sales professionals regardless of the store in which they worked have the same job.")  But the record

---

13. Indeed, highlighting the limitations of a general job description (such as that at Hassan Decl., Exhibit N / Tr. Exhibit 35A), Chang testified that there were responsibilities included on Exhibit N / Tr. Exhibit 35A (such as stocking or de-stocking) that did not apply to all sales professionals.  (*See* Trial Tr. at 174:9-175:10.)

14. *See* Trial Tr. at 45:17-20 (Stipulated Facts) ("All sales professionals are required to comply with the Varvatos dress code, which imposes different requirements on male sales professionals and female sales professionals."); *id*. at 206:7-16 (Plaintiff Romero) (Plaintiff Romero admitting that male sales professionals have the obligation to dress in Varvatos-only clothes and female sales professionals do not); *id*. at 251:22-25  (Plaintiff Crouchen) (same).

15. *See, e.g.*, Trial Tr. at 265:25-266:2 (In response to a question by Plaintiffs' Counsel, "did the women sales professionals and men[]sales professionals have exactly the same job?," Plaintiff Romero responded, "Yes.").

16

shows that Harris also testified that "there's one difference [between the jobs of male and female sales professionals] which is that men were responsible for wearing the John Varvatos clothing."  (*Id*. at 310:24-311:3.)[16]

- Plaintiffs also relied on a 2016 email from Chang to an industry contact.  In response to the question, "just to follow up - so if you have two people in the same/similar position or level, the male will receive a clothing allowance, and the female will not?," Chang responded, "Correct, males will get an allowance, females in similar positions and level will not."  (Hassan Decl., Exhibit I / Tr. Exhibit 16 at JVE-001924.)  The jury could not have reasonably relied on this statement as evidence that the jobs of male and female sales professionals are "substantially equally" under the EPA and NYEPA.  There is nothing in the email chain or the record to suggest that Chang's statement was anything but a general reference to the word "similar."[17]

Thus, based on the totality of evidence, a reasonable jury could not have found that the jobs of male and female sales professionals are substantially equal.  Accordingly, Varvatos is entitled to judgment as a matter of law on this issue.  In the alternative, Varvatos is entitled to a new trial because the jury's determination that the jobs of male and female sales professionals were substantially equal is against the clear weight of evidence.

**B.    The Evidence Does Not Support the Jury's Finding that Female Sales Professionals Were Paid Less Wages than Male Sales Professionals.**

With regard to equal wages, the Court instructed the jury as follows:

> To prove this element, the plaintiffs must prove that Varvatos pays its sales professionals who are male more wages than it pays sales professionals who are female.  **Wages in an Equal Pay Act claim include all forms of pay, including the Clothing Allowance and the All Saints discount**, whether or not anyone actually called them "wages."  **In this case, you must compare the value of the men's**

---

16.   Likewise, while Mayorga testified that he did not understand the positions of male and female sales professionals to be different jobs and could not think of a difference in the jobs they performed (*see* Hassan Decl., Exhibit Q (Mayorga Dep. Tr.) at 54:2-9), he also testified, in response to a question from Plaintiffs' Counsel about whether there is a difference in the "job requirements of male and female sales professionals," that there is, in that male sales professionals are "required" to wear Varvatos clothing at work and female sales professionals are not (*id*. at 131:2-15).

17.   Indeed, Chang testified that the jobs of male and female sales professionals differed in that only male sales professionals were required to wear and model Varvatos clothes.  (*See* Trial Tr. at 78:2-9.)

96633951

> **clothing assistance to the value of the women's clothing assistance.**

(Hassan Decl., Ex. R / Jury Instructions at 12-13 (emphasis added).)  A reasonable jury could not have found that Varvatos paid female sales professionals less than male sales professionals, *i.e.*, the value of the clothing assistance that Varvatos provided to female sales professionals was less than that provided to male sales professionals.  Such a finding is against the clear weight of evidence.

The evidence shows that male sales professionals at Varvatos retail stores "pulled" clothes of up to $3,000 at full retail price, per season (*i.e.*, per quarter) (or $12,000 per year), while male sales professionals at Varvatos outlet stores "pulled" clothes of up to $1,500 at full retail price, per season (or $6,000 per year).  (*See* Trial Tr. at 46:22-47:6 (Stipulated Facts); *see also id*. at 418:20-419:8 (Shears) (discussing "pulls" at retail stores).)  However, this was the full retail price of the brand new clothes when the male sales professionals received them.[18]  The male sales professionals were then required to wear the limited pieces of clothing that they pulled for the entire season.  (*See id*. at 409:6-23 (Shears).)  Many of these items experienced wear and tear as a result of the constant wear.  (*See, e.g.,* Trial Tr. at 315:2-13 (Harris testifying that after three or six months of constant use, "there would appear holes in various parts of the pants that would render them unable to be worn."); *id*. at 316:3-11 (Harris testifying that "when [he] was done using those shirts [that he pulled under the Clothing Allowance] [his] own personal experience is that [he] would dispose of the shirts;" in fact, he used some to wash his car); *see also id*. at 392:5-22 (Byron testifying with regard to clothing she received to work to

---

18.  (*See* Trial Tr. at 418:20-419:2 (Shears explaining that Clothing Allowance for retail stores includes "pulls" "up to $3,000 at the retail price of the item," and retail price "is what the ticket says.  It is what we sell it to the consumer at.").)

96633951

work at a prior employer that the reason the employees did not return the clothing was because "it would be worn and so it wouldn't be something that you would want to return to the company for resale."). In addition, as set forth in detail in Section IV.A. below, the Clothing Allowance of $12,000 in retail value for male sales professionals in the retail stores and of $6,000 in retail value for male sales professionals in the outlet stores, in fact translated into $2,400 and $1,200 of additional annual income on their pay statements only – none of which the male sales professionals received in cash. (*See infra* at 38.) As also discussed below, *at best*, the evidence shows that the monetary benefit or value male sales professional received from the Clothing Allowance was the cost-savings of $4,200 a year for male sales professionals in the retail stores and $1,800 for male sales professionals in the outlet stores. (*See id*. at 45-46.) In addition, male sales professionals had to pay dry cleaning costs since most Varvatos clothing is such that it requires dry cleaning. (*See supra* at 11, n.9 (*See* Trial Tr. at 187:8-19; 187:24-188:3).) They also had to pay mandatory income tax on the value of the clothing they pulled. (*See supra* at 11-12 (*See* Trial Tr. at 384:20-386:10 (Byron testifying that the average male sales professionals would have had a tax burden of $600 a year because of the Clothing Allowance; Shears testifying that he paid annually, on average, $1,000 in income tax on the clothing he had to pull)).)

On the other hand, the evidence shows that female sales professionals could comply with the Varvatos dress code without *needing* to spend any money on new clothing. Even if they chose to purchase new clothing, they could, as some of the Plaintiffs did, comply with the Varvatos dress code by spending less than $1,000 a year. (*See supra* at 42.) In fact, the out-of-pocket expense for at least a couple of Plaintiffs to comply with the Varvatos dress code was approximately $600 to $700 (annualized) – less than or comparable to the tax burden on an

average male sales professional in a Varvatos retail store because of the Clothing Allowance. (*See supra* at 11 (*See* Hassan Decl., Exhibit F / Tr. Exhibit U at 1; Hassan Decl., Exhibit G / Tr. Exhibit V at 1).)  Nor were female sales professionals required to purchase clothing that required the expense of dry cleaning.  (*See supra* at 11, n.9 (*see* Trial Tr. at 187:8-19; 187:24-188:3).)  In addition, Varvatos provided female sales professionals a 50% discount at AllSaints.  The AllSaints discount allowed female sales professionals to buy, over the course of the year, $10,000 worth of clothing at full retail price by paying $5,000 only – more than what a female sales professional needed to pay out of pocket to comply with the Varvatos dress code.  (*See* Trial Tr. at 393:5-394:14 (Byron); Hassan Decl., Exhibit C / Tr. Exhibit C (AllSaints Discount Policy).)  Female sales professionals could get brand new clothing using the AllSaints discount, which they could choose to wear to work or use personally.  (*See* Trial Tr. at 395:25-396:9 (Byron).)  Whereas male sales professionals could only use the Clothing Allowance to "pull" in-season clothing that they could wear on the sales floor, female sales professionals had no such restriction.  (*See, e.g.,* Trial Tr. at 46:10-21 (Stipulated Facts) ("Employees eligible for the clothing allowance can only pull items against the clothing allowance that can be worn on a sales floor.  For example, they cannot use the clothing allowance for heavy outerwear.");[19] Hassan Decl., Exhibit C / Tr. Exhibit C (AllSaints Discount Policy, "Discount is 50% off full retail price

---

19.  Shears explained that the corporate department sends them a list of "excluded" items that cannot be pulled under the Clothing Allowance.  These include items that Varvatos knows are selling well and do not need to be worn on the sales floor to push sales.  (*See* Trial Tr. at 417:8-418:8 (Shears illustrating the point by speaking about a boot on the "excluded" items list:  "It is a boot that I really like but we have already sold 70 percent of them in the company, they don't need anyone to pull it because it kind of defeats the whole purpose of wearing it to sell it.").)  Shears explained that the exclusions also include accessories (such as sunglasses, belts and jewelry), and items produced under collaborations and partnerships (such as the Led Zeppelin and Game of Thrones lines of clothing).  (*Id*. at 417:8-418:18.)

for all Womenswear categories including outerwear, leather (excludes handbags), accessories, and jewelry.").

Thus, considering the evidence presented, a reasonable jury could not have found that the value of the clothing assistance provided to female sales professionals was less than the value of the clothing assistance provided to male sales professionals.  At a minimum, the jury's determination is against the clear weight of evidence.  Varvatos is thus entitled to judgment as a matter of law on the question of whether female sales professionals were paid less than their male counterparts, or a new trial, in the alternative.[20]

## II.   VARVATOS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW, OR A NEW TRIAL IN THE ALTERNATIVE, ON PLAINTIFFS' TITLE VII AND NYSHRL CLAIMS.[21]

To succeed on their Title VII and NYSHRL claims, the Court instructed the jury that Plaintiffs must prove that "(1) Varvatos paid [female sales professionals] less than men and (2) their [the female sales professionals] sex was a motivating or substantial factor in Varvatos's decision to pay them less than men."  (Hassan Decl., Ex. R / Jury Instructions at 13.)

---

20.  It also is undisputed that at least during the time that Byron worked at Varvatos (2012-17), female sales professionals' hourly pay was on average a dollar more than that of male sales professionals  (Trial Tr. at 397:15-25 (Byron)), and that female sales professionals, including some of the Plaintiffs, were consistently some of the highest earning sales professionals.  (*See id*. at 195:21-196:10 (Chang), 398:1-16 (Byron).)  Therefore, the evidence does not support the jury's determination that female sales professionals were paid less.

21.  Varvatos sought summary judgment on Plaintiffs' Title VII and NYSHRL claims on, among others, the grounds that Varvatos did not intentionally discriminate against female sales professionals and that female sales professionals were paid less wages than male sales professionals.  (*See* ECF 184 at 20-25, 28-29.)  Varvatos moved for a directed verdict on the same grounds as its summary judgment papers after the close of Plaintiffs' case, on which the Court reserved judgment (*see* Trial Tr. at 343:3-15).

21

**A.      The Evidence Does Not Support the Jury's Finding that Female Sales Professionals Were Paid Less Wages than Male Sales Professionals.**

For the reasons set forth in Section I.B. above, a reasonable jury could not have found that Varvatos pays female sales professionals less than male sales professionals.  Such a finding is against the clear weight of the evidence.  Varvatos should, therefore, be granted judgment as a matter of law on this issue, or a new trial in the alternative.

**B.      The Evidence Does Not Support the Jury's Finding of Intentional Discrimination.**

To find that Varvatos intentionally discriminated against female sales professionals, the jury had to find that the sex of the female sales professionals was a motivating or substantial factor in Varvatos' decision to give male sales professionals the Clothing Allowance and not female sales professionals.  *See Belfi v. Prendergast*, 191 F.3d 129, 136 (2d Cir. 1999) ("a Title VII plaintiff must also produce evidence of discriminatory animus.") (internal quotation marks omitted).  The Court instructed the jury that "plaintiffs are offering two independent reasons why the jury should find that Varvatos intentionally discriminated against the female sales professionals":  (1) female sales professionals were "similarly situated in all material respects to the male sales professionals," but did not receive the Clothing Allowance, thus, Plaintiffs "argue, the fact that they were paid less shows that their sex must have been a motivating or substantial factor in the decision to pay them less"; and (2) "even if the male sales professionals were not similarly situated to the female sales professionals in all material respects, Varvatos intentionally discriminated against the female sales professionals by paying them less because of their sex.  In other words, [Plaintiffs] are claiming that the female sales professionals' compensation was lower *because* of their sex."  (Hassan Decl., Ex. R / Jury Instructions at 15.)

22

For the reasons set forth in Section I.A. above, a reasonable jury could not have found that male and female sales professionals at Varvatos are "similarly situated in all material respects."  Such a finding also is against the clear weight of the evidence.  Varvatos should, therefore, be granted judgment as a matter of law on Plaintiffs' first argument for intentional discrimination, or a new trial in the alternative.

Nor could a jury, reasonably or justly, have found that Varvatos adopted its Clothing Allowance policy due to some intent to discriminate against women or that the intent to discriminate against women factored in any way – much less as a motivating or substantial factor – in that decision.  There is overwhelming evidence of the lack of intentional discrimination.

First, Varvatos is a menswear brand (*see* Trial Tr. at 248:21-22 (Plaintiff Crouchen); Trial Tr. at 239:1-5 (Plaintiff Romero); Hassan Decl., Exhibit P (Plaintiff Kassen Dep. Tr.) at 36:12-16; Trial Tr. at 80:4-6 (Chang)); as a marketing tool, it requires its male sales professionals to wear Varvatos-only, in-season clothes while at work (*see supra* at 15 (testimony that male sales professionals act as models or walking billboards)); it is helpful for Varvatos sales and consistent with industry practice to have the male sales professional wear Varvatos-only clothes at work;[22] and given the high price point of Varvatos clothes (*see supra* at 8-9 (*see, e.g.*, Trial Tr. at 44:6-9 (Stipulated Facts); *see also* Hassan Decl., Exhibit B / Tr. Exhibit B at 1-6).), Varvatos gives the male sales professionals a limited number of in-season clothing each season as the Clothing Allowance (*see id.* at 9).  Varvatos does not give the Clothing Allowance to female sales professionals because Varvatos does not make clothes for women.  (*See* Trial Tr.

---

22.  *See, e.g.*, *supra* at 15 (compiling testimony from (Plaintiff Crouchen that Varvatos requiring male sales professionals to wear Varvatos clothes helped with her sales); Trial Tr. at 324:17-22 (Harris testifying that having sales professionals wear the retailer's clothes as a means of marketing is "a known in the industry… it's something that's a known fact in the industry.").

at 252:7-13 (Plaintiff Crouchen testifying that it was impossible for female sales professionals to wear Varvatos clothing because it was men's clothes and it does not fit women the same).)  Nor does Varvatos require, as is undisputed, female sales professionals to wear Varvatos clothes at work or clothing of any particular brand, store or price-point.  (*See supra* at 7-8.)  Thus, Varvatos' decision to give the Clothing Allowance to male sales professionals and not female sales professionals is directly motivated by the nature of its business rather than any intent to discriminate against female sales professionals because they are women.

Two additional pieces of undisputed evidence underline the fact that business reasons, not the intent to discriminate against female sales professionals, motivated and underlie Varvatos' clothing assistance policy.  One, as Plaintiffs admit, around 2004 and 2005, when Varvatos designed and marketed a line of clothing for women, Varvatos required its female sales professionals to dress in Varvatos' women's clothing at work and gave female sales professionals a Clothing Allowance as well.  (*See* Trial Tr. at 49:22-50:1 (Stipulated Facts).)  Varvatos stopped doing so when its business changed, *i.e.*, it stopped making women's clothes and stopped requiring female sales professionals to wear those clothes.  (*See* Hassan Decl., Exhibit P (Plaintiff Kassen Dep. Tr.) at 54:24-55:7.)  Two, it is undisputed that Varvatos does not give the Clothing Allowance to all its male employees.  As Chang explained at trial, employees who "worked in a retail store" or those in corporate who "were in a position working directly with products or interfacing with a lot of external third-party vendors or [C]-level executives" were given the Clothing Allowance.  (*See* Trial Tr. at 185:24-186:24; *see also id*. (Chang testifying that all corporate male employees did not get the Clothing Allowance and that getting the Clothing Allowance was based on job responsibility).)

96633951

Second, the evidence also overwhelmingly supports the lack of any intent on the part of Varvatos to engage in sex discrimination against female sales professionals.  *E.g.*, the evidence clearly shows that Varvatos hires both men and women as sales professionals.  (*See* Trial Tr. at 44:25-45:1 (Stipulated Facts).)  Sex plays no role in Varvatos' decision whether or not to hire an applicant for a sales professional position.  (*Id*. at 45:2-3.)  Varvatos does not discriminate between male and female sales professionals in the hourly wage rate and the commission structure that Varvatos sets for its sales professionals.  (*Id*. at 45:4-6.)  In fact, female sales professionals were paid on average more per hour than male sales professionals.  (*Id*. at 397:15-25 (Byron); *see also id*. at 267:25-268:10 (Plaintiff Crouchen admitting that her hourly wage rate was higher than some of her male colleagues).)  And some female sales professionals, including some of the Plaintiffs, have consistently been among the highest earnings sales professionals.  (*See id*. at 185:17-196:10 (Chang), 398:1-16 (Byron).)  Finally, although Varvatos does not design or sell women's clothing, and does not require its female sales professionals to wear clothing from any particular store or season, Varvatos gives its female sales professional – and not its male sales professionals – the AllSaints discount, which they are free to use on personal or work clothing.  (*See* Trial Tr. at 49:14-18 (Stipulated Facts); *id*. at 393:6-394:18 (Byron) and 221:5-16 (Plaintiff Romero); Hassan Decl., Exhibit C / Tr. Exhibit C (AllSaints Discount Policy).)

While there is overwhelming evidence that Varvatos did not intentionally discriminate against female sales professionals because they are women, Plaintiffs offered no evidence based on which a reasonable jury could have determined otherwise:

- Plaintiffs asked the jury to infer that Varvatos was motivated by an intent to discriminate against female sales professionals *because* of their sex because Varvatos has a facially discriminatory policy, *i.e.*, it gives the Clothing Allowance to male sales

professionals and not to female sales professionals.  (*See* Trial Tr. at 600:14-16 (Plaintiffs' Closing Argument) ("So Varvatos had a policy to treat men and women sales professionals differently.")  But, that argument is legally insufficient.  As discussed below, in Section III.A., courts repeatedly have found that sex-specific dress codes and grooming standards do not themselves discriminate based on sex. (*See infra* at 28-32.)

- Plaintiffs also asked the jury to infer that Varvatos was motivated by an intent to discriminate against female sales professionals *because* of their sex because: (1) "Varvatos never studied how much value it gets [from] having male sales professionals wear the cloth[ing]"; and (2) Varvatos gives the clothes to male sales professionals rather than collecting the clothes back after they can no longer be worn on the sales floor.  (*See* Trial Tr. at 602:8-604:20.)  Such an inference cannot be reasonably and fairly drawn.  Other than the fact that Plaintiffs' contentions ignore the evidence,[23] had it been Varvatos' intent to give men some kind of windfall motivated by an intent to discriminate against female sales professionals, there is no logical reason why Varvatos would not have given the Clothing Allowance to all male employees.  As the evidence shows, that is not the case.  (*See infra* at 30-31.)

Therefore, based on the evidence presented, a reasonable jury simply could not make a finding of intentional discrimination.  Accordingly, Varvatos is entitled to judgment as a matter of law on the issue of intentional discrimination.  In the alternative, Varvatos is entitled to a new trial on the issue of intentional discrimination because the jury's finding against Varvatos is against the clear weight of evidence.

---

23. With regard to Plaintiffs' first contention that "Varvatos never studied how much value it gets [from] having male sales professionals wear the cloth[ing], *see, e.g.*, Trial Tr. at 324:12-22 (in response to Plaintiffs' question that "[t]he information you have to support your conclusion that having the men's sales professionals wear the Varvatos clothing in the store helps Varvatos sales is really backed up by anecdotes or stories about what has happened to people rather than any scientific or rigorous study, right?," Harris explained, "It's a known in the industry and it's the same as we wouldn't conduct a study on whether or not we should put clothes on tables or whether we should hang our clothes on hangers.  It's something that's a known fact in the industry that we wouldn't necessarily need a study to understand because it's part of just our everyday experience."), *see also id*. at 412:6-413:17 (Shears giving examples of customers buying clothes in response to seeing them on a males sales professional).

With regard to Plaintiffs' second contention that Varvatos should lend the clothes to males sales professionals, *see, e.g.*, Trial Tr. at 316:3-11 (Harris testifying that "when [he] was done using those shirts [that he pulled under the Clothing Allowance] [his] own personal experience is that [he] would dispose of the shirts"; in fact, he used some to wash his car); *see also id*. at 392:19-22 (Byron testifying with regard to clothing she received to work to work at a prior employer that the reason the employees did not return the clothing was because "it would be worn and so it wouldn't be something that you would want to return to the company for resale.").

26

III.    **VARVATOS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS AFFIRMATIVE DEFENSES, OR A NEW TRIAL IN THE ALTERNATIVE, WITH AFFIRMATIVE DEFENSES.**[24]

A.    **Varvatos Is Entitled Judgment as a Matter of Law on the Affirmative Defense of Factor Other than Sex, or a New Trial in the Alternative.**

Wage disparities between men and women due to a factor other than sex are permitted under all of the Plaintiffs' claims.  *See* 29 U.S.C. § 206(d)(1)(iv) (EPA); New York Lab. Law § 194 (1.d.) (NYEPA); *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 132 (2d Cir. 1996) ("the Bennett Amendment to Title VII incorporates the enumerated affirmative defenses of the Equal Pay Act into Title VII in sex discrimination cases"); *Hyek v. Field Support Servs*., Inc., 461 F. App'x 59, 60 (2d Cir. 2012) (NYHRL) (claims under New York's Human Rights Law "are analyzed identically" and "the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under ... Title VII.").  To succeed on a "factor other than sex" defense, an employer must "demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential."  *Belfi*, 191 F.3d at 136.

At the February 27, 2020 Charging Conference, the Court ruled that Varvatos was not entitled to a jury instruction on the affirmative defense of a factor other than sex.  With regard to the EPA, the Court ruled that "[t]he factors pointed out to me by the defendants in their briefing

---

24.  Varvatos moved for summary judgment on the affirmative defenses of factor other than sex, bona fide occupational qualification and business necessity.  (*See* ECF 184 at 19-20, 27.)  The Court denied Varvatos' motion for summary judgment.  In its pretrial submissions, Varvatos asked that the jury be instructed on all three defenses.  (*See* ECF 259 (Trial Memorandum) at 3-9; ECF 270 at 6-12 (Supplemental Trial Memorandum); ECF 257 (Proposed Jury Instructions) at 24, 36-44).)  On February 26, 2020, after the close of Plaintiffs' case, Varvatos moved for a directed verdict on the same grounds as its motion for summary judgment, on which the Court reserved judgment (*see* Trial Tr. at 343:3-15).  At the February 27, 2020 Charging Conference, after Plaintiffs and Varvatos had rested their respective cases, the Court ruled that Varvatos was not entitled to a jury instruction on the affirmative defenses, and Varvatos put its objection to the ruling on the record.  (*See* Feb 27, 2020 Tr. at 484:21-488:25.)

96633951

and jury instructions and oral argument all these alleged factors other than sex virtually all related to the necessity of men to wear and/or buy clothing.  No jury could find, as the case law puts it, that sex did not play any part[] [that] [s]ex is unrelated to these factors and thus sex did not play any part in the decision to give the extra compensation to men."  (Feb. 27, 2020 Tr. at 486:21-487:7.)  With regard to Title VII, the Court ruled:  "As to the Title VII defenses, we'[v]e spoken about factors other than sex.  I think there are other problems.  What comes to me is d[i]sp[a]rate treatment compensation case under Title VII that makes a factor other than sex defense logically impossible.  As I said there are other reasons that I just gave."  (*Id*.)

However, the defense of factor other than sex was available to Varvatos as a matter of law.  First, as demonstrated below, whether an employee gets the Clothing Allowance depends on job responsibility, specifically, whether the employee is required to comply with the Varvatos-only dress code.  The fact that only male sales professionals (or certain other male employees) are required to comply with the Varvatos-only dress code does not render that requirement (and the associated clothing assistance) an impermissible "factor other than sex." Courts repeatedly have found that sex-specific dress codes and grooming standards do not themselves unlawfully discriminate based on sex.  *See Longo v. Carlisle DeCoppet & Co.*, 537 F.2d 685, 685 (2d Cir. 1976) ("All four courts of appeals that have ruled on the question have held that requiring short hair on men and not on women does not violate Title VII."); *see also Tavora v. New York Mercantile Exch.*, 101 F.3d 907, 908 (2d Cir. 1996) (rejecting plaintiff's contention that his employer's policy "limiting hair length for male employees but imposing no similar restriction on female employees[] discriminates against male employees on the basis of gender in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*"); *Capaldo v. Pan Am. Fed. Credit Union*, No. 86 CV 1944, 1987 WL 9687, at *2 (E.D.N.Y. Mar. 30, 1987) ("The Second Circuit

28

has adopted the position of other Circuits as to the permissibility of such minor sex-based distinctions in dress and grooming codes."), *aff'd sub nom. Capaldo v. Pan Am Fed. Credit Union*, 837 F.2d 1086 (2d Cir. 1987).  Moreover, prior to the trial, Plaintiffs represented to the Court that they are not challenging that Varvatos requires only its male sales professionals to comply with the Varvatos-only dress requirement (*see* Feb. 21, 2020 Pre-Trial Tr. at 84:14-16 ("Yes, but see that's our point, is that we are not here claiming that it is unlawful for them to ask the men to wear the Varvatos clothes.")), and then repeated that assertion during their opening statement (*see* Trial Tr. at 28:9-11 ("We are not bringing this lawsuit because Varvatos wants the men to wear its clothing.")).  If Plaintiffs are not challenging the underlying obligation, they cannot logically challenge the corresponding tools provided to male sales professionals to comply with that obligation, and foreclose the use of the factor other than sex defense.  Second, there is no restriction under the law to a defendant's reliance on a factor other than sex defense in a disparate treatment, pay differential case under Title VII.  *See, e.g.*, *Siegel v. Bd. of Educ. of City Sch. Dist. of City of New York*, 713 F. Supp. 54, 58 (E.D.N.Y. 1989) (granting summary judgment to defendant on plaintiffs' disparate treatment pay discrimination case under Title VII, including on the factor other than sex defense).

In any event, Varvatos is entitled to judgment as a matter of law on the factor other than sex defense.  The legislative history of the EPA makes clear that the "factor other than sex" defense is broad,[25] and it applies here with regard to Varvatos' clothing assistance policy.

---

25.  During the debate preceding the passage of the Equal Pay Act, "Representative Griffin, for example, explained that the [factor other than sex] defense is a 'broad principle,' which 'makes clear and explicitly states that a differential based on any factor or factors other than sex would not violate this legislation.'" *Washington Cty. v. Gunther*, 452 U.S. 161, 171 n. 11 (1981) (quoting 109 Cong. Rec. 9203 (1963)).

96633951

Here, the difference in who gets the Clothing Allowance is directly attributable to the employee's job responsibility vis-à-vis the dress code, *i.e.*, whether the employee is required to comply with the Varvatos-only dress code, which is a gender-neutral factor other than sex. Varvatos presented clear evidence on this fact. In particular, the evidence shows that all male employees at Varvatos do not receive the Clothing Allowance – only employees who have a role in retail or interface with third-parties, such as vendors, are required to comply with the Varvatos-only dress code and accordingly receive a Clothing Allowance:

- Chang testified that all corporate male employees did not receive the Clothing Allowance and that getting the Clothing Allowance was based on job responsibility. (Trial Tr. at 185:24-186:23.) As Chang explained, employees who "worked in a retail store" or those in corporate, who "were in a position working directly with products or interfacing with a lot of external third-party vendors or [C]-level executives" were given the Clothing Allowance. (*See id.* at 185:24-186:24.)

- Shears explained that even though he was not a sales professional now, he received the Clothing Allowance because he was "actively on the floor trying to help increase our net sales." (Trial Tr. at 419:9-18.)

- Byron recounted having to explain to a tailor, who did not want the Clothing Allowance because he did not want to pay the taxes associated with it, that he was required to accept the Clothing Allowance and represent the brand because he was a customer-facing employee. (*See* Trial Tr. at 386:16-387:4; Hassan Decl., Exhibit E / Tr. Exhibit F (Email from Ann Byron to Bernard Babikian dated April 4, 2016) ("As a Tailor Manager you need to represent the brand in an appropriate manner and your adherence to our dress standards is required.").)

- The documentary evidence also shows all the corporate positions eligible for the Clothing Allowance have a customer or third-party-facing aspect. (*See* Hassan Decl., Exhibit M / Tr. Exhibit 35 (Clothing Allowance Key – Retail & Corporate).)[26]

---

26. *See also* Hassan Decl., Exhibit M / Tr. Exhibit 35 at JVE-000143 & JVE-000148 (an Account Executive (one of the corporate positions identified on Exhibit M / Tr. Exhibit 35 (at JVE-000143) as receiving the Clothing Allowance) was responsible for "develop[ing] working relationships with specialty and department store buyers" and the Director of Public Relations (another position similarly identified on Exhibit M / Tr. Exhibits 35 (at JVE-000148)) was "responsible for the development of relationships with key members of the media, fashion publications and luxury fashion industry and enhances department's/organization's reputation.").

30

It is undisputed that male sales professionals are subject to the Varvatos-only clothing requirement and female sales professionals are not.  (*See supra* at 7-8.)  Accordingly, based on that job responsibility – which is a factor other than sex – male sales professionals receive the Clothing Allowance and female sales professionals do not.

Based on the foregoing, Varvatos is entitled to judgment as a matter of law on the factor other than sex defense.  In the alternative, Varvatos is entitled to a new trial with the jury being instructed on the defense, so that a jury can weigh the evidence and fairly determine whether Varvatos prevails on it.  *See MacEdward v. N. Elec. Co.*, 595 F.2d 105, 109 (2d Cir. 1979) (ordering a new trial because trial court should have, but failed to, instruct the jury on certain affirmative defense).  The Court having declined to give the jury an instruction on the affirmative defense of a factor other than sex is analogous to a court declining to give a jury an instruction on self-defense in a murder trial.

### B.     Varvatos Is Entitled Judgment as a Matter of Law on the Affirmative Defense of Bona Fide Occupations Qualification, or a New Trial in the Alternative.

Under the bona fide occupational qualification (or "BFOQ") defense for Title VII and NYSHRL claims, it is not unlawful for an employer to discriminate on the basis of sex in hiring or employing a person where sex "is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise."  42 U.S.C.A. § 2000e-2 (West 2019); *see also Ferrara v. City of Yonkers*, No. 13 Civ. 1221 (KBF), 2015 U.S. Dist. LEXIS 66906, at *10-12 (S.D.N.Y. May 21, 2105).  To succeed on a BFOQ defense, an employer must prove: (1) that the qualification relates to the essence or central function of the employer's business, and (2) the qualification is reasonably necessary to the employer's business.  *See Westchester Cty. Corr. v. Cty. of Westchester*, 346 F. Supp. 2d 527, 533 (S.D.N.Y. 2004).  This

31

defense is permitted, *e.g.*, "where necessary 'for the purpose of authenticity or genuineness' in the employment of actors or actresses, fashion models, and the like." *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 545–47 (1971) (Marshall, J., concurring); *see also* 29 C.F.R. § 1604.2(a)(2) (sex can constitute a BFOQ where it is "necessary for the purpose of authenticity or genuineness").

At the February 27, 2020 Charging Conference, the Court ruled that Varvatos was not entitled to a jury instruction on the BFOQ affirmative defense, stating that:

> As to the bona fide occupational qualification defense, statutory language speaks to an occupational qualification for when a defendant hires or employs. There is strong statutory evidence that terms do not cover a compensation assistance, which is how the plaintiffs asked me to instruct the jury. I don't think it is possible for it to be a bona fide occupational qualification to be paid more money, to phrase it in those terms.
>
> The issue of whether it's okay for a men's clothing store to require all male sales employees to wear the men's clothing store's clothes in this case is not contested in this case. It is not part of this case. It is not part of this case. The BFOQ defense as requested by the plaintiff does not need to address that issue and it does not address that issue.

(Feb. 27, 2020 Tr. at 488:1-14.) However, the jury should have been instructed on the BFOQ defense for the following reasons.

First, Plaintiffs did elicit, not once, but multiple times, testimony at trial questioning whether it is okay for Varvatos to require only its male sales professionals to wear the Varvatos clothing and whether there is any value in doing so, *i.e.*, whether it was reasonably necessary. (*See, e.g.*, Trial Tr. at 88:11-89 (Plaintiffs' Counsel asking Chang, "Now, some women wear Varvatos clothes; right?"; "Have you ever worn anything that you personally purchased at a Varvatos store?"; "Haven't you purchased a scarf?"; "You purchased something at a Varvatos

32

store that you personally have worn; right?"; "If a woman comes into Varvatos and says that she

wants to buy clothing for herself, Varvatos will sell it to her; correct?"); *id*. at 324:12-16

(Plaintiffs' Counsel asking Harris, "The information you have to support your conclusion that

having the men's sales professionals wear the Varvatos clothing in the store helps Varvatos sales

is really backed up by anecdotes or stories about what has happened to people rather than any

scientific or rigorous study, right?").)[27]   Although, as discussed above, Plaintiffs made some

statements prior to and during trial that they were not challenging the fact that Varvatos requires

only male sales professionals to comply with the Varvatos-only dress code (*see supra* at 29), the

above and like evidence reasonably could have left the jury adversely confused against Varvatos,

questioning whether Varvatos was even permitted to require male sales professionals only to

comply with the Varvatos-only dress code (which in turn is the reason that Varvatos provides

male sales professionals the Clothing Allowance).   Therefore, Varvatos was entitled to have the

jury instructed on the BFOQ defense.  *See MacEdward*, 595 F.2d at 109 (stating that it is

---

27.  *See also* Trial Tr. at 80:4-9 (Plaintiffs' Counsel asking Chang, "Well, Varvatos doesn't want women sale professionals wearing Varvatos clothes; right? … Women aren't even allowed to wear Varvatos clothes while they are on the floor; right?"); *id*. at 208:2-5 (Plaintiffs' Counsel asking Plaintiff Romero, "Did having the men sales professionals wearing the Varvatos clothing help sell the Varvatos clothes?," and Romero responding, "I don't know that it did. I didn't track that for me personally."); *id.* at 324:1-8 (Plaintiffs' Counsel asking Harris: "Now, in your capacity in managing the company did you have any understanding that the company had ever done any scientific or rigorous study to determine whether or not having the men sales associates wear the Varvatos clothing in the store had a quantitative impact on Varvatos sales."); *id.* at 324:17-24 (Harris) (in response to Harris' testimony that the fact that having male sales professionals wear Varvatos clothes while at work helps Varvatos sales, is "known in the industry and it's the same as we wouldn't conduct a study on whether or not we should put clothes on tables or whether we should hang our clothes on hangers," Plaintiffs' counsel asking, "That's a conclusion you reached based upon experience rather than study though, right?"); *id.* at 266:6-10 (Plaintiffs' Counsel asking Plaintiff Crouchen, "Now, Mr. Bassen asked you question about whether having men's sales professionals in the store wearing the Varvatos clothes assisted you in making sales to your customers in the store?" and Crouchen responding, "At time, yes."); *id.* at 603:2-4 (Plaintiffs' Closing Argument) ("Now, Varvatos never studied how much value it gets of having male sales professionals wear the cloth[es].").

fundamental error when a jury charge fails to cover the basic elements of a defense when the facts are in dispute).

Second, the Court instructed the jury on Plaintiffs' two different theories of finding intentional discrimination under Title VII:  (1) "although the female sales professionals were similarly situated in all material respects to the male sales professionals, they did not receive the Clothing Allowance"; and (2) "even if the male sales professionals were not similarly situated to the female sales professionals in all material respects, Varvatos intentionally discriminated against the female sales professionals by paying them less because of their sex."  (Hassan Decl., Ex. R Jury Instructions at 14-15.)  A reasonable jury could have determined the following, for instance:  male and female sales professionals are similarly situated in all material respects; but, there are differences, even if immaterial, between their jobs, such as only male sales professionals had to wear and model Varvatos clothing; giving the Clothing Allowance to male sales professionals only, including letting the male sales professionals keep that clothing so that they could speak with complete authority as to the clothes, related to the essence of Varvatos' business, which was to sell clothes and this form of marketing was reasonably necessary to Varvatos' business.  This would mean that sex of the male sales professionals was a bona fide occupations qualification for the job that required male sales professionals to receive, wear and own Varvatos-only clothes for work.  Since the similarly situated test does not require jobs to be identical (*see Butler v. New York Health & Racquet Club*, 768 F. Supp. 2d 516, 529 (S.D.N.Y. 2011)), whether there is some difference between the jobs of male and female sales professionals that forms the basis of a BFOQ defense should have been decided by the jury.

Moreover, Varvatos is entitled to judgment as a matter of law on the BFOQ defense.  It should be undisputed that being male is a BFOQ for the job that requires the sales professional to

wear and model Varvatos clothes.  Plaintiffs appear to have conceded that.  (*See supra* at 29 (Plaintiffs stating that they are not challenging Varvatos' policy of requiring male sales professionals only to wear the Varvatos clothing).)  As the evidence demonstrates, being male also is a BFOQ for the job that requires the sales professional to wear and model Varvatos clothes and allows the sales professional to keep those clothes because it helps the essence of Varvatos' business – selling the clothes.  Shears, a long-time sales professional and now manager at Varvatos testified, for instance, that borrowing Varvatos clothing, instead of owning it, could affect his ability to sell Varvatos clothing.  (*See* Trial Tr. at 454:15-455:17.)  He stated that if customers ask whether he owns what he is wearing, then "if you are speaking organically that I like this thing, it's not forced on me," it helps, and that "countless" customers have asked him whether he owned the clothing he was wearing.  (*See id*.)

Based on the foregoing, Varvatos is entitled to judgment as a matter of law on the BFOQ defense.  Alternatively, Varvatos is entitled to a new trial with the jury being instructed on the BFOQ defense, so that the jury can weigh the evidence and fairly determine whether Varvatos prevails on this defense.  Again, the Court declining to give the jury an instruction on the affirmative BFOQ defense is analogous to a court declining to give a jury an instruction on self-defense in a murder trial.

## IV.    VARVATOS IS ENTITLED TO A REDUCTION OF DAMAGES.

Under the jury's verdict, Plaintiffs have been awarded a total judgment of $3,516,051.23 as well as post-judgment interest.  (ECF 362.)  Thus judgment consists of $2,669,009.56 in compensatory damages and $847,041.67 in punitive damages.  (Hassan Decl. ¶ 8.)  The $2,669,009.56 in compensatory damages consists of $1,371,450.00 in back pay damages under the EPA, NYEPA or Title VII; $319,517.89 in prejudgment interest under the NYEPA or Title

VII; and $978,041.67 in liquidated damages under the EPA or NYEPA.  (*Id*. ¶ 7.)  The back pay damages amount is based on the jury awarding Plaintiffs the full retail value of the clothing received by male sales professionals under the Clothing Allowance of $3,000 per "pull" (or per quarter) for Plaintiffs who worked in the Varvatos retail stores and $1,500 per "pull" for Plaintiffs who worked in outlet stores.  (ECF 334 at 3.)  The $847,041.67 in punitive damages includes punitive damages awarded under Title VII or the NYEPA.  (Hassan Decl. ¶ 7.)

As set forth below, the compensatory and punitive damages award is incorrect and excessive as a matter of law; it is not supported by the evidence; in fact, it is contrary to the clear weight of the evidence, and represents a miscarriage of justice.  Accordingly, the damages award ought to be set aside and reduced as a matter of law; in the alternative, Varvatos is entitled to a new trial on the amount of damages; as a final alternative, Varvatos is entitled to a remittitur of damages.

### A.    Plaintiffs Are Not Entitled to the Full Retail Value of the Clothing Allowance as Compensatory Back Pay Damages.

Compensatory damages are "intended to redress the concrete loss that the plaintiff has suffered" because of the defendant's conduct.  *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc*., 532 U.S. 424, 432 (2001*); see also Osofsky v. Zipf*, 645 F.2d 107, 111 (2d Cir. 1981) (compensatory damages are damages that are "the result of the injury alleged and proved," and "shall be precisely commensurate with the injury suffered") (quoting *Birdsall v. Coolidge*, 93 U.S. 64, 64 (1876)).  In determining appropriate compensatory damages, the Court "must, as nearly as possible, recreate the conditions and relationships that would have been had there been no unlawful discrimination" and "make the injured party whole by placing him or her in the same position he or she would have been absent the discrimination."  *Gulino v. Bd. of Educ. of*

*City Sch. Dist. of City of New York*, 96 CIV. 8414, 2016 WL 11485633 at *4 (S.D.N.Y. June 13, 2016).  "It also follows from the 'make whole' purpose [of compensatory damages] that 'such remedy as is given should not constitute a windfall at the expense of the employer, its union, or its [male] employees.'"  *Rios v. Enter. Ass'n Steamfitters Local Union 638 of U.A.*, 860 F.2d 1168, 1175–76 (2d Cir. 1988) (citation omitted); *see also Mittl v. New York State Div. of Human Rights*, 307 A.D.2d 881, 882 (1st Dept. 2003) ("The purpose of a back pay award is ... not to punish an employer or provide a windfall to the employee.") (quoting *Meling v. St. Francis Coll.*, 3 F. Supp. 2d 267, 275 (E.D.N.Y. 1998)).

Here, Plaintiffs have sought compensatory damages in the form of back pay.  Back pay is determined based on what a plaintiff would have earned at the time of discrimination, but for the discrimination.  *See, e.g.*, *Sands v. Runyon*, 28 F.3d 1323, 1327–28 (2d Cir. 1994) (affirming that district court property determined "back pay at the contemporaneously prevailing wage rates beginning on the date [plaintiff] should have been hired" and "ending at the date of [plaintiff's] actual hiring"); *see also Greenbaum v. Handelsbanken*, 67 F.Supp.2d 228, 270 (S.D.N.Y. 1999) (holding that the back pay period should reflect what the person would have earned if not for the discrimination).  Other compensatory damages, including prejudgment interest and liquidated damages compensate the plaintiff for the delay in receiving that back pay.  *See R&R adopted*, No. 11 Civ. 5788 (ARR), 2012 WL 3877963 (E.D.N.Y. Sept. 4, 2012) (prejudgment interest is meant "to compensate a plaintiff for the loss of use money"); *Santillan v. Henao*, 822 F. Supp. 2d 284, 298 (E.D.N.Y. 2011) (liquidated damages awarded under the FLSA for unpaid overtime, like prejudgment interest, are "designed to compensate employees for delay in payment").

Consistent with the above, the Court instructed the jury that compensatory damages are "meant to put a plaintiff in the position he or she would have occupied if the alleged

37

discrimination had not occurred," and that the jurors must "determine the value in dollars of what a female sales professional should have received – over and above what she actually received – for any given calendar quarter when a female sales professional was employed at Varvatos." (Hassan Decl., Ex. R / Jury Instructions at 16.)

### 1. The Back Pay Award is Incorrect and Excessive as a Matter of Law.

Based on the law and the jury instructions, to determine back pay, the jury was required to determine what Plaintiffs would have received at the time they were working at Varvatos while their male counterparts were receiving clothing under the Clothing Allowance, which they were required to wear to work every day.  The back pay awarded to Plaintiffs cannot be more than what their male counterparts received.  *See Rios*, 860 F.2d at 1176 (the "make whole" purpose of compensatory damages means that the remedy given to plaintiffs cannot "constitute a windfall" at the expense of the employer or other employees).  A reasonable jury could not have found that Plaintiffs were entitled to the retail value of the Clothing Allowance as back pay because, as set forth below, there is no legally sufficient basis in the record to support the conclusion that Plaintiffs would have been paid $3,000 per quarter in retail stores and $1,500 per quarter in outlet stores in lieu of the Clothing Allowance that their male counterparts received. The back pay awarded to Plaintiffs thus results in a windfall to Plaintiffs as compared to what their male counterparts received.

### (a) Male Sales Professionals Did Not Receive $3,000 or $1,500 of Cash or Unencumbered Clothing.

It is undisputed that male sales professional did not receive the $3,000 in cash per quarter (for retail stores) or $1,500 in cash per quarter (for outlet stores) that the Plaintiffs have now been awarded.  Rather, male sales professionals received clothing that they were required to wear

38

to work.  (*See, e.g.*, Trial Tr. at 427 (Shears) (Q.  "Do you [receive] any money or cash as part the clothing allowance?"  A.  "No."  Q.  "What do you get?"  A.  "You get your uniform."); *see also id*. at 46-47 (Stipulated Facts).)  Nor did male sales professionals receive $3,000 or $1,500 worth of any clothing they liked, to do whatever they wished with the clothing.  Rather, the uncontested record is that male sales professionals were required to pull a limited amount of Varvatos-only clothing each quarter, which could be worn on the sales floor, and which they were then required to wear to work for the rest of the season, complying with the three-piece rule.  (*See supra* at 7-8.)  Female sales professionals, on the other hand, were not required to wear clothes from any particular store or brand, any specific number of pieces of clothing, or clothing from the current season.  (*See supra* at 7-8.)  Moreover, female sales professionals would comply with the Varvatos dress code by spending nothing or less than $1,000 per year (*i.e.*, $333 per quarter).  (*See supra* at 11).  Thus giving Plaintiffs $3,000 or $1,500 in cash per quarter at the time would have been over and above the Clothing Allowance being given to their male counterparts.  Plaintiffs cannot be entitled to an amount in back pay today that they were not entitled to at the time of the discrimination.  *See Ingram v. Madison Square Garden Ctr., Inc.*, 709 F.2d 807, 812 (2d Cir. 1983) (awarding back pay more broadly than would "recreate the conditions that would have existed in the absence of discrimination," constituted an "unwarranted windfall" to plaintiffs).[28]

---

28.  Plaintiffs might argue that Varvatos could have placed restrictions on the female sales professionals as well, such as requiring them to use the $3,000 or $1,500 on work clothes only, and from certain stores only.  (*See* Trial Tr. at 606:13-17.)  However, the facts are that Plaintiffs were not subject to such restrictions during their employment with Varvatos.

96633951

**(b)** **Male Sales Professionals Did Not Receive Additional Income of $3,000 or $1,500, but 20% of that Amount.**

The trial record shows that the additional income added to the pay statement of a male sales professionals as a result of receiving the Clothing Allowance – *i.e.*, the additional income on which the male sales professionals were required to pay income tax – was approximately 20% of the retail value of the Clothing Allowance.[29]  Byron, Varvatos' former Vice President of Human Resources, testified that the 20% represents the "economic value of the clothing" to Varvatos, and that for a male sales professional working at a Varvatos retail store, who received a Clothing Allowance at full retail price of $12,000 per year, the "dollar amount that would be considered to be income" as a result of the Clothing Allowance was $2,400; which was also the amount on which the male sales professional was taxed.  (*See* Trial Tr. at 383:8-384:19.)  Shears, a longtime sales professional at Varvatos retail stores, and now manager of a Varvatos store, similarly testified that he paid income tax related to the Clothing Allowance "at the cost of actual clothing, which is to my understanding about 20 percent of the retail."  (*Id*. at 429:5-8.)  He confirmed that this $2,400 was the additional income added to pay statements that he received from Varvatos.  (*See id*. at 448:9-12 (Plaintiffs' counsel:  Q.  "So you would receive some statement from Varvatos pursuant to some IRS regulation explaining to you that you have additional taxable income of 2400, correct?"; A.  "Correct.").  Thus, the uncontested record shows that the Clothing Allowance resulted in additional income to male sales professionals at retail stores of $2,400 per year (or $600 per quarter), not the $12,000 per year (or $3,000 per quarter) that the jury has awarded the female sales professionals.  For the same reasons, the

---

29.  Varvatos similarly argued in its summary judgment papers that the value of the Clothing Allowance on which the male sales professional were taxed was 20% of the retail price of the clothing that they received.  (*See* ECF 184 at 12-13).

record supports the conclusion that the Clothing Allowance resulted in additional income to male

sales professionals at outlet stores of $300 per quarter (20% of the quarterly retail value of the

Clothing Allowance), not the $1,500 per quarter that the jury has awarded the female sales

professionals.  Based on this uncontested evidence, Plaintiffs are entitled to additional income of

at most $600 per quarter (for retail stores) and $300 per quarter (for outlet stores).

> **(c)** ........... **Plaintiffs Did Not Have an Out-of-Pocket Expense in the Amounts Awarded.**

In valuing non-monetary components of compensation, courts typically consider the out-

of-pocket expense incurred by the plaintiff.  *See U.S. v. City of New York*, No. 07–CV–2067

(NGG)(RLM), 2015 WL 1063403 at *5 (E.D.N.Y. Mar. 11, 2015) (explaining that had the

parties not reached a settlement, the loss of fringe benefits should be valued by expenses that the

claimants actually incurred, specifically, health care premiums paid by claimants and their actual

out-of-pocket medical expenses); *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*,

No. 96-CV-8414 (KMW), 2018 WL 6583844, at *3 (S.D.N.Y. Dec. 14, 2018) (stating that

plaintiffs had to prove they suffered an out-of-pocket expense due to the denial of health

insurance in order to receive compensation for health care costs).  At trial, Plaintiffs argued that

male sales professionals received "free" clothing to wear to work, while they received no

comparable benefit (Trial Tr. at 605:20-24 (Plaintiffs' Counsel)), *i.e.*, Plaintiffs did not receive

"free" clothing to wear at work.  However, except for some evidence for the opt-in Plaintiffs,

Plaintiffs did not present evidence at trial to show how much each of them in fact spent on

clothing to wear at work at Varvatos.  Instead, Varvatos presented evidence that (1) given the

broad neutral-colored dress code for female sales professionals at Varvatos, female sales

professionals were not *required* to spend any money on buying new clothes to wear to work at

41

Varvatos (*see* Trial Tr. at 182:8-14 (Chang); *id.* at 240:10-13 (Plaintiff Romero)[30]); (2) even if female sales professionals had to purchase clothing to wear to work at Varvatos, they could comply with the Varvatos dress code by spending less than $1,000 on work clothes, per year. In particular, Plaintiffs stipulated to the following for purposes of trial: "A number of plaintiffs have represented that they have spent less than a thousand dollars annually on their work clothes to comply with the Varvatos dress code." (Trial Tr. at 49:6-8 (Stipulated Facts).) Varvatos also presented admissions from Plaintiffs Crandle and Ortiz that they spent approximately $600-$700 (annualized) on clothes to wear at work. (*See supra* at 11 (*see* Hassan Decl., Exhibit F / Tr. Exhibit U at 1; Hassan Decl., Exhibit G / Tr. Exhibit V at 1).) Thus, except for the few Plaintiffs whose out-of-pocket expense on their clothes to wear at work at Varvatos is in the record, based on the foregoing, Plaintiffs' back pay damages must be limited to, at most, $1,000 per year ($333 per quarter).[31]

The fact that some Plaintiffs spent more than that amount on clothes to wear to work at Varvatos (*see, e.g.*, Trial Tr. at 49:8-13 (Stipulated Facts)) does not change the above. Plaintiffs were free to spend as much as they wanted on work clothes. As discussed above, the evidence shows that they were not required to do so by Varvatos. (*See supra* at 10-11*; see also* Hassan Decl., Exhibit P (Plaintiff Kassen Dep. Tr.) 55:22-56:10 (stating that she already owned "a lot"

---

30. Romero agreed that female sales professionals at Varvatos could wear clothes they previously owned "[a]s long as it fell within the dress code." (Trial Tr. at 240:10-13.)

31. At trial, Plaintiffs elicited testimony from Plaintiff Romero that it was her "belie[f]" that had she found cheaper clothes that complied with the Varvatos dress code for female sales professionals and worn those to work, her sales would have suffered. (*See* Trial Tr. at 217:17-20.) Romero's testimony is purely speculative, and cannot be the basis of a back pay award. *E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 124 (2d Cir. 1999) ("back pay remedy must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practices."). Nor did Plaintiffs elicit any evidence that the sales of Plaintiffs Crandle and Ortiz, who spent less than $1,000 a year, on average, to comply with the Varvatos dress code, suffered in any way.

of clothing that complied with the Varvatos dress code at the time she started at Varvatos); *id.* at 70:1-13 (agreeing that the amount of money she spent on clothing increased over the years because she had more disposable income, so she could purchase either more clothing or more expensive clothing); *id.* at 70:16-71:15 (acknowledging that the amount of money she spent on clothing in 2016 was "so much higher than the other years" because she cleaned out her closet that year);  Trial Tr. at 240:10-13 (Plaintiff Romero) (admitting that female sales professionals could wear clothes they previously owned as long as it fell within the dress code); *id.* at 217:1-13 (Plaintiff Romero) (admitting that she could have complied with the dress code at Varvatos by spending less than the $4,000 per year that she spent).)  Moreover, the record shows that male sales professionals also routinely spent money out-of-pocket to supplement the limited number of clothing to wear to work that they received under the Clothing Allowance.  (*See* Trial Tr. at 456:5-457:8  (Shears testifying that back in 2017, he spent on average $500 a year on Varvatos clothes in addition to the Clothing Allowance; now he spends on average approximately $1,500 a year on Varvatos clothes in addition to the Clothing Allowance, $800-$1000 of which he needs to spend to have enough clothes to comply with the Varvatos dress code for male employees in the stores); *see also id.* at 387:23-389:5 (Byron) (testifying that Varvatos ran a report that showed men spent money outside of the clothing allowance to comply with the dress code); *id.* at 242:8-15 (Plaintiff Romero) (admitting that male sales professionals purchased Varvatos clothing outside of the Clothing Allowance, including to wear at work).  Varvatos did not reimburse the male sales professionals for that out-of-pocket expense.  Nor should Varvatos be required to reimburse Plaintiffs for the out-of-pocket expense they chose to incur over and above what was required.

At trial, Plaintiff Romero testified that she estimates that while working at Varvatos, she spent on average $4,000 on clothes to wear to work.  (Trial Tr. at 217:1-6.)  Even if the jury put aside – which a reasonable jury should not have – the fact that Romero admitted that she could have complied with the Varvatos dress code by spending less money (*id*. at 217:7-13), and that she had the special circumstance of having sold most of her work clothes when she moved from California to New York (*id*. at 214:15-21),[32] the estimated $4,000 Romero spent per year is a fraction of the $12,000 a year in back pay that the jury has awarded to Plaintiffs who worked at Varvatos retail stores.  Plaintiffs' evidence from Romero simply highlights the fact that the back pay awarded to Plaintiffs is unfair and effects a miscarriage of justice.

### (d)    Male Sales Professionals Did Not Receive a Benefit of $3,000 or $1,500 Per Quarter.

The only other way a reasonable jury could have determined the baseline back pay for Plaintiffs based on the Court's instructions and the trial record is by basing it on the benefit that the male sales professional received as a result of receiving the Clothing Allowance.  *See Equal Employment Opportunity Comm'n*, 350 F. Supp. 3d at 229 (finding that although the defendant matched up to 6% of its employees' 401k contributions, the plaintiff was only entitled to a 5.76% because that was the amount she was actually contributing to her 401k at the time).

The trial record shows that all sales professionals – including Plaintiffs – received an employee discount of 65% at retail stores and 70% at outlet stores.  (Trial Tr. at 45:8-13 (Stipulated Facts); 399:15-24 (Byron); Hassan Decl., Exhibit D / Tr. Exhibit D (Retail Employee Discount Policy).)  Witness after witness confirmed that had the male sales professionals needed

---

32.  *See also* Hassan Decl., Exhibit P (Plaintiff Kassen Dep. Tr.) at 70:16-71:15 (acknowledging that the amount of money she spent on clothing in 2016 was "so much higher than the other years" because she cleaned out her closet that year).

to purchase out-of-pocket the clothing they received under the Clothing Allowance, they would

have had to spend, not $3,000 per quarter (for retail stores), but $1,050, using their employee

discount.  (*See* Trial Tr. at 235:6-14 (Plaintiff Romero); 249:21-250:8 (Plaintiff Crouchen);

420:10-23 (Shears).)  The benefit of the Clothing Allowance to the male counterparts of the

Plaintiffs who worked at the retail stores, therefore, was at most, a cost-savings of $1,050 per

quarter, not $3,000.  Similarly, the benefit of the Clothing Allowance to the male counterparts of

the Plaintiffs who worked at the outlet stores, was at most, a cost-savings of $450 per quarter, not

$1,500.  To the extent that Plaintiff female sales professionals were entitled to any cash value of

the benefit that their male counterparts were receiving, it can be no more than the

contemporaneous out-of-pocket cost saving by the male sales professionals.

Notably, Varvatos raised the argument in its summary judgment papers that the

maximum benefit or value of the Clothing Allowance to a male sales professional in a retail store

is $1,050 per quarter, not $3,000 per quarter because of the discount that all sales professional

receive.  (*See* ECF 184 at 11.)  Although the Court denied Varvatos' motion for summary

judgment (as it did Plaintiffs' motion for summary judgment), at the oral argument for the

motions, the Court specifically noted the following as to compensatory damages in a colloquy

with Plaintiffs' Counsel:

> THE COURT: And I don[']t want you to waste time having an
> argument about whether what the women are getting is worth 12,000
> [per year] because I'm absolutely convinced it's 4,200 [per year].
> All right.  You're not going to talk me out of it. That's what it would
> cost the men to do it.
>
> MR. DUNNEGAN: If we were commodity traders, that's what it
> would cost.
>
> THE COURT: Yeah.

(Jan. 31, 2019 Hearing Tr. at 13:12-19.)  Therefore, as the record shows, and as the Court has

also recognized, what the male sales professionals received under the Clothing Allowance was

worth less than what the jury has now awarded Plaintiffs.  Based on the foregoing, Plaintiffs'

back pay should be reduced to, at most, $1,050 per quarter for Plaintiffs who worked at retail

stores and $450 per quarter for Plaintiffs who worked at outlet stores.[33]

> **(e)      The Back Pay Award Does Not Take Into Account the AllSaints Discount.**

The fact that the jury awarded Plaintiffs the full retail value of the clothing pulled by their

male counterparts under the Clothing Allowance shows that the jury did not account for the

AllSaints discount at all.  This is against the clear weight of the evidence.  There is

overwhelming and undisputed evidence that all female sales professionals received a 50%

discount at AllSaints; they were free to use that discount; male sales professionals did not receive

this discount; and Plaintiffs did in fact take advantage of this discount.  (*See* Ex. I (Class

Representative Knox's bank statement showing use of the AllSaints discount); Trial Tr. at

216:22-25 (Plaintiff Romero admitting that when she got the AllSaints discount, she shopped at

AllSaints for clothes to wear to work); *see also id*. at 220:2-7 (Romero bought "plus ten" items

on her AllSaints discount); Dep. R. at 61:9-24 (Plaintiff Kassen admitted that she used the

AllSaints discount).)[34]  By not taking the AllSaints discount into account, the jury has over-

---

33. Varvatos reserves all its arguments that the baseline back pay (or other damages) award should be the minimum as discussed in this Section IV.A.  The purpose of providing these alternative arguments is to seek any reduction of damages at this stage as possible and to highlight the error and unfairness of the jury's award.

34. Although Plaintiffs argued at trial that the AllSaints discount required Plaintiffs to spend money out of pocket to take advantage of the discount and that there were other alleged issues with the discount (e.g., Plaintiffs had to go to another store to use the discount) (*see* Trial Tr. at 221:17-19, 222:11-13 (Plaintiff Romero)), none of this overcomes the undisputed facts that the AllSaints discount was given to Plaintiffs and there is evidence of Plaintiffs using it.  Thus a jury, reasonably and fairly, could not have given the AllSaints discount a value of $0.

96633951

compensated Plaintiffs, giving them more than what their male counterparts received.  However, the purpose of compensatory damages is to make plaintiffs whole; not give plaintiffs a windfall. *See, e.g.*, *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 412 (S.D.N.Y. 1996) (to ensure that Title VII plaintiff did not receive a windfall, back pay award must be reduced by other salary she earned during the relevant period).[35]

### (f)     Plaintiffs' Arguments Are Unavailing.

Plaintiffs' Counsel raised certain arguments during the closing argument why Plaintiffs should get the full retail value of the Clothing Allowance.  These arguments cannot overcome the law on compensatory damages or the facts elicited during trial.

First, Plaintiffs argued that regardless of any employee discount, the retail value of the clothes received by the male sales professionals was what it was – $3,000 per quarter for retail employees and $1,500 per quarter for outlet employees.  (Trial Tr. at 594-95 (Plaintiffs' Closing Argument).)  However, this argument is both simplistic and misleading:  $3,000 or $1,500 worth of clothes that males sales professional received is not the same as $3,000 or $1,500 in cash that the Plaintiffs have been awarded; the retail value of the clothing does not account for the fact that male sales professionals did not receive this as free clothing to do what they wanted with it, rather they were required to wear these clothes to work; there was ample evidence at trial that by the end of a quarter, male sales professionals are not left with brand new clothing, which when "pulled," had a retail of $3,000 or $1,500 (*see supra* at 18-19); and the full retail value of the

---

35.  The jury's award is also contrary to the Court's instructions, which required them to look at what a female sales professional was receiving during her employment at Varvatos.  (*See* Hassan Decl., Ex. R / Jury Instructions at 16 ("you must determine the value in dollars of what a female sales professional should have received – *over and above what she actually received* ….") (emphasis added).

clothing does not take into account the AllSaints discount which only female sales professional received, not the male sales professionals (*see supra* Section IV.A.).

Second, Plaintiffs argued that they are entitled to full retail value of the Clothing Allowance because many of them are no longer Varvatos employees and do not have access to the employee discount, so they need to "go out and buy at retail the same dollar amount of free clothes that the men" received, is contrary to the law. (*See* Trial Tr. at 32 (Opening Statement, Plaintiffs' Counsel) and 595-96 (Plaintiffs' Closing Argument).) One, as discussed above, back pay damages are calculated based on what a plaintiff would have received at the time of the discrimination. (*See supra* at 37-39.) Two, other compensatory damages, in particular prejudgment interest and liquidated damages, both of which have been awarded to Plaintiffs, are legally intended to account for the delay in a plaintiff receiving the back pay, not the back pay itself. (*See id*.)

Third, Plaintiffs argued that even when they were employed at Varvatos and had their employee discount, they may not have had the after-tax dollars to purchase the clothes their male counterparts were receiving. (*See* Trial Tr. at 595 (Plaintiffs' Closing Argument).) This is a red herring. Plaintiffs are not seeking the Varvatos clothes that their male counterparts received under the Clothing Allowance, but a "comparable benefit" to the Clothing Allowance. (*See* Trial Tr. at 264:6-9 (Plaintiff Crouchen) (confirming that she did not want "physical Varvatos clothes as a benefit.").)

\*\*\*\*\*\*

For the reasons noted above, the award of the full retail value of the clothing given to male sales professional under the Clothing Allowance as back pay to the Plaintiffs is not supported by the evidence adduced at trial, is contrary to the law, and results in an unfair

48

windfall to Plaintiffs.  The jury's award of back pay, therefore, should be set aside and the back

pay award must be reduced as a matter of law to the minimum possible supported by the

evidence; in the alternative, Varvatos is entitled to a new trial on the amount of back pay

damages.  As a final alternative, Varvatos is entitled to a remittitur of back pay damages.

**B.      Varvatos is Entitled to a New Trial on the Issue of Good Faith.**

**1.      The Issue of Good Faith Should Have Been Determined by the Court.**

The issue of Varvatos' good faith is relevant under both the EPA and the NYEPA, and

should have been decided by the Court rather than the jury and before the jury was asked to

decide the issue of willfulness.[36]  Under the EPA, the court clearly determines the issue of good

faith with regard to liquidated damages:

> [I]f the employer shows to the satisfaction of the court that the act
> or omission giving rise to [the] action [at issue] was in good faith
> and that he had reasonable grounds for believing that his act or
> omission was not a violation of the Fair Labor Standards Act of
> 1938, as amended, the court may, in its sound discretion, award no
> liquidated damages or award any amount thereof not to exceed the
> amount specified in section 216 of this title.

29 U.S.C. § 260.  Separately, under a different provision of the EPA, the jury makes a decision

on willfulness, which determines the question of whether a plaintiff will be awarded two or three

---

36.  In its pretrial submissions, Varvatos asked that the Court first decide the issue of good faith before submitting
the issue of willfulness to the jury.  (Hassan Decl. ¶ 10.)  In the alternative, Varvatos asked that, to the extent
the Court decides to instruct the jury as to willfulness before the Court considers good faith, and to the extent
the Court finds that a finding of willfulness by the jury would preclude a subsequent finding of good faith under
the EPA or NYEPA, then the Court instruct the jury to consider whether Varvatos acted in good faith as a factor
in its assessment of whether Varvatos willfully violated the EPA or NYEPA.  (*Id.*)  During the pre-trial
conferences, Varvatos argued that the Court first decide the issue of good faith before submitting the issue of
willfulness to the jury.  (*Id.* ¶ 11.)  At the February 21, 2020 pretrial conference, the Court ruled that he would
give the jury the issue of willfulness to decide, and that "[w]e can always ignore the jury verdict if I choose to
later," and further, that "if you are right that legally I had to decide good faith first then I think I would be
entitled to throw it out."  (*Id.* ¶ 12-13.)  Following additional letter briefing after the jury returned its verdict, the
Court ruled that "Court is bound by the jury's finding of wil[l]fulness for purposes of determining whether
Varvatos acted in good faith and had reasonable grounds for believing that its payment decisions were not a
violation of the federal Equal Pay Act under 29 U.S.C. § 260."  (*Id.* ¶ 15.)

years' worth of back pay.  *See* 29 U.S.C. § 255(a) (establishing a two-year statute of limitations,

"except that a cause of action arising out of a willful violation may be commenced within three

years after the cause of action accrued").  There is no requirement within the statutory language

of the EPA that requires that the question of willfulness be decided by the jury before the court

decides the issue of good faith.

On the other hand, the statutory language of the NYEPA strongly supports the conclusion

that the issue of good faith be decided before the issue of willfulness.  The relevant provision of

the New York Labor Law reads in part as follows:

> In any action . . . in which the employee prevails, the court shall
> allow such employee to recover the full amount of any
> underpayment, all reasonable attorney's fees, prejudgment interest
> as required under the civil practice law and rules, and, **unless the
> employer proves a good faith basis** to believe that its
> underpayment of wages was in compliance with the law, an
> additional amount as liquidated damages equal to one hundred
> percent of the total amount of the wages found to be due, **except
> such liquidated damages may be up to three hundred percent of
> the total amount of the wages found to be due for a willful
> violation of section one hundred ninety-four of this article**.

N.Y. Lab. Law § 198 (1-a) (2016) (emphasis added).  Thus, unlike the EPA:  (1) the NYEPA

involves a determination of good faith and willfulness on the same issue (of liquidated damages);

and (b) both elements are referenced within the same statutory provision, which provision

strongly supports the conclusion that the issue of good faith must be determined before the issue

of willfulness under the NYEPA – if no liquidated damages are warranted because the employer

acted in good faith, then no decision-maker should need to decide the issue of willfulness, which

only enhances the amount of liquidated damages.

Although counsel for Varvatos is not aware of any court decision in this Circuit which

involves claims under both the EPA and the NYEPA and addresses (i) the sequence of the

determination of the issues of good faith and willfulness, and (ii) who decides these issues as between the court and the jury:  per the clear language of the NYEPA, the issue of good faith is to be decided prior to that of willfulness, and per the clear language of the EPA, the issue of good faith is to be decided by the judge.  Based on this reading, the Court should have determined the issue of good faith (and only sent the issue of willfulness to the jury upon finding a lack of good faith).  Sending the issue of willfulness to the jury first was prejudicial error – as set forth in Section IV.B. below, Varvatos believes that had the Court considered the issue of good faith, it would have found in Varvatos' favor, eliminating liquidated damages under the EPA and making the determination of willfulness under the NYEPA moot.[37]

### 2.    Varvatos Is Entitled to Judgment as a Matter of Law on the Issue of Good Faith, a New Trial in the Alternative, or a Remittur.

To establish "good faith," a defendant must produce "plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it."  *Reich v. S. New England Telecommunications Corp.*, 121 F.3d 58, 71 (2d Cir. 1997); *see also* Hassan Decl., Ex. R / Jury Instructions at 18 ("To establish 'good faith,' Varvatos must produce plain and substantial evidence of at least an honest intention to comply with the law.").

A reasonable jury could not have found that Varvatos did not act in good faith.  The trial record contains overwhelming and clear evidence that Varvatos had *at least* an honest intention to comply with the law, and acted on that intent.  The trial record shows that Varvatos consulted

---

37. Varvatos does not believe that the Court is restrained from making a good faith determination, in particular under the EPA (29 U.S.C. § 260), despite the jury's willfulness determination.  (*See* ECF 350 (Mar. 6, 2020 Joint Letter to the Court, including Varvatos application and argument on this issue) at 4-6.)  Varvatos believes that its grounds for appealing the Court's denial of Varvatos' application (*see* ECF 355) are fully preserved, but in the abundance of caution, Varvatos is re-asserting its application, for the reasons set forth in the March 6, 2020 Joint Letter, that the Court independently make a determination of whether Varvatos' violation was in good faith.

outside lawyers regarding its policies and procedures, including its dress code policy, and also

consulted with outside lawyers on the very issue of the Clothing Allowance being provided to

male sales professionals and not female sales professionals.  *See Ruggles v. Wellpoint, Inc.*, No.

108CV201LEKRFT, 2010 WL 11579429, at *4 (N.D.N.Y. May 28, 2010) ("A reliance on the

advice of counsel may provide that good faith defense.") (citation omitted).  In particular, the

record contains the following evidence:

Byron, Varvatos' Vice President of Human Resources, testified that she obtained legal

advice from Varvatos' outside attorneys specifically with regard to the Clothing Allowance:

> Q. So, Ms. Byron, did there come a time when you consulted with
> an outside attorney regarding the issue of whether Varvatos giving
> a clothing allowance to male sales professionals and not female sales
> professionals would be legal under U.S. law?
>
> A. Yes.
>
> Q. What was that?
>
> A. In probably late 2013 or January of 2014.
>
> Q. Did you personally have a conversation with the outside attorney
> and just limit your answer just to a yes or no?
>
> A. Yes.
>
> Q. And after that conversation did you feel confident that Varvatos
> was not violating any U.S. laws regarding discrimination by
> providing the clothing allowance to male sales professionals only?
>
> A. Yes.

(Trial Tr. at 368:15-369:5.)  Byron further testified that she communicated this message –that

Varvatos was not in violation of any anti-discrimination laws in the U.S. by providing the

clothing allowance to male sales professionals only – to other high level officials at Varvatos,

including Ben Harris, Vice President of Retail; Wayne Meichner, President of Retail; Christiano

52

Quieti, President and CEO; and John Varvatos, Chairman.  (*See* Trial Tr. at 369:6-9, 375:23-

376:15.)  Chang, who reported to Byron and later was the chief human resources professional at

Varvatos (Trial Tr. at 66:19-67:6 (Chang)), corroborated this testimony, testifying as follows:

> THE COURT: Hold on. Let's start with answering the question. The
> question is: Did you discuss with Ann Byron the legality of the
> clothing allowance after she had the discussion about getting the
> legal opinion? Just yes or no, did you discuss it with her?
>
> THE WITNESS: Yes.
>
> Q. What was your understanding in that discussion?
>
> A. That we were legally compliant.

(Trial Tr. at 168:23-169:6.)

Byron also testified that she and Chang created the Varvatos Dress Code Policy, which

was updated annually from at least 2013 to 2016.  (*See* Hassan Decl., Exhibit C / Tr. Exhibit. C;

Trial Tr. at 381:3-11 (Byron).)  Each version of the Dress Code Policy included some variation

of the language that, "Since all male retail employees receive a clothing allowance, it is essential

that John Varvatos clothes be worn every day and those worn represent the current season."

(Hassan Decl., Exhibit A / Tr. Exhibit A at JVE-000079 (Sept. 2016 version).)  The Dress Code

Policy had no similar provision for female sales professionals.  Byron testified that Varvatos

submitted versions of the policy to its outside attorneys, and all of them were approved by

outside attorneys, without any issue or concern being raised regarding the Clothing Allowance

being provided to male sales professionals only.  Byron testified specifically as follows:

> Q. So, to your recollection, were the different versions of the dress
> code policy at Exhibit A reviewed by outside counsel?
>
> A. Most of them.
>
> Q. And all of those versions which were reviewed by outside
> counsel, were they approved?

> A. Yes.
>
> Q. And were they approved, given the language that only the male retail employees received a clothing allowance?
>
> A. Yes.

(Trial Tr. at 381:3-11.)  Chang also testified that Varvatos consulted with its outside attorneys regarding its employee handbook, including the language regarding Varvatos' compliance with all local statutes and laws.  (*See* Trial Tr. at 158:7-22.)[38]

At trial, Plaintiffs attacked as insufficient, Varvatos' evidence on it reliance on the advice of counsel.  Contrary to Plaintiffs' argument (*see* Trial Tr. at 610:10-14 (Plaintiffs' Closing Argument)), there is no requirement that advice of counsel be in writing.  *See Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 102 (2d Cir. 2001) (district court properly denied enhanced damages where there was evidence of a "consult[ation]" with counsel.)[39]  Although Plaintiffs

---

38.  As set forth in further detail in Section IV.C. below, Varvatos was also aware of other clothing retailers giving clothing allowances to male or female sales professionals only depending on whether the retailer sold menswear or womenswear.  (*See infra* at 60-61.)  Although industry practice on its own may not suffice to show good faith, in discussing one such retailer – her former employer, Stuart Weitzman – Byron specifically noted that Stuart Weitzman had in-house and outside counsel in explaining why she had not been concerned about their practice of giving the female sales professionals only a shoe allowance:

> Q. Now, Ms. Byron, in your capacity as an HR professional, did you understand at the time that there are U.S. laws that prevent or prohibit discrimination based on gender?
>
> A. Yes.
>
> Q. Did you have any concerns while you were at S[tuar]t Weitzman that there was a shoe allowance given to women salespersons but not to the men salespersons?
>
> A. I did not have any -- I did not have any concerns.
>
> Q. Why was that?
>
> A. We had internal counsel as well as we used external counsel.

(*Id*. at 355:1-11.)

39.  In its appellate brief, Defendant Instructional Systems, Inc. ("ISI") asserted that its owner contacted ISI's attorney "by telephone to discuss the Charge and to determine ISI's options."  (*See* Brief for Defendant-

54

96633951

might attack what they do not know about the advice (*e.g.*, which law firm it was, what information Byron specifically provided to the lawyer in procuring advice), there is nothing in the trial record that negates the facts that Byron did consult with outside counsel on "whether Varvatos giving a clothing allowance to male sales professionals and not female sales professionals would be legal under U.S. law," and following the call "fe[lt] confident that Varvatos was not violating any U.S. laws regarding discrimination by providing the clothing allowance to male sales professionals only." (*See supra* at 54 (Trial Tr. at 368:15-369:5).) Ignoring this testimony goes against the weight of clear evidence and results in a miscarriage of justice. Plaintiffs' other issues with Byron's testimony on the advice of counsel are based on mere speculation, without any basis in the evidence – *e.g.*, "Do we know whether the lawyer told Ann Byron that she couldn't rely on his opinion?" (Trial Tr. at 610:22-24 (Plaintiffs' Counsel)), or the "real reason" Varvatos did not get a written opinion was because "Varvatos knew that the clothing allowance policy was illegal." (*Id*. at 611:20-22.)

    In light of the above, it is evident that Varvatos produced plain and substantial evidence of *at least* an honest intention to comply with the law. Thus, there is no evidence supporting the jury's determination that Varvatos' violation of the EPA and NYEPA (if any) was not in good faith. In fact there is overwhelming evidence supporting a finding of good faith, and Varvatos is entitled to judgment as a matter of law on that issue. Accordingly, Varvatos asks that the Court make a determination of good faith in Varvatos' favor, and eliminate the liquidated damages awarded to Plaintiffs under the EPA and NYEPA. *See* 29 U.S.C. § 260; N.Y. Lab. Law § 198

---

Appellee-Cross-Appellant in *Farias v. Instructional Sys., Inc*., No. 00-9045(L), 00-9135(XAP) (2d Cir.), 2001 WL 34106885, at *15 (Jan. 22, 2001).

(1-a) (2016).[40]  In the alternative, Varvatos submits that the Court grant Varvatos a new trial on

the issue of good faith, or as a final alternative, remit the damages as set forth above.[41]

### C.      The Evidence Does Not Support a Finding of Willfulness.

The jury found that Varvatos violated the EPA and the NYEPA willfully.  (ECF 334.)  A

determination of willfulness extended the statute of limitations under the EPA from two to three

years (*see* 29 U.S.C. § 255(a)); and resulted in enhanced liquidated damages against Varvatos

under the NYEPA (*see* N.Y. Lab. Law § 198 (1-a) (2016)).

The Court instructed the jury as follows with regard to willfulness:

> "Willful" means that the defendant <u>knew</u> or showed <u>reckless
> disregard</u> for whether or not its conduct was prohibited by law.
> Thus, if you find that the plaintiffs have proven by a preponderance
> of the evidence that Varvatos knew or showed reckless disregard for
> whether or not its compensation of female sales professionals was
> prohibited by law, you will find that it acted "wil[l]fully." You may
> find Varvatos acted "wil[l]fully" even if you find that Varvatos did
> not act with an intent to violate the law in determining its legal
> obligation as to how to pay the female sales professionals. That is
> because wil[l]fulness can be shown if a defendant acted with
> reckless disregard for the law.  However, if you find that Varvatos

---

40.  The two prior versions of the NYEPA relevant to this case also required a determination of good faith with
regard to an award of liquidated damages.  *See* N.Y. Lab. Law § 198 (effective, November 24, 2009 to April 8,
2011) ("1-a. … In any action instituted in the courts upon a wage claim by an employee or the commissioner in
which the employee prevails, the court shall allow such employee reasonable attorney's fees and, unless the
employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law,
an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found
to be due."); N.Y. Lab. Law § 198 (effective, April 9, 2011 to January 18, 2016) ("1-a … In any action
instituted in the courts upon a wage claim by an employee or the commissioner in which the employee prevails,
the court shall allow such employee to recover the full amount of any underpayment, all reasonable attorney's
fees, prejudgment interest as required under the civil practice law and rules, and, unless the employer proves a
good faith basis to believe that its underpayment of wages was in compliance with the law, an additional
amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due.").

41.  As discussed above (*supra* at Section IV.B., the Court is permitted to and should have decided the issue of good
faith under the EPA, and there is no restriction in the statutory language of the NYEPA preventing that
determination to carry over to the issue of good faith under the NYEPA as well.  Therefore, if the Court finds
that the jury's decision on good faith is in error or against the clear weight of evidence, *i.e.*, it satisfies the
requirements of a new trial, the Court should decide the issue of good faith without requiring a new trial or
giving Plaintiffs the option of a new trial on remittitur.

> acted unreasonably, but not recklessly, in determining its legal
> obligation as to how to pay the female sales professionals, you must
> find that its actions were not willful.

(Hassan Decl., Ex. R / Jury Instructions at 17-18 (emphasis added)); *see also Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 119 (2d Cir. 1997) (defendant's violation of the Equal Pay Act is willful or reckless within the meaning of § 255(a) if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.") (citation omitted).

Here, there is no evidence that Varvatos acted with knowledge that it was violating the law or with reckless disregard for whether or not its conduct was prohibited by law in giving the Clothing Allowance to male sales professionals only (and the AllSaints discount to female sales professionals). Rather there is overwhelming and clear evidence to the contrary.

As a preliminary matter, there is no evidence that Varvatos knew that its clothing assistance policy was in violation of the law. Rather, at trial, Plaintiffs' Counsel argued that Varvatos must have known this or known that there was a real risk of this since the time this action was filed. However, Varvatos had every reason to believe that it would prevail on its defense of this action through and up to the point of the jury's verdict. For example, in January 2019, this Court denied not only Varvatos', but also Plaintiffs' motion for summary judgment in full. *See* Jan. 15, 2019 Minute Entry (ECF 219); *see also Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 287 (S.D.N.Y. 2015) (commenting unfavorably on the use of "the fact of the suit or the settlement offers as proof at trial of defendants' willfulness for not changing course after the suit was filed").

Nor is there any evidence that Varvatos acted with "reckless disregard" of whether its clothing assistance policy was in violation of the law. Rather there is overwhelming and clear

57

evidence showing that Varvatos had a reasonable and good faith basis to believe that it was not in violation of any U.S. laws.

First, as discussed above in Section IV.B., Varvatos had a good faith belief that its clothing assistance policy was in compliance with U.S. antidiscrimination laws.  In particular, Varvatos regularly consulted with its outside attorneys regarding its policies and procedures; Byron, specifically consulted with Varvatos' outside attorneys in late 2013 or 2014 to confirm that giving the Clothing Allowance to male sales professionals only was compliant with U.S. laws; Change corroborated this testimony; Byron shared her comfort that Varvatos was in compliance with U.S. antidiscrimination laws with other executives at Varvatos; Varvatos routinely had its Dress Code Policy reviewed by its outside attorneys, and at no point was any issue raised regarding the explanation in the policy that male sales professionals receive a Clothing Allowance.  (*See supra* at 53-57.)

Second, there is additional evidence that bolsters that Varvatos had a reasonable belief that its clothing assistance policy was not in violation of any U.S. antidiscrimination laws. Byron, who joined Varvatos in 2012, with roughly 30 years of Human Resources experience in the clothing retail industry (*see* Trial Tr. at 347:12-354:21), testified that she was not concerned about the clothing assistance policy being in violation of U.S. antidiscrimination laws because Varvatos "only produced men's clothing."  (Trial Tr. at 360:19-361:2.)  Moreover, Varvatos' practice of providing a Clothing Allowance to male sales professionals and not to female sales professionals because Varvatos is a menswear company was not extraordinary, but consistent with industry practice.  Byron testified that prior to joining Varvatos in 2012, she worked at Stuart Weitzman, a women's shoe retailer; that Stuart Weitzman required its female sales professionals, and not their male counterparts, to wear and model the current-season shoes; and

that accordingly, Stuart Weitzman gave a shoe allowance to its female sales professionals only. (*See* Trial Tr. at 354:15-25.)  Byron noted that she had not been concerned this practice violated U.S. antidiscrimination laws because Stuart Weitzman had in-house counsel as well as external counsel.  (*Id*. at 355:5-11.)  Similarly, Chang testified that she knew of other retailers that had the same practice – two women's-only retailers, Oscar de la Renta and La Perla, provided clothing allowances to female employees only and not male employees.  (*See* Trial Tr. at 195:1-15.)

At trial, Plaintiffs relied on the fact that Varvatos gives female sales professionals in the U.K. a certain clothing allowance as evidence that "Varvatos knew that it was doing something that was illegal discrimination or at least took the risk that its actions would be illegal discrimination."  (Trial Tr. at 607:10-22 (Plaintiffs' Closing Argument).)  However, the jury could not consider what Varvatos did in the U.K., under an entirely different legal regime, to infer Varvatos' knowledge or willfulness regarding its compliance with the laws in the U.S.  The Court specifically instructed the jury not to do so.  (*See, e.g.*, Trial Tr. at 123:22-124:15;[42] 256:21-257:4; 341:7-25.)[43]

---

42. For example, the Court instructed the jury at this point as follows:  "What happened in London is not directly relevant to anything here.  What's very important is that the law London, which is part of the United Kingdom, is not United States law.  And there is nothing in the record about what that law is.  Nothing that happened in the United Kingdom in terms of who did or did not get a clothing allowance has any bearing about what would be required or appropriate in the United States.  You are not to think about it for that purpose.  It may be something entirely different.  The fact that there was some different policy in the UK should not be used by you to make any determination about whether Varvatos was required to have a policy in the United States.  It's being provided to you merely for background for what prompted a discussion following that."

43. Plaintiffs specifically referenced an email from Chang in which Chang stated the following:  "Correct, males will get an allowance, females in similar positions and level will not.  Only exception is in the UK, due to local laws, we must offer females some sort of allowance since we are offering to males (not the case in US or Ontario, Canada).  They do not have to be equal amounts but something does have to be provided to females to make them 'whole'."  (Hassan Decl., Exhibit J / Tr. Exhibit 16A at JVE-001924.)  Plaintiffs asked the jury to infer willfulness from Chang's "make them whole" statement.  (*See* Trial Tr. at 607:15-608:6 (Plaintiffs' Closing Argument).)  However, that inference is unreasonable.  The context of the email shows that Chang was commenting on what she understood was required in the U.K., "due to local laws," and was "not the case in US or Ontario, Canada."  (Hassan Decl., Exhibit J / Exhibit 16A at JVE-001924.)  As noted above, the jury, as a matter of law, could not infer what was required under U.S. law from what was required under U.K. law.

96633951

In addition, Plaintiffs relied on the following prior deposition testimony from Chang as support for their argument that Varvatos somehow knew that its clothing assistance policy violated the law or showed reckless disregard for that law:

> Q. And clothing allowance that Ann Byron was considering a possibility of giving to women in the U.S. [in the 2014 timeframe], do you know anything about what kind of form such a program would have taken?
>
> Your answer?
>
> A. No.  I honestly do not think that she thought that far into it.  I think there were some initial discussions on wanting to do it and can we do it.  And when it was realized that it wasn't financially feasible for us to do it, at that moment it stopped right there.  So I don't think she went ahead and started thinking about what the structure of the allowance would look like for women.

(*See* Trial Tr. at 608:7-609:6 (Plaintiffs' Closing Argument).)  However, a jury could not reasonably have inferred from this evidence – that Byron or others at Varvatos might have considered or favored some kind of clothing allowance for female sales professionals in the U.S. other than the AllSaints discount or that Varvatos did not explore the details of what this alternative would look like because Varvatos determined it could not afford the allowance – that Varvatos knew that it was in violation of the law or in reckless disregard of it.  There is not a shred of evidence that Byron's or Chang's interest in considering some kind of clothing allowance for female sales professionals was motivated by any legal concerns.  Indeed, Chang testified that her interest in providing some kind of clothing allowance to female sales professionals was motivated by HR factors:

---

Tellingly, Plaintiffs never asked Chang, when she testified at trial, what she meant by the "make them whole" statement.

96633951

Q. You were asked whether you were opposed to giving a clothing allowance to female sales professionals and you said you were not opposed; correct?

A. Correct.

Q. Why were you not opposed?

A. I was not opposed because for female sales professionals specifically I thought it would -- might be a good tool for retention and to keep us competitive in the market when we're recruiting and competing for talent with other brands that do offer womenswear or unisex.

...

Q. I am asking you in your not being opposed were you considering what the law required, or was it for the reason you just said?

A. It was for the reason that I just said.

(Trial Tr. at 170:6-171:3.)  Tellingly, Plaintiffs did not cross-examine Byron when she testified at trial to ask her why she had favored giving some kind of clothing allowance to female sales professionals.  Plaintiffs' inference also ignores the undisputed evidence that in late 2013 or in 2014, Byron had in fact consulted with outside counsel and confirmed that Varvatos' clothing assistance policy was not in violation of the law.  (*See supra* at 53-55.)

Plaintiffs also relied on an email from Byron, in which, in the context of a discussion regarding AllSaints telling a female sales professional (in the U.S.) that she was entitled to "free clothes" from AllSaints, Byron commented to a colleague:  "I am not sure why All Saints would be providing this information unless they are confusing what *we do in the UK versus here based on local regulations*.  I would appreciate it if you would not share this information regarding the UK with employees."  (Hassan Decl., Exhibit I / Tr. Exhibit 15 (emphasis added).)  There is no basis in Byron's email to reasonably infer her knowledge or reckless disregard of what was required under U.S. laws.  Nor does her desire not to share information about the clothing

61

allowance for female sales professionals in the U.K. with U.S. employees reasonably suggest anything nefarious.  What it reflects is a human resource professional's concerns about employee morale.  Indeed, Byron's response only underscores her (and Varvatos') understanding that a clothing allowance for female sales professionals was required *in the U.K.* – not in the U.S. – based on "local" U.K. regulations.  A jury could not reasonably have inferred otherwise, especially given that Plaintiffs tellingly did not ask Byron about this email, although she appeared and testified at trial. [44]

　　For the reasons set forth above, Varvatos is entitled to judgment as a matter of law that its violation of the EPA and NYEPA (if any), was not willful.[45]  In the alternative, Varvatos is entitled to a new trial on the issue of willfulness, or a remittitur of damages.[46]

---

44. Plaintiffs also relied on some emails in which Chang and Harris responded to female sales professionals inquiring about whether female sales professionals in the U.S. would get some kind of clothing allowance. Plaintiffs asked the jury to infer from these emails that Chang and Harris knew that the policy of not giving a clothing allowance to female sales professionals in the U.S. was "indefensible," and, therefore, they did not defend Varvatos' policy on the "merits," but "stalled."  (*See* Trial Tr. at 613:6-615:5; *see also* Hassan Decl., Exhibit H / Tr. Exhibit 12 (Harris telling a female sales professional that "We're working on something from here, together with HR for clothing allowance for our Women; no promises yet, but I'll keep you posted."); Hassan Decl., Exhibit K / Tr. Exhibit 18 (Chang explaining to a female sales professional that "we do not have a clothing allowance program outside of the 50% discount from All Saints.  We had hoped to be able to roll something out this year, however, does not seem like we will until 2017.").)  Yet nothing in these emails provides a basis to infer that Varvatos knew that its clothing assistance policy was illegal under U.S. law or that Varvatos showed reckless disregard for the law.  Also, in other similar correspondence, Varvatos did explain the "merits" of its clothing assistance policy. (*See, e.g.*, Hassan Decl., Exhibit L / Tr. Exhibit 20 (Chang explaining to Class Representative Knox that "Clothing allowances are provided to male employees only.  Similarly, to compare against one of our peers, Stuart Weitzman does not provide allowances to male employees since they only produce women's footwear.  I understand that this may be disappointing, however, that is our policy at this time.").)

45. Varvatos sought summary judgment on the issue of willfulness (*see* ECF 184 at 20 n.4), and then moved for directed verdict on the same grounds as its summary judgment papers after the close of Plaintiffs' case.  The Court reserved judgment on Varvatos' motion for a directed verdict.  (*See* Trial Tr. at *supra* at 343:3-15.)

46. After the trial, and following additional letter briefing from the parties, the Court determined that the jury's finding of willfulness precluded the Court from exercising its discretion under 29 U.S.C. § 260 to find good faith and reduce or eliminate the award of liquidated damages under the EPA.  (ECF 355; *see also* Hassan Decl. ¶¶ 14-15.)  While Varvatos disagrees with this decision, putting aside the jury's willfulness determination should also allow the Court to make its own determination of good faith under 29 U.S.C. § 260.  (*See supra* at 50-52.)

**D.    The Evidence Does Not Support the Jury's Finding that Plaintiffs Are Entitled to Punitive Damages.**

Varvatos is entitled to a new trial on the issue of whether punitive damages were warranted in this case.  Alternatively, the Court should set aside the jury's award of punitive damages under a motion for a remittitur.

The Court instructed the jury as follows on punitive damages:

> Punitive damages are limited to cases in which the defendant has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual.  Malice and reckless indifference refer to the defendant's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.  A plaintiff may establish the requisite state of mind for an award of punitive damages with (1) evidence that the **defendant discriminated in the face of a perceived risk that its actions violated federal law**, or (2) **evidence of egregious or outrageous acts** that may serve as evidence supporting an inference of the requisite evil motive.  Thus, if you find that Varvatos acted in a good faith belief that it was not violating the law, the standard for punitive damages is not met.[47]

(Hassan Decl., Ex. R / Jury Instructions at 18-19 (emphasis added).)  Here, the jury's award of punitive damages is against the weight of clear evidence and results in miscarriage of justice.

The trial evidence does not support a jury determination that Varvatos discriminated against its female sales professionals "in the face of a perceived risk" that providing a Clothing Allowance to male sales professionals only because of the difference in dress code requirements "violated federal law."  Rather, the same evidence that supports the lack of a willfulness finding, as discussed in detail in Section IV.B. above, also shows that there was no reasonable grounds for Varvatos to believe it was acting in the face of a "perceived risk" of being in violation of U.S.

---

47.  The Court's instructions were based on *United States v. Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir. 2005).  (*See* Feb. 27, 2020 Charging Conference Tr. at 535:1-536:18.)

antidiscrimination laws.  (*See supra* at 53-57.)  The clear weight of this evidence is that there was no grounds for a perceived risk that Varvatos' clothing assistance policy violated U.S. law, and the jury erred in finding that punitive damages were warranted.  *See, e.g., Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 527, 119 S. Ct. 2118, 2120, 144 L. Ed. 2d 494 (1999) ("There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard, as where the employer … discriminates with the distinct belief that its discrimination is lawful.").

Nor is there any evidence that supports a jury determination that Varvatos, in giving a Clothing Allowance to male sales professionals only, engaged in "egregious or outrageous acts" from which an "evil motive" on Varvatos' part against its female sales professionals can be inferred.  The same evidence that supports the lack of a willfulness finding and a lack of "perceived risk" finding also clearly shows the lack of any egregious or outrageous conduct by Varvatos.  *See, e.g.*, *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 102 (2d Cir. 2001) (finding that the plaintiff did not present evidence showing defendant's conscious knowledge or "egregious" or "outrageous" conduct because defendant acted on the advice of counsel).  Additional evidence shows the clear absence of any "egregious or outrageous conduct" by Varvatos as to its female sales professionals.  As also set forth in further detail in Section IV.B. above, this evidence shows the following:  Varvatos hires both men and women as sales professionals; sex plays no role in Varvatos' decision whether or not to hire an applicant for a sales professional position; Varvatos does not discriminate between male and female sales professionals in the hourly wage rate and the commission structure that Varvatos sets for its sales professionals; in fact, female sales professionals were paid on average a dollar more per hour than male sales professionals, and Plaintiff Crouchen admitted that her hourly wage rate was

64

higher than some of her male colleagues; some female sales professionals, including some of the

Plaintiffs, have consistently been among the highest earnings sales professionals; and finally,

although Varvatos does not design or sell women's clothing, and does not require its female sales

professionals to wear clothing from any particular store or season, Varvatos gives its female

sales professional – and not its male sales professionals – the AllSaints discount, which they are

free to use on personal or work clothing and many Plaintiffs have used the discount, including

the Class Representative, Tessa Knox, and testifying Plaintiff Romero.[48]

Therefore, the jury award of punitive damages against Varvatos is against the clear

weight of the evidence and must be set aside to prevent a miscarriage of justice.

### E.    The Jury's Punitive Damages Award Is Excessive.

Under the jury's verdict, Plaintiffs have been awarded $847,041.67 in punitive damages.

This Court may set aside a punitive damages award when the amount is "so high as to shock the

judicial conscience and constitute a denial of justice."  *Lee v. Edwards*, 101 F.3d 805, 808 (2d

Cir. 1996).  Punitive damages "must be reasonable in their amount and rational in light of their

purpose to punish what has occurred and to deter its repetition."  *Vasbinder v. Scott*, 976 F.2d

118, 121 (2d Cir. 1992) (internal citation omitted).  The Supreme Court has laid out three

guideposts for determining whether punitive damages are so excessive as to violate constitutional

due process: (1) the degree of reprehensibility of the tortious conduct, (2) the ratio of the harm or

potential harm suffered due to the defendant's conduct and the punitive damages awarded, and

(3) the difference between this remedy and the civil penalties authorized or imposed in

---

48.  *See supra* at 25-26 (citing to the record as follows:  *See* Trial Tr. at 49:14-18 (Stipulated Facts); *id*. at 393:6-394:18 (Byron) and 221:5-16 (Plaintiff Romero); Hassan Decl., Exhibit C / Tr. Exhibit C (AllSaints Discount Policy.)

comparable cases.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *see also Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 580 (S.D.N.Y. 2011).  The *Gore* court also noted that reprehensibility of a defendant's conduct is "perhaps the most important" factor, and identified certain aggravating factors that are associated with "particularly reprehensibility conduct": (1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Lee*, 101 F.3d at 809 (citing *BMW. Of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)).  Application of the *Gore* factors to the facts of this case should lead the Court to conclude that the jury's punitive damages award of $847,041.67 is excessive because the first and third *Gore* factors lean strongly in favor of Varvatos.

First, none of the factors support a finding that Varvatos' conduct was reprehensible. Varvatos' actions do not involve violence of any kind and there is no evidence – and Plaintiffs have not alleged – that Varvatos' actions caused any harm aside from economic harm.  *See Iannone*, 941 F. Supp. at 414 ("an economic harm may merit a less substantial award than physical or emotional injury.").  Nor did Varvatos act with deceit or malice.  (*See supra* at 53-57.)  Further, the trial record shows that Varvatos has not engaged in repeated instances of misconduct and has otherwise treated its male and female sales professionals equally.  (*See supra* at 25.)  Varvatos' actions do not rise to the level of reprehensibility that warrants almost a million dollars in in punitive damages.

Second, while comparing the punitive damages award in this case to awards in other cases is necessarily of "limited utility" because each award is fact-specific, *Chisholm*, 824 F. Supp. at 580, a comparison with civil penalties in other discrimination cases indicates that

66

Varvatos' discriminatory conduct was not sufficiently reprehensible or egregious to warrant the

jury's punitive damages award.  *See, e.g.*, *MacMillan v. Millennium Broadway Hotel*, 873 F.

Supp. 2d 546, 566 (S.D.N.Y. 2012) (in race discrimination case, after remitting compensatory

damages award from $125,000 to $30,000, remitting $1 million punitive damages award to

$100,000 because, although employer's discriminatory "conduct could be viewed as 'repeated,' "

it was "clear that the [the employer's] conduct did not result in physical injury to [plaintiff], nor

did it evince an indifference to or reckless disregard for the health or safety of others") (internal

quotation marks and citations omitted); *Fernandez v. North Shore Orthopedic Surgery & Sports*

*Medicine, P.C.,* 79 F. Supp. 2d 197 (E.D.N.Y. 2000) (although no compensatory damages had

been awarded, remitting a $100,000 punitive damage award against a medical center to $50,000,

citing lack of reprehensible conduct); *Iannone*, 941 F. Supp. at 414 (remitting a $250,000

punitive damages award to $50,000 where the court found that "[t]he defendant's conduct ... was

by no means as reprehensible as that in many other gender discrimination, sex harassment, and

retaliation cases.").

Moreover, in determining whether a particular punitive damages award is excessive, a

court must keep in mind that "an award should not be so high as to result in the financial ruin of

the defendant." *Vasbinder*, 976 F.2d at 121.  An excessive award, even if warranted, will serve

no punitive purpose, if the defendant cannot financial satisfy the judgment.  Moreover, damage

awards which greatly exceed the defendant's ability to pay result in a waste of time both for the

jury, and later, the bankruptcy courts.  *See Waits v. City of Chicago*, No. 01 C 4010, 2003 WL

21310277, at *6 (N.D. Ill. June 6, 2003) (citing *Kemezy v. Peters*, 79 F.3d 33, 35 (7th Cir.1996)).

Accordingly, courts in this circuit have reduced punitive damages awards for this reason.  *See*

*Holness v. Nat'l Mobile Television, Inc*., No. 09 CV 2601 KAM RML, 2012 WL 1744847, at *6

(E.D.N.Y. Feb. 14, 2012) (reducing punitive damages from $100,000 to $50,000 given

defendants' tenuous financial situation); *Chisholm*, 824 F. Supp. 2d at 580 (reducing an award

from $1 million to $50,000, noting that the $50,000 was a "significant financial hardship" to the

defendant).

Here, the trial record shows that Varvatos is struggling financially and the additional

award of punitive damages will push it further into financial jeopardy, possibly also bankruptcy.

Varvatos' Chief Financial Officer Zorda, testified extensively at trial that Varvatos is struggling

financially.  For example, Zorda testified that Varvatos is not a profitable business – it is not

even breaking even; Varvatos cannot make payments as they become due; it has been late paying

rent for its stores; and, in fact, earlier this year, a landlord of one of the Varvatos stores in Texas

padlocked the store because of a delay in the month's rent.  (*See* Trial Tr. at 686:16-692:21.)

Zorda also testified that Varvatos does not have the liquidity to pay even the compensatory

damages; that Varvatos could borrow to the maximum of $2 million against its revolver or asset-

based facility with Wells Fargo to pay the compensatory damages, but at the expense of paying

its employees, covering their benefits, paying rent or paying any operating expenses for a period

of several weeks.  (*Id*. at 694:7-13; 696:8-697:6; 697:9-15.)  Short of a settlement, the only other

realistic option for Varvatos was filing for bankruptcy.[49]  In these circumstances, the significant

punitive damages of almost $1 million will further compromise Varvatos' financial condition

---

49. Zorda testified that, unable to come up with the money by itself, Varvatos had four options: ask its bank, Wells
Fargo, for the money, ask its parent company, Lion Capital, for the money, reach a settlement with the
plaintiffs, or file for bankruptcy.  (*See* Trial Tr. at 711:7-16.)  He further testified that Wells Fargo was unlikely
to lend Varvatos more money because "they already considered the business insolvent and are looking to Lion
Capital to figure out something with the business to get them out of the loan" (*id*. at 712:16-18); that following
the judgment of compensatory damages on February 28, 2020, Lion Capital had already refused further funding
to Varvatos (*id*. at 712:19-713:1); and that from Lion Capital's perspective, it would be more prudent to let
Varvatos into bankruptcy and that Lion Capital had previously allowed companies they owned to go into
bankruptcy (*id*. at 713:2-714:19).

96633951

and its ability to retain its employees and keep its doors open.  Moreover, as Zorda testified, in the event that Varvatos is forced to file for bankruptcy, there is a real prospect that the ability of Plaintiffs – who will be treated as unsecured creditors – to collect even their compensatory damages will be severely compromised.  (*See id*. at 718:23-720:1.)  In these circumstances, even a nominal award of punitive damages will be sufficient punishment and deterrence.

Accordingly, in the event that the Court determines on this motion that punitive damages are warranted – which as set forth above are not – the Court should order a new trial on the amount of punitive damages; in the alternative, the Court should remit the excessive punitive damages award to a nominal amount of $1,000 per Plaintiff.

## CONCLUSION

For the foregoing reasons, Varvatos respectfully requests that the Court grant the relief requested herein.

Dated:     New York, New York
           April 21, 2020

                                     Respectfully submitted,
                                     HUGHES HUBBARD & REED LLP

                                     By: /s/ Ned H. Bassen

                                     Ned H. Bassen
                                     Amina Hassan
                                     Joanne Liu
                                     HUGHES HUBBARD & REED LLP
                                     One Battery Park Plaza
                                     New York, New York 10004-1482
                                     Telephone:  (212) 837-6000
                                     Facsimile:  (212) 422-4726
                                     ned.bassen@hugheshubbard.com
                                     amina.hassan@hugheshubbard.com
                                     joanne.liu@hugheshubbard.com

                                     *Attorneys for Defendant John Varvatos*
                                     *Enterprises, Inc.*

69