UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TESSA KNOX,                                            :

                    Plaintiff,                    :          <u>OPINION AND ORDER</u>

   -v.-                                               :          17 Civ. 772 (GWG)

JOHN VARVATOS ENTERPRISES INC.,          :

                Defendant.                   :

-----------------------------------------------------------------X

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

      Plaintiff Tessa Knox, on behalf of a class of female "sales professionals" employed by

clothing retailer John Varvatos Enterprises, Inc. ("Varvatos"), brought this action alleging that

Varvatos's clothing allowance policy, which included giving free clothing to male sales

professionals but not female sales professionals, violated various federal and state anti-

discrimination laws.  A jury trial was held in February and March 2020, and the jury returned a

verdict in favor of plaintiffs on all claims.  Judgment was entered in accordance with that verdict.

Varvatos now moves for judgment as a matter of law and/or a new trial or remittitur on various

issues relating to liability and damages.[1]  <u>See</u> Fed. R. Civ. P. 50(a), 59(e).  For the reasons set

forth below, Varvatos's motions are denied, except that the Court orders a new trial or remittitur

on the issues of compensatory and punitive damages.

---

    [1]  Motion for Judgment as a Matter of Law, filed April 21, 2020 (Docket # 374);
Declaration of Amina Hassan in Support, filed April 21, 2020 (Docket # 375) ("Hassan Decl.");
Memorandum of Law in Support, filed April 21, 2020 (Docket # 376) ("Def. Mem.");
Memorandum of Law in Opposition, filed September 9, 2020 (Docket # 392) ("Pl. Mem.");
Memorandum of Law in Support, filed September 25, 2020 (Docket # 397) ("Reply").

I. <u>BACKGROUND</u>

Plaintiffs are a class of 72 current or former female "sales professionals" at Varvatos (<u>see</u> List of Plaintiffs, annexed as Exhibit 15 to Hassan Decl. (Trial Exhibit 45)), a menswear brand. (<u>See</u>, <u>e.g.</u>, Tr. 10).[2]  Plaintiffs brought claims under the federal Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); the New York Equal Pay Act, N.Y. Lab. L. § 194 ("NY EPA"); Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5 ("Title VII"); and the New York Human Rights Law, N.Y. Exec. L. § 296 ("NYHRL") alleging that male sales professionals were given a Clothing Allowance and that female sales professionals were not given equivalent compensation.

As background, the Varvatos dress code required the male sales professionals to wear at least three articles of specified Varvatos-branded clothing while on the sales floor.  <u>See</u> Appearance and Dress Standards at 1, annexed as Exhibit 1 to Hassan Decl. ("Dress Code Policy") (Trial Exhibit A).  It required female sales professionals to wear outfits that were "appropriate for the work environment and representative of the brand."  <u>Id.</u>  To assist the males in complying with the dress code, Varvatos's Clothing Allowance allowed male sales professionals to select and keep Varvatos clothing worth $3000 at retail prices four times per year — once for each season.[3]  The selections were known as "pulls."  (<u>See</u> Tr. 46-47).  Female sales professionals were not provided any free clothing.  (Tr. 47:17-19).  Instead, female sales professionals (and not the males) received a 50 percent discount on women's clothes at "AllSaints," a sister brand of Varvatos.  (Tr. 49:14-16).

---

[2] "Tr." refers to the trial's Transcript, filed on March 5, 2020 at Docket ## 338, 340, 342, 344, 346, and 348.

[3] Male sales professionals at outlet stores were given a pull at half that value.  (Tr. 47:4-6).  Although the jury was presented with the numbers for both retail and outlets stores and gave awards accordingly, we only refer to the retail store amounts in the interest of simplicity.

A trial was held from February 24, 2020 to March 2, 2020.  On February 28, 2020, the jury delivered a verdict in favor of plaintiffs as to liability on all counts, awarded the compensatory damages sought by plaintiffs ($3000 per quarterly pull), and found Varvatos was liable for liquidated damages and punitive damages.  See Verdict Sheet, filed Feb. 28, 2020 (Docket # 334) ("Jury Verdict Sheet # 1").  Following the presentation of additional evidence, the jury fixed the award of liquidated damages at $2500 per quarter and punitive damages at $2500 per quarter.  See Verdict Sheet, filed March 2, 2020 (Docket # 335) ("Jury Verdict Sheet # 2").  On March 23, 2020, a judgment was entered in keeping with the jury's verdict awarding plaintiffs a total judgment of $3,516,051.23.  Docket # 362.

Varvatos now moves for judgment as a matter of law on a number of issues pursuant to Fed. R. Civ. P. 50 and also moves for a new trial on certain issues, or a remittitur on damages, pursuant to Fed. R. Civ. P. 59(a).

II.  APPLICABLE LEGAL PRINCIPLES

A.  Fed. R. Civ. P. 50

Federal Rule of Civil Procedure 50(a) provides:

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
(A) resolve the issue against the party; and
(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Under Fed. R. Civ. P. 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."  Fed. R. Civ. P. 50(b).  In considering a motion under Rule 50, courts have an obligation to "consider the evidence in the light most favorable to the party against whom the motion was made and to give

that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor

from the evidence."  Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001) (citation omitted).

In performing this function, a court cannot "assess the weight of conflicting evidence, pass on

the credibility of the witnesses, or substitute its judgment for that of the jury, and must disregard

all evidence favorable to the moving party that the jury is not required to believe."  Id. (citation

omitted).

     B.  Fed. R. Civ. P. 59

Federal Rule of Civil Procedure 59(a)(1)(A) provides that a court may grant a new trial

"after a jury trial, for any reason for which a new trial has heretofore been granted in an action at

law in federal court."  "The general grounds for a new trial are that (1) the verdict is against the

clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the

admission or rejection of evidence of the giving or refusal of instructions to the jury; or (4)

damages are excessive."  Welch v. United Parcel Service, Inc., 871 F. Supp. 2d 164, 174

(E.D.N.Y. 2012) (citation omitted).

"Unlike judgment as a matter of law, a new trial may be granted even if there is

substantial evidence supporting the jury's verdict."  DLC Management Corp. v. Town of Hyde

Park, 163 F.3d 124, 134 (2d Cir. 1998).  Moreover, "[o]n new trial motions, the trial judge may

weigh the evidence and the credibility of witnesses and need not view the evidence in the light

most favorable to the verdict winner."  Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418

(2d Cir. 2012) (citation omitted).  However,

> trial judges must exercise their ability to weigh credibility with caution and great
> restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility,
> and may not freely substitute his or her assessment of the credibility of witnesses for that
> of the jury simply because the judge disagrees with the jury.

Id. (citation and quotation marks omitted).  Furthermore, when "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice."  Id. at 418-19.  Also, "a trial court should be most reluctant to set aside that which it has previously decided . . . ."  LiButti v. United States, 178 F.3d 114, 118 (2d Cir. 1999).

## III.  DISCUSSION

### A.  Elements of Federal and New York EPA Claims

To prove their EPA claims, the plaintiffs had to "demonstrate that (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions."  E.E.O.C. v. Port Auth. of N.Y. & N.J., 768 F.3d 247, 254-55 (2d Cir. 2014) (alterations omitted) (quoting Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999)).  The parties agreed that male sales professionals and female sales professionals performed work under similar working conditions.  (See Tr. 632:16-17).  Thus, the questions presented to the jury were whether the jobs were substantially equal and whether female sales professionals were paid less than their male counterparts.  Id. at 19-20; see also Jury Verdict Sheet # 1, questions 1-3.

#### 1.  Finding that the Jobs Were Substantially Equal

As to whether the males and females performed jobs requiring equal skill, effort, and responsibility, the parties agreed that the jobs of female sales professional and male sales professional required the same skill.  (Tr. 634:2-4).  Varvatos argues, however, that the jury could not have found that the jobs involved substantially equal effort and responsibility.  Equal effort is the "measurement of the physical or mental exertion needed for the performance of a job."  29 C.F.R. § 1620.16(a); accord Port Auth. of N.Y. & N.J., 768 F.3d at 255.  Equal

responsibility is defined as "the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation."  29 C.F.R. § 1620.17(a); accord Port Auth. of N.Y. & N.J., 768 F.3d at 255.

The only evidence that the jobs of male and female sales professionals differed in any way related to the Varvatos dress code.  There was ample evidence, however, from which the jury could find that the jobs of female and male sales professional otherwise involved "substantially" equal effort and responsibility notwithstanding any difference in dress or responsibilities occasioned by the dress code.  There was a single job description for the job of sales professional.  (Chang: Tr. 98:5-7).  Varvatos's own head of human resources (Chang: Tr. 67:22, 68:3-5) admitted that "both men sales professionals and women sales professionals have to perform all those job responsibilities which are listed under heading job responsibilities" in the job description.  (Chang: Tr. 98:16).  Two sales professionals testified that male sales professionals and female sales professionals had the same job, despite having different dress codes.  (See Romero: Tr. 204:8; Crouchen Tr: 265:24).  This evidence was more than sufficient for the jury to find that the jobs involved substantially equal effort and responsibility.

Varvatos points to testimony that might have influenced the jury to find differently.  See Def. Mem. at 6-17.  But none of this evidence required the jury to make a different finding.  Some of Varvatos's arguments relate to its claim that evidence supported the conclusion that it was more costly for male sales professionals to comply with the dress code policy than for female associates to do so.  Id. at 9.  But the jury could have rationally decided that any alleged cost differential in complying with the dress code was unrelated to the issue of "equal skill, effort, and responsibility."  Port Auth. of N.Y. & N.J., 768 F.3d at 255.  It thus could have relied on the evidence that the day to day, hour by hour, responsibilities of the jobs were substantially

identical.  Also, the jury could easily have found that any evidence regarding male associates

needing to model or occasionally try on clothing, see Def. Mem. at 14-15, or that they had less

"freedom" as to what they wore, id. at 12-14, was inconsequential when evaluating the overall

responsibilities of the job.[4]

Accordingly, the jury had a legally sufficient evidentiary basis to conclude that the jobs

of male sales professional and female sales professional required substantially equal effort and

responsibility.  Furthermore, such a conclusion was not against the weight of the evidence and

thus no new trial is warranted on this issue.  See, e.g., Crockett v. City of N.Y., 2017 WL

1437333, at *16 (E.D.N.Y. Apr. 21, 2017) ("The court finds that the evidence was sufficient for

the jury to decide to choose one side's version of events over the other . . . For these reasons, the

Court finds that the jury's verdict was not against the weight of the evidence."), aff'd, 720 F.

App'x 85 (2d Cir. 2018).

### 2. Finding that Female Sales Professionals Were Paid Less

On the question of whether female sales professionals were paid less than their male

counterparts, the jury was instructed that

> plaintiffs must prove that Varvatos pays its sales professionals who are male more wages
> than it pays sales professionals who are female.  Wages in an Equal Pay Act claim
> include all forms of pay, including the Clothing Allowance and the All Saints discount,
> whether or not anyone actually called them "wages."  In this case, you must compare the
> value of the men's clothing assistance to the value of the women's clothing assistance.

---

[4]  Additionally, plaintiffs presented testimony that to act as an in-store model, nothing
more was required of a male sales professional than to show up to work dressed in accordance
with the dress-code policy.  (Chang: Tr. 108:25).  Moreover, there was evidence that instances
where male sales professionals tried on clothing for purposes of making a sale were isolated and
brief (see Romero: Tr. 211:5, 213:23-25).

(Tr. 636:17-24).  We focus on the issue of the amount of pay that was effectively given to male and female sales professionals in detail in section III.D.1.a.ii below.  For the reasons explained in that section, the jury was entitled to find that, as a result of the implementation of the Clothing Allowance, Varvatos paid male sales professionals more than female sales professionals.  Thus, Varvatos is not entitled to judgment as a matter of law or a new trial on the issue of EPA or NY EPA liability.

B.  Elements of Title VII and NYHRL Claims

In addressing the employment discrimination claims, the jury was instructed that "[a] key difference between the Employment Discrimination claims and the Equal Pay Act claims is that the Employment Discrimination claims require that the plaintiffs show that defendants acted with discriminatory intent, while the Equal Pay Act claims have no such requirement."  (Tr. 637:16-20).  Thus, the jury was instructed that "the plaintiffs must prove that [1] Varvatos paid them less than men and [2] their sex was a motivating or substantial factor in Varvatos's decision to pay them less than men."  (Tr. 637-38).

1.  Finding that Female Sales Professionals Were Paid Less

For the reasons articulated in section III.D.1.a.ii below, the jury could properly conclude that Varvatos paid female sales professionals less than male sales professionals.

2.  Finding of Intentional Discrimination

42 U.S.C. § 2000e-2(a)(1) provides in pertinent part that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . . "  A separate section, 42 U.S.C. § 2000e-2(m), provides that "an unlawful employment practice is established when the complaining party demonstrates

8

that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice."  See also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015) ("an action is 'because of' a plaintiff's race, color, religion, sex, or national origin where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action") (citation omitted).  Here, it was undisputed that the difference in compensation between plaintiffs and male sales professionals aligned exclusively on the sex of the employee.  The Clothing Allowance Policy was unequivocal on this point.  A male employee was given the Clothing Allowance. A female employee was not.  Thus, using any normal meaning of the term "motive," the uncontroverted evidence was that sex was not merely "a" motivating factor in this differential in treatment.  It was the only motivating factor.

Varvatos argues that it did not have an "intent to discriminate against women."  Def. Mem. at 23.  It points to the fact that having males wear Varvatos clothing was a "marketing tool," id., and the only reason it did not give females the Clothing Allowance was because it did not market women's clothing, id. at 23-24.  It argues that this lack of "intent . . . to engage in sex discrimination," is further shown by the fact that it paid men and women the same hourly wages and commissions, id. at 25.

Varvatos's error is assuming that intent to discriminate requires proof of some kind of malevolent bias.  In fact, 42 U.S.C. § 2000e-2(m) requires only that sex was a "motivating" factor for the employment practice, not that the practice arose from a desire to harm the protected class.  As the Supreme Court has squarely held, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy. . . . "  UAW v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991).

This obvious reading of the statute is confirmed here by applying the three-step burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S 792 (1973), which applies to both Title VII and NYSHRL employment discrimination claims, see, e.g., Lenzi v. Systemax, Inc., 944 F.3d 97, 107 n.7 (2d Cir. 2019).  Under that framework, "[a] showing of disparate treatment — that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' — is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case."  Mandell v. Cty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (quoting Graham v. Long Island R.R., 200 F.3d 34, 39 (2d Cir. 2000)).  The burden then shifts to the employer to provide a "legitimate[,] nondiscriminatory" reason for the disparate treatment.  Id. at 380; accord Garcia v. Barclays Capital, Inc., 281 F. Supp. 3d 365, 375 (S.D.N.Y. 2017).  Varvatos's reason for the difference in pay, however, is based entirely on the Clothing Allowance policy, which explicitly discriminates between men and women in that it gives the Clothing Allowance only to male employees, not female employees.  Thus, Varvatos did not give a "nondiscriminatory" explanation for the difference in pay and the inference of discrimination raised under the McDonnell Douglas Corp. framework was never rebutted.  Mandell, 316 F.3d at 380.

As the Supreme Court has noted, "the beneficence of an employer's purpose does not undermine the conclusion that an explicit gender-based policy is sex discrimination . . . ." Johnson Controls, 499 U.S. at 200.  In the end, Varvatos's "policy does not pass the simple test of whether the evidence shows treatment of a person in a manner which but for that person's sex would be different," and thus the jury could reasonably find intentional discrimination.  Id. (citation and quotation marks omitted).

Varvatos argues that the jury could not have made this inference because "courts repeatedly have found that sex-specific dress codes and grooming standards do not themselves discriminate based on sex." Def. Mem. at 26. These cases are irrelevant, however, because, as the Court noted to the attorneys at trial, the plaintiffs never challenged the permissibility of the dress code. (Tr. 488:9-12 ("The issue of whether it's okay for a men's clothing store to require all male sales employees to wear the men's clothing store's clothes in this case is not contested in this case. It is not part of this case.")). And the plaintiffs never argued its applicability to the jury as a basis for finding discrimination or for any other purpose.[5]

C. Varvatos's Affirmative Defenses

Varvatos sought to argue three affirmative defenses to the jury: 1) that any sex discrimination was based on a factor other than sex; 2) that giving the Clothing Allowance only to men constituted a "bona fide occupation qualification" ("BFOQ"); or 3) that the policy was allowed as a "business necessity." Joint Pretrial Order at 6, filed Feb. 20, 2020 (Docket # 330). The affirmative defenses were raised during the charge conference pursuant to Rule 51(b)(2) and the Court refused to instruct the jury on them. (See Tr. 484-488). Varvatos argues that not presenting the first two arguments to the jury was error, and that it is entitled to judgment as a matter of law on these two defenses or, in the alternative, a new trial where it can present these defenses. See Def. Mem. at 27, 31.

---

[5] Defendants argue that plaintiffs' position on intentional discrimination is tantamount to arguing "that a violation of an EPA claim means there is legally sufficient evidence to also support violations of Title VII and NYSHRL claims," Reply at 12. In fact, the vast majority of cases arising under the EPA do not involve jobs where the employer has explicitly used sex as the criterion for affording an employee a monetary benefit. In those rare cases where the employer does so, such as this case, it may well be that proving an EPA claim will normally result in proving a Title VII claim.

1. <u>Factor-Other-than-Sex Defense</u>

Varvatos seeks a new trial based on the Court's refusal to give a charge to the jury as to the EPA and NY EPA claims that the difference in pay between men and women was based on a "factor other than sex." 29 U.S.C. § 206(d)(1)(iv) (permitting difference in pay where "a differential [is] based on any other factor other than sex"); N.Y. Lab. L. § 194(1)(iv) (permitting difference in pay where "a differential [is] based on . . . a bona fide factor other than [sex], such as education, training, or experience").

Varvatos argues that the difference in pay was attributable not to sex but rather to "whether the employee is required to comply with the Varvatos-only dress code." Def. Mem. at 30. By framing the question in these terms — and ignoring that the dress code was based exclusively on sex — Varvatos argues that its implementation of the Clothing Allowance was a "gender-neutral factor." <u>Id.</u>

The flaw in Varvatos's logic is the same as existed for Varvatos's arguments as to intentional discrimination: it fails to recognize that the Clothing Allowance, the policy determining the pay differential, was specifically based on sex. Varvatos seeks comfort in the following quotation from the Second Circuit case of <u>Belfi v. Prendergast</u>: "to successfully establish the 'factor other than sex' defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential." 191 F.3d 129, 136 (2d Cir. 1999) (quoted by Def. Mem. at 27). It argues that it had a legitimate business reason to give the pay differential because only men were "required to comply with the Varvatos-only dress code." Def. Mem. at 28. But as the quotation from <u>Belfi</u> makes plain, a defendant's "legitimate business reason" may only be considered if there was a "gender-neutral" factor that brought about the wage differential. <u>Belfi</u>, 191 F.3d at 136. Here,

the jury could only find that the differential was "brought about" because of the sex of the person receiving the wages.  Id.  As was true in City of Los Angeles, Dep't of Water & Power v. Manhart, 435 U.S. 702 (1978), a factfinder "cannot say" that a "distinction based entirely on sex is based on any other factor other than sex.  Sex is exactly what it is based on."  Manhart, 435 U.S. at 713 (citation and quotation marks omitted).  Varvatos's reference to the fact that "there is no restriction under the law to a defendant's reliance on a factor other than sex defense in a disparate treatment, pay differential case under Title VII," Def. Mem. at 29 (citing Siegel v. Bd. of Educ. Of City Sch. Dist. Of City of New York, 713 F. Supp. 54, 58 (E.D.N.Y. 1989)), is beside the point, because Varvatos presented no evidence of such a factor justifying the wage differential.  Siegel, 713 F. Supp. at 58.  Siegel involved pay differentials between elementary and high school principles.  Id.  There was no claim made in that case that the selection for those jobs was based on sex.  Id.

### 2. Bona Fide Occupational Qualification Defense

Varvatos challenges the Court's refusal to charge the jury on the issue of whether Varvatos had shown a "bona fide occupation qualification" defense.  Def. Mem. at 31.  42 U.S.C. § 2000e-2(e) provides in relevant part:

> it shall not be an unlawful employment practice for an employer to hire and employ employees, . . . on the basis of his . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

Varvatos was not entitled to a jury instruction on this defense because there was no evidence from which it could argue that the defense applied.  The defense applies only to the "hir[ing]" and "employ[ing]" of workers — not to their pay.  As explained by the Ninth Circuit, "this exception does not apply to the full range of possibly discriminatory employment actions" because "[i]t uses only the words 'to hire and employ,' while the earlier section

13

[§ 703(a)] . . . includes a catchall phrase, 'or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment.'" E.E.O.C. v. Fremont Christian Sch., 781 F.2d 1362, 1366 (9th Cir. 1986) (third alteration in original) (quoting 1 L. Larson, Employment Discrimination § 13.00 (1985) at 4-1 to 4-2). The Ninth Circuit noted that it would be a "'mistake[] to invoke the BFOQ exception in a case involving, say, discrimination in pay.'" Id. at 1367 (quoting 1 L. Larson, Employment Discrimination § 13.00 at 4-2). Thus, the defense could not have been found to apply here.

D. Damages/Whether Plaintiffs Were Paid Less Than Male Sales Professionals

What remains to be addressed are various issues that ultimately relate to the award of damages: specifically, (1) the compensatory damage award; (2) the jury's finding as to good faith; (3) the jury's finding as to willfulness; and (4) the entitlement to punitive damages and whether the punitive damage award was excessive. Def. Mem. at 35-69. Except as otherwise stated, the defendant seeks relief both under Rule 50 and Rule 59 as to these issues.

In conducting our review under either rule, we keep in mind that the purpose of a remedy in an employment discrimination suit is to "make the victims of unlawful discrimination whole, and . . . the attainment of this objective . . . requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 582 n.15 (1984) (citation and quotation marks omitted). The purpose of an award of back pay is similarly to make a plaintiff whole, that is, to "completely redress the economic injury the plaintiff has suffered as a result of discrimination." Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 145 (2d Cir.1993) (internal citation and quotation marks omitted). "The 'make-whole' approach requires that victims of discrimination

14

be 'restored to the economic position they would have occupied but for the intervening unlawful conduct of employers.'" Munnelly v. Mem'l Sloan Kettering Cancer Ctr., 741 F. Supp. 60, 62 (S.D.N.Y. 1990) (quoting Rodriguez v. Taylor, 569 F.2d 1231, 1238 (3d Cir. 1977)). "By the same token, the make-whole approach requires that recoveries be calculated in order to prevent plaintiffs from receiving an unwarranted windfall." Id.

Before addressing the four areas, we note that plaintiffs raise a threshold issue as to some of them: namely, whether any arguments under Rule 50 (as opposed to Rule 59) were properly preserved. "Under Rule 50(a), a motion for judgment as a matter of law must first be made before the case is submitted to the jury, and renewed following the verdict pursuant to Rule 50(b)." ING Glob. v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 99 (2d Cir. 2014). "[F]ailure to move under Rule 50(a) has consequences," namely, "the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice." Id. (citation omitted). "Manifest injustice exists where a jury's verdict is wholly without legal support." Id. (citations omitted).

"A post-trial Rule 50(b) motion for judgment as a matter of law is properly made only if a Rule 50(a) motion for judgment as a matter of law has been made before submission of the case to the jury . . . Though a procedural requirement, it may not be waived by the parties or excused by the district court." Bracey v. Bd. of Educ. of City of Bridgeport, 368 F.3d 108, 117 (2d Cir. 2004) (citation omitted). "To ensure that that opportunity is a 'fair' one, . . . Rule 50(a) also provides that '[t]he motion must specify the judgment sought and the law and facts that entitle the movant to the judgment . . . .'" Lore v. City of Syracuse, 670 F.3d 127, 152 (2d Cir.

2012) (quoting Fed. R. Civ. P. 50(a)(2)).  "[T]he specificity requirement is obligatory."  Holmes
v. United States, 85 F.3d 956, 962 (2d Cir. 1996) (citation and quotation marks omitted).

Here, the defendant's motion pursuant to Rule 50(a) was made "for all the reasons that
were set forth in the summary judgment motion."  (Tr. 343:4-5).  The summary judgment
motion, see Memorandum of Law in Support of Defendant John Varvatos Enterprises, Inc.'s
Motion for Summary Judgment, filed May 24, 2018 (Docket # 184) ("SJ Mem."), covered some
but not all of the damages issues.  As to each of the damages issues raised by defendant, we will
address whether any argument under Rule 50 was preserved.

    1.  Whether Plaintiffs Were Paid Less Than Males/Whether the Jury Could
       Properly Award Full Retail Value of the Clothing Allowance as Compensatory
       Back Pay

Varvatos argues (a) that plaintiffs were not paid less than their male counterparts, Def.
Mem. at 17-22; and (b) that the jury could not have awarded the full retail value of the clothing
($3000) per quarter as compensatory damages, id. at 36-49.  The first issue goes to liability and
the second to damages, but since they are so closely related, we discuss them together.[6]  We first
discuss these issues in the context of Rule 50.  We then discuss whether Varvatos is entitled to a
new trial or remittitur as to damages.

---

[6]  We note that it is not clear that Varvatos believes it is capable of winning an argument
under Rule 50 as to issue "(a)" given that its brief argues that the jury's decision on this point
was "against the clear weight of the evidence."  Def. Mem. at 18.  Nonetheless, we will assume
arguendo that it seeks review of issue "(a)" both under Rule 50 and Rule 59.

a. <u>Application of Fed R. Civ. P. 50</u>

i. <u>Preservation</u>

We first address the question of whether these issues have been preserved as required by Rule 50(a)(2).  We look to the arguments made in Varvatos's summary judgment motion because Varvatos relied entirely on that motion in making its Rule 50 motion.  (Tr. 343:4-5).

In its summary judgment motion, Varvatos did address issue "(a)" above: that is, the question of whether the male and female sales professionals received unequal wages, arguing that the wages were equal.  <u>See</u> SJ Mem. at 12-13.  But it never sought summary judgment on issue "(b)" above — that is, that the award could not reach the maximum value of the clothing pull.  Certainly, one of the bases of the argument that the sales professionals' pay was equal derived from Varvatos's contention relating to the value of the clothing pull.  <u>Id.</u>  In that argument, Varvatos argued that the value of the clothing pull was $600 per quarter and that female sales professionals got an extra $200 per month (or $600 per quarter) to compensate for not getting the clothing allowance, and that the two payments cancelled each other out.  <u>Id.</u>  Putting aside the fact that the evidence that plaintiffs were paid an extra $200 per month was never presented at trial, the mention of the clothing pull's value was only in service of the argument that the male and female associates received equal compensation.  Varvatos never sought summary judgment on the specific issue of whether the value of the clothing pull was or was not the retail value.  Indeed, we wonder whether it would have been possible to seek summary judgment on this issue given that it involved merely a potential damage award.  In any

event, we conclude that Varvatos did not preserve the specific argument that the jury could not award the $3000 quarterly pull as damages for purposes of a motion under Fed. R. Civ. P. 50.[7] Thus, we will review argument "(a)" under both Rule 50 and 59.  We will review argument "(b)" only under Rule 59.

As to the merits, Varvatos presents five reasons to argue that the benefit to male sales professionals did not reach the full retail value of $3000: 1) male sales professionals did not receive the full retail value of the clothing allowance in "cash or unencumbered clothing," Def. Mem. at 38; 2) the value of the clothing for the purpose of income tax reporting was not the full retail value of the clothing but rather only 20% of that amount, see id. at 40; 3) female sales professionals did not have out-of-pocket expenses in the amount of the full retail value of the Clothing Allowance given to the male sales professionals, and could comply by spending "less than $1,000 on work clothes, per year," id. at 42; 4) the benefit to male sales professionals was not the full retail value of the clothing because all sales professionals received a Varvatos discount, see id. at 44; and 5) the back-pay award attributes no value to the AllSaints discount which only female sales professionals received, see id. at 46.

Varvatos uses some of these arguments and two other related arguments to argue that the males in fact received no greater benefit from the clothing allowance compared with benefits afforded females: namely, that (6) the pulled clothing experienced "wear and tear as a result of constant wear," and the males had to pay dry cleaning costs, id. at 18-19; and (7) the males did not receive full retail value anyway because they had to pay income tax on the clothing, id. at 19.

---

[7]  Given our finding below that Varvatos is entitled to a new trial on damages under Rule 59, we do not find it necessary to reach the question of whether we should address this issue under Rule 50 to prevent a "manifest injustice."  ING Glob., 757 F.3d at 99.

We next address these arguments as to issues "(a)" and "(b)".

ii.  Whether Plaintiffs Were Paid Less Than Their Male
Counterparts

Many of the arguments raised by Varvatos explaining why the male and female pay was equal could properly have been rejected by the jury out-of-hand.  The fact that Varvatos chose to value the benefit for income tax purposes at its cost, or 20% of the retail value, could not bind the jury as to its own valuation of the Clothing Allowance benefit.  Also, the fact that the males had to pay tax on the benefit would be relevant only if it were assumed that being given the clothing did not amount to a net benefit to the males, a conclusion the jury was free to reject.  That all sales professionals received a Varvatos discount could have been properly ignored by the jury on the ground that the value of the discount was potentially worthless to the female sales professionals if they had no need for men's clothing.  It was also worthless if they did not want to advance their own money to make a purchase of such clothing.  The same is true of the discount offered at AllSaints stores, given that the clothing was identified as expensive, and the females had to advance their own after-tax dollars to take advantage of it.  Moreover, the AllSaints discount had restrictions, such as black-outs for certain periods (see Chang: Tr. 93:19-23, Romero: Tr. 222:2-7), inapplicability to particular items (see Chang: Tr. 90-91; Romero: Tr. 221-22), and having to shop in-store (see Chang: Tr. 92:12-14).  Additionally, plaintiffs presented evidence that AllSaints had sales open to the public of 50% off or more, rendering their own 50% discount without any special value.  (See Chang: Tr. 94:15-17).  Accordingly, the jury did not have to accord any value to the AllSaints discount.

As for the defendant's argument regarding the plaintiffs' out-of-pocket expenses, Def. Mem. at 41-44, it is unclear precisely what point it is trying to make.  It seems that it views the expenses incurred by the females in buying work clothing to be the true measure of damages.

But, as explained further below, the jury did not have to find that the females' outlay to buy clothing was the only measure of the plaintiffs' damages, given that it could have concluded the males were supplied with superior clothing and in greater quantity.

Finally, the jury was not required to find that any wear-and-tear to the clothing pulled by the males or dry-cleaning costs detracted so significantly from its value that each and every pull was effectively worthless — particularly given that there was testimony from one of the defendant's own witnesses that he could sometimes comply with the dress code by wearing clothes from prior seasons (Shears: Tr. 442:16-19) and that he had worn one jacket for nine years (id. 446:7).  In any event, the jurors could use their common sense to conclude that highly expensive clothing from a premier retailer would have a benefit to male employees outside of the season and outside of the sales floor, even if it was worn daily for three months.

What remains is Varvatos's argument that male sales professionals did not receive the full retail value of the clothing allowance in "cash or unencumbered clothing," Def. Mem. at 38.  While there is some force to this argument, as is described in the next section, it is not enough to diminish the value of the clothing pull to zero as a matter of law.  Given that the jury was not required to attribute any value to the AllSaints discount, all it had to do was find that the clothing allowance had some net benefit to the males.  The jury could easily have inferred that the clothing allowance spared the males from having to purchase work clothes in the way they normally would and that the clothes had life outside the workplace that benefited the males.  The jury could also conclude that the females got nothing of value from the Clothing Allowance policy.

Accordingly, Varvatos is not entitled to judgment as a matter of law that male and female sales professionals received the same compensation.  Nor does the weight of the evidence demand a contrary conclusion.

b.  Whether Varvatos Is Entitled to a New Trial under Rule 59 on Damages

We turn to the question of whether the jury's finding that the damages to plaintiffs were the full retail value of the clothing per quarter was against weight of the evidence under Rule 59. We note again that in conducting this analysis, the Court is free to re-weigh the evidence and need not view it in the light most favorable to the plaintiffs.  DLC Management Corp., 163 F.3d at 134.[8]

In addressing this question, our guiding principle is that a compensatory damage award must place the claimant in the position she would have been in had the discriminatory action not occurred.  See Firefighters Local Union No. 1784, 467 U.S. at 582 n.15.  In light of this principle, we ask the following question: what award could the jury make to a female sales professional that would place her in an equivalent position to a male?  Another way to look at this question is to ask: if Varvatos now wanted to treat male and female sales professionals equally, and was limited in doing so to paying a sum of money to the female sales professionals at the time of each quarterly pull, what sum of money should Varvatos's Clothing Policy give a female sales professional in order to put the female sales professional in a position equal to the

_____

[8]  As to one aspect of the various arguments Varvatos presented attacking the compensatory damages verdict — relating to the female sales professionals' "out-of-pocket" expenses — plaintiffs argue that Varvatos "waived" its ability to make this argument by not requesting a jury charge on it or objecting to the jury instructions.  Pl. Mem. at 28-29.  We need not parse whether plaintiffs intended their "waiver" argument to apply to any Rule 59 challenge. It is enough to point out that, unlike Rule 50, Rule 59 does not contain a preservation requirement.  See Giles v. Rhodes, 171 F. Supp. 2d 220, 224 (S.D.N.Y. 2001) ("[Rule 59] contains no pre-requisite to such relief.") (citing cases).

male sales professionals?  We of course ignore the fact that the $3000 pull was taxed to the

males since any money given to a female sales professional would similarly be taxed.

The jury's answer to this question was, in essence, that Varvatos must give each female $3000 in

cash to put the female in the same position as the male.  On close scrutiny, however, we find this

sum to be plainly too much to achieve that goal.

        Plaintiffs view the assessment of the jury's award as a determination that allows the jury

to simply calculate the "market value" of the Clothing Allowance.  E.g., Pl. Mem. at 27.  But to

assess exclusively the "market value" of the clothing at the moment before it was given to the

males ignores all the circumstances attendant to the Clothing Allowance.  Giving $3000 cash in

compensation to a female sales professional means giving her an unrestricted ability to use the

money for any purpose.  But that is not what the Clothing Allowance gave the male sales

professional.  Most importantly, a male sales professional received not cash but clothing.  A

consumer given the choice of goods and the cash needed to purchase those goods will always

find cash more valuable, since it gives her the opportunity to choose what to do with the money.

This is particularly true here, given that it would have cost a female sales professional only

$1050 to purchase the identical clothing on the date that it was given to the males in light of the

65% discount given to all Varvatos employees (Stipulation 9: Tr. 45).  Alternatively, the female

sales professional could have used $1500 of the $3000 cash to obtain $3000 worth of clothing at

the AllSaints store (which was said to be comparable to Varvatos but offered women's clothing

(Chang: Tr. 90-91; Byron: Tr. 393)), leaving her with $1500 in cash that could be spent in an

unrestricted manner.  It would be one thing if the goods given to the males were fungible and

could be re-sold on a market for their full retail value with minimal transaction costs.  But there

was absolutely nothing in the record to suggest that the clothing could be treated in this manner and it does not accord with common sense.

There were additional significant and uncontested limitations on the value of the Clothing Allowance compared with cash.  First, the benefit could be used only for Varvatos-brand clothing.  (Stipulation 18: Tr.46-47).  Second, the clothing could only be clothing that could be worn on the sales floor, and thus not heavy outerwear.  (Stipulation 20: Tr. 47).  Finally, the dress codes for males and females were vastly different.  The male sales professional had to wear Varvatos clothing every day in accordance with certain rules (most obviously, the "three-piece" rule which required three of the following Varvatos items: pants, shirt and either a sweater, jacket or vest).  (Chang: Tr. 79:20-23; Shears Tr. 410:2-4).  Additionally, the males had to wear clothing that was for the particular season in which it was being sold; that is, the males could not wear out-of-season clothing on the sales floor.  (Stipulation 16, 17: Tr 46).

By contrast, the dress code for a female sales professional had no restrictions as to brand and relatively few restrictions as to what she could wear.  (Stipulation 23-28: Tr. 47-49).  It was stipulated that at least some female sales professionals purchased compliant wardrobes for $250 or less per quarter at retail.  (Stipulation 29: Tr. 49).

Taken in this light, there are obviously vast differences between (1) having to comply with a highly costly dress code and receiving clothing to satisfy this code valued at $3000 based on full retail price and (2) having a relatively unrestricted dress code and receiving $3000 in cash.  Given the significant restrictions on the benefit accorded to males, coupled with the mandate of the dress code, the clothing benefit given to the males is manifestly of far less value than a cash payment of $3000 to the females.

Viewed from the plaintiffs' perspective, if awarded $3000, plaintiffs could use the payment to buy any brand of clothing (unlike male sales professionals). They could use it for any type of clothing (unlike male sales professionals). Also, to fulfill their dress code obligation, it would require only a fraction of that amount (less than 10% for some plaintiffs (see Stipulation 29: Tr. 49)) to purchase their work clothes, given that females did not have to comply with the "three-piece" rule (Stipulation 16: Tr. 46). And of course, unlike the men, they would not have to use the benefit for clothing at all.

Plaintiffs' brief contends that "[w]here the discriminatory compensation takes the form of an asset transfer, as opposed to reimbursement for an out-of-pocket expense, the appropriate measure of damages is the value of the asset, not the out-of-pocket expense." Pl. Mem. at 30. We do not disagree with this argument as a general principle. But this statement elides the important question in this case of how the asset (here, the clothes) should be valued. In our view, the "asset" must be valued in relation to how the person receiving the asset could use it, and an effort must be made to determine what it would take for the person unjustly deprived of that asset to be awarded an equivalent.

One way to address that question in this case is to ask the following: how much money would it take for a female sales professional to purchase work clothing at retail prices that matched the value to male sales professionals of the Varvatos clothing they were allocated each quarter?

The plaintiffs might have an argument that $3000 in compensation was necessary to put them in a position equivalent to the males if a jury could reasonably find that the females were required to spend $3000 a quarter in clothing at retail in order to comply with the Varvatos dress code as it applied to females. But the evidence was decidedly to the contrary, given that the

24

males had a far more onerous dress code (requiring quantitively more clothing and far more expensive clothing).  Additionally, it was undisputed that a number of females were able to spend less than $250 per quarter for work clothing to comply with the dress code, even if some paid more  (Stipulation 29: Tr. 49).

This is not to say that an award that attempts to duplicate the plaintiffs' out-of-pocket expenses for work clothing — whether it is $250 or something more— would be sufficient to place females in the same position as males.  There are other factors at play here.  Most importantly, the jury was entitled to conclude (though the evidence on this point was spotty) that a significant part of the value of the clothing to the men was the fact that it could be worn outside the workplace.  In other words, the jury could infer the males obtained a personal benefit from having the clothes, in that they could wear them during their non-work hours.  Given the minimal clothing requirements for females, it could easily conclude that the value outside the workplace of the female-purchased clothing was far less than what was afforded the men by the quarterly pull.  In other words, the jury could conclude that the quality and quantity of the clothing represented in the Varvatos pull was not equivalent to what plaintiffs obtained as a result of paying for their own work clothing, and thus that the clothing had a greater value for the males outside the workplace.

It would of course have been much easier if there was clear evidence in the record as to what may be termed the "collateral" benefit of the clothing pull — that is, how much male sales professionals valued having Varvatos clothing that they could wear during non-work hours, how much time the average piece of clothing was worn at the store vs. worn outside the store, and how many work shifts of wearing clothing resulted in the clothing becoming useless due to wear

and tear.  There was virtually no evidence as to any of these matters.  Nonetheless, the jury could make some judgments on this point based on common sense.

In the end, the jury needed to determine how much money a female would require to purchase a wardrobe compliant with the dress code that was equal in quality to Varvatos clothing and to also end up with the same collateral (i.e., out-of-workplace) benefit of the clothing the males enjoyed.  Ideally, this number also needed to take into account the fact that males were constrained to buy only Varvatos clothing and had to buy the particular articles that conformed with the more onerous dress code.[9]

While a factfinder might use their common sense and shopping experience to answer this question, there was in fact some evidence in the record as to how much it would cost to obtain potentially equivalent clothing.  This evidence was given with reference to the AllSaints store. AllSaints was described as a "sister" store to Varvatos that sold "brand appropriate" clothing (Chang: Tr. 90, 91; see also Byron Tr. 393:8-9 (AllSaints' "clothing had some of the esthetics of the John Varvatos brand")), and we thus can reasonably infer that it carried clothing of similar quality and longevity to that of Varvatos.  While there was no evidence as to how much it would cost to purchase outfits at AllSaints, we could not reasonably infer that a female would require $3000 or more to obtain the equivalent of $3000 in Varvatos clothing.  This is because there was uncontroverted evidence that "[f]rom time to time All Saints has sales which are more than 50 percent."  (Chang: Tr. 94:15-16).  As a result, we may infer that a $1500 cash payment to

---

[9]  While having once thought otherwise, the Court agrees with plaintiffs that the answer is not necessarily the $4200 that it would have cost females to purchase $12,000 in Varvatos clothing using their employee discount.  After all, a female sales professional would understandably have little interest in purchasing male clothing and the clothing could not have been used to satisfy the Varvatos female dress code.

females would allow for the purchase of an AllSaints wardrobe valued at $3000 retail.  The fact that the AllSaints sales were only "[f]rom time to time" roughly approximates the fact that the "pulls" for the males occurred only four times a year.  The equivalence is not perfect since the limitations on what clothing could be pulled by males at Varvatos was significant, while cash used at AllSaints can be used to purchase any item.

The $1500 is arguably a ceiling on damages since the males have to actually wear far more items of clothing because of the three-piece rule than the females, who need only wear one piece of clothing.  Thus, the wear-and-tear to the clothing was necessarily going to be greater for the males than for the females, thereby decreasing the longevity of the clothes for the males and decreasing their collateral non-workplace value compared with the females.

After considering all the evidence, and given the stark disparity in real value of the quarterly clothing pull to the males and a cash payment of $3000 to the females, we find that the jury could not have found that $3000 in cash represented compensation that would put the female sales associates in the "position where they would have been were it not for the unlawful discrimination." Firefighters Local Union No. 1784, 467 U.S. at 582 n.15 (citation and quotation marks omitted).  Indeed, were Varvatos to institute today a corporate policy of giving each female sales professionals the same compensation the jury awarded — that is, $3000 per quarter or $12,000 per year in cash — and limiting the males to pulling clothing worth $3000 retail (which of course they could purchase for $1050), and subjecting the males to the more onerous dress code, the male sales professionals would have a strong Equal Pay Act or Title VII suit against Varvatos based on the obvious disparity in compensation.

For these reasons, the Court concludes that the jury's verdict was against the weight of the evidence and Varvatos is entitled to a new trial on the issue of compensatory damages.

c. Remittitur

The Court has the option of offering remittitur in cases where a damages verdict is

against the weight of the evidence.  As the Second Circuit has explained:

> The trial judge has "'discretion to grant a new trial if the verdict appears to [the judge] to
> be against the weight of the evidence.' . . .  This discretion includes overturning verdicts
> for excessiveness and ordering a new trial without qualification, or conditioned on the
> verdict winner's refusal to agree to a reduction (remittitur)."  Gasperini v. Center for
> Humanities, Inc., 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (quoting
> Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 540, 78 S.Ct. 893, 2
> L.Ed.2d 953 (1958)).  The district court has authority to enter a conditional order of
> remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and
> a new trial, in at least two distinct kinds of cases:
>
>> "(1) where the court can identify an error that caused the jury to include in the
>> verdict a quantifiable amount that should be stricken, . . . and (2) more generally,
>> where the award is 'intrinsically excessive' in the sense of being greater than the
>> amount a reasonable jury could have awarded, although the surplus cannot be
>> ascribed to a particular, quantifiable error."
>
> Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 337 (2d Cir.1993)
> (quoting Shu–Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2d Cir.1984)).
> Where there is no particular discernable error, we have generally held that a jury's
> damage award may not be set aside as excessive unless "'the award is so high as to shock
> the judicial conscience and constitute a denial of justice,'" O'Neill v. Krzeminski, 839
> F.2d 9, 13 (2d Cir.1988) (quoting Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir.1978)).
> Where the court has identified a specific error, however, the court may set aside the
> resulting award even if its amount does not "shock the conscience."

Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir. 1998).  For the reasons already stated, our

view is that the jury's decision was based on an error — and one that was specifically invited by

plaintiffs' counsel in their closing argument: namely, that the retail value of the clothing given to

the men was an appropriate measure of damages.  (See Tr. 606:13-15) ("To treat the men and

women equally you have to award the women enough money to go out and buy $12,000 a year

of clothing at retail.  That's $3,000 a quarter or $3,000 a pull."))  We thus do not need to evaluate

the award based on the "shock the conscience standard," though we would find the standard met

in this case given the severe disconnect between the damages awarded and the provable damages incurred.

In weighing the evidence for purposes of determining an appropriate remittitur amount, we have attempted to view this from the following perspective: what should a payment to a female sales professional be such that, if a person had the choice of being assigned the role of female sales professional or male sales professional, that person would feel that there was no difference between being a male and female sales professional from a monetary perspective — that the person would be just as likely to voluntarily take the place of a male or a female from a monetary perspective?

We recognize that there is a wide range of sums that a jury could appropriately fix in an effort to answer that question. A jury might reasonably have awarded a sum of money close to the range of $250 per quarter if it viewed the Varvatos clothing as having no value to the men outside the workplace. But in an effort to respect the jury's obvious intention to award at the high end of any permissible range, and for the reasons stated in the previous section, we conclude that an award of $1500 per quarter would be a reasonable award at the very high end of the range of permissible awards. Accordingly, the Court grants defendant a new trial on the issue of damages, unless plaintiffs accept a remittitur of the compensatory damages award in the amount of $1500 per quarter.[10]

---

[10] As explained in footnote 3 above, this means a remittitur in the compensatory damages award to employees of outlet stores from $1500 to $750.

2. <u>Good Faith Defense to Liquidated Damages</u>

a. <u>The Court's Refusal to Determine Good Faith</u>

The parties agreed to the following: the issue of "good faith" under the EPA was a question for the Court, <u>see</u> Transcript of Proceedings at 7:12-13, filed Feb. 27, 2020 (Docket # 332) ("Pre-Trial Conf."); the issue of "willfulness" under the EPA was a question for the jury, <u>see</u> Def. Mem. at 56; Pl. Mem. at 36; and the issues of "good faith" and "willfulness" under the NY EPA were questions for the jury, Pre-Trial Conf. at 7:14. This left a dispute regarding in what sequence the findings of "good faith" and "willfulness" should be made. <u>See id.</u> at 7:20-21.

The Court decided to submit the issues of willfulness and good faith to the jury without making its own ruling, and the jury found that Varvatos did not act in good faith and that its violation was willful. <u>See</u> Jury Verdict Sheet # 1 at 4. The parties then disputed whether the Court could and/or should find that Varvatos acted in good faith under the EPA. <u>See</u> Joint Letter, filed March 6, 2020 (Docket # 350). In a written order, the Court concluded that it lacked the power to make such a finding, stating:

> We recognize that there is no controlling authority from the Second Circuit on the issue of whether this Court is bound by the jury's finding of wil[l]fulness for purposes of determining whether Varvatos acted in good faith and had reasonable grounds for believing that its payment decisions were not a violation of the federal Equal Pay Act under 29 U.S.C. § 260. In the end, we find the reasoning of cases holding that the Court is bound by the jury's finding of wil[l]fulness to be more persuasive. <u>See</u>, <u>e.g.</u>, <u>Perry v. City of N. Y.</u>, 2019 WL 7047327, at *3 (S.D.N.Y. Dec. 23, 2019).

Order at 1, dated March 11, 2020 (Docket # 355). We continue to find the holding in <u>Perry</u> more persuasive than the arguments Varvatos raises, and thus stand by the conclusion that the Court is

bound by the jury's determinations.  Accordingly, this Court cannot make its own good faith

determination and, as a result, cannot decline to award liquidated damages under the EPA.[11]

> b.  Good Faith Findings

Varvatos argues that it is entitled to judgment as a matter of law under Rule 50 or a new

trial under Rule 59 on the ground that the evidence could only allow a conclusion that it was

acting under the good-faith belief that the Clothing Allowance was legally permissible.  See Def.

Mem. at 51-56.  Plaintiffs have not argued that defendant failed to preserve their Rule 50

argument.  Thus, we address the issue under both standards.

Good faith has two prongs: first, a defendant must produce "'plain and substantial

evidence of at least an honest intention to ascertain what the Act requires and to comply with

it,'" Reich v. S. New England Telecomms. Corp., 121 F.3d 58, 71 (2d Cir. 1997) (quoting Brock

v. Wilamowsky, 833 F.2d 11, 19 (2d Cir. 1987)); and second, the defendant must "demonstrate

objectively reasonable grounds for believing that [it] was in compliance with the [law]," Herman

v. RSR Sec. Servs. Ltd., 172 F.3d 132, 143 (2d Cir. 1999).

The Second Circuit has held:

> "Good faith" in this context requires more than ignorance of the prevailing law or
> uncertainty about its development.  It requires that an employer first take active steps to
> ascertain the dictates of the [statute] and then move to comply with them.  See Cooper
> Elec., 940 F.2d at 908.  See also Williams v. Tri–County Growers, Inc., 747 F.2d 121,
> 129 (3d Cir.1984).  That [the defendant] did not purposefully violate the provisions of the
> [statute] is not sufficient to establish that it acted in good faith.  Cooper Elec., 940 F.2d at
> 909.  Nor is good faith demonstrated by the absence of complaints on the part of
> employees, see Tri–County Growers, 747 F.2d at 129, or simple conformity with
> industry-wide practice. see Cooper Elec., 940 F.2d at 910; Wilamowsky, 833 F.2d at 19-
> 20.

---

[11]  Plaintiffs assert as a threshold argument that this issue cannot be reached because the
Court's prior ruling is the subject of a pending notice of appeal.  Pl. Mem. at 37.  In light of our
ruling, it is not necessary to reach this question.

<u>Reich</u>, 121 F.3d at 71.

In support of its good faith argument, Varvatos points to evidence that it consulted outside counsel regarding the dress-code policy and the Clothing Allowance.  Def. Mem. at 51-56.  This evidence included the testimony of Ann Byron who said she "personally" "consulted with an outside attorney regarding the issue of whether Varvatos giving a clothing allowance to male sales professionals and not female sales professionals would be legal under U.S. law . . . [i]n probably late 2013 or January of 2014."  (Byron: Tr. 368).  She then testified that "after that conversation . . . [she] fe[lt] confident that Varvatos was not violating any U.S. laws regarding discrimination by providing the clothing allowance to male sales professionals only" and she conveyed this impression to "Ben Harris," vice president of retail (Byron: Tr. 369, 375), and "Wayne Meichner, . . . president of retail; Christiano Quieti, . . . president and CEO of the company; and John Varvatos, the chairman," plus "Nicole Chang" (Byron: Tr. 376).  Chang corroborated this testimony, saying that after speaking with Byron she understood that Varvatos was "legally compliant."  (Chang: Tr. 168:20).  Byron also testified that most versions of the Varvatos dress code, which made reference to the male-sales-professional-only Clothing Allowance, were reviewed and approved by outside counsel.  (<u>See</u> Byron: Tr. 381:3-11).

Reliance on advice of counsel certainly can provide the basis for a good faith defense.  <u>See</u> <u>Ruggles v. Wellpoint, Inc.</u>, 2010 WL 11579429, at *4 (N.D.N.Y. May 28, 2010).  The testimony in this case, however, failed to identify what exactly Varvatos told its attorneys and what exactly those attorneys told Varvatos — a critical omission.  The testimony also lacked such obviously relevant details as the identity of outside counsel, his or her credentials, and the context or length of their discussion.  Also, any advice was only in oral, not written, form (Byron: Tr. 368:23-25), which a juror might assume is the normal way that attorney advice on

important issues is given, even if it is not legally required.  In the end, the jury could appropriately disbelieve that Varvatos had given counsel a full explanation of all the facts and thus conclude that Byron's testimony — that after speaking to counsel she "fe[lt] confident that Varvatos was not violating any U.S. laws" (Byron: Tr. 369:1-5) — was unjustified.

Defendant also points to the fact that Varvatos was aware of other retailers giving clothing allowances to employees of a single sex.  Def. Mem. at 54 n.38 (incorporating Def. Mem. at 56-62); (see also Chang: Tr. 195:1-2, Crouchen: Tr. 251:11-14, Byron: Tr. 354-55). However, without more information on exactly how the programs worked at other retailers, the jury could properly give this evidence little weight.  See Reich, 121 F.3d at 71 ("good faith" not shown by "simple conformity with industry-wide practice").

Notably plaintiffs presented evidence of female sales professionals complaining to Varvatos about the lack of a comparable benefit for females, which made no impact on Varvatos's decision.  See, e.g., Chang: Tr. 149-150; Emails between Ben Harris and Tanya Sergei, annexed as Exhibit 8 to Hassan Decl. ("Sergei Emails") (Trial Exhibit 12); Emails from Laurentina Chapparro, annexed as Exhibit 11 to Hassan Decl. ("Chaparro Emails") (Trial Exhibit 18); Tessa Knox Emails, annexed as Exhibit 12 to Hassan Decl. (Trial Exhibit 20).  Indeed, Chang testified that the reason why no clothing allowance was given to women was that Varvatos "realized that it wasn't financially feasible for us to do it" and that "at that moment it stopped right there."  (Chang: Tr. 142:7-9).  The jury could also have relied on the fact that on some dates Varvatos strung female sales professionals along with the suggestion that a clothing allowance was in the works.  See, e.g., Chang: Tr. 149-150; Sergei Emails; Chaparro Emails.

In sum, given the odd and truncated testimony as to Varvatos's conversations with its attorneys, the lack of clarity as to what exactly the other retailers' policies consisted of, the

significant disparity in the benefits given to males and females, and Varvatos's view that it was not "financially feasible" to give a clothing allowance to the females, the jury could properly reach its conclusion that Varvatos did not act in good faith. Thus, Varvatos is not entitled to a judgment as a matter of law under Rule 50 that it acted in good faith.

As to its argument under Rule 59, this is a much closer question. But unlike the ruling as to damages, any ruling contrary to the jury's verdict would require the Court to disregard the jury's apparent refusal to fully credit the testimony of the Varvatos witnesses as to their interactions with counsel. As already noted, in such a case, a verdict "generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." Raedle, 670 F.3d at 418-19. While the Court might not have come out the same way as the jury, we cannot find that this high standard is met. Accordingly, we deny the motion for a new trial on the issue of "good faith."

### 3. Willfulness

Regarding willfulness, the jury was instructed:

> [I]f you find that the plaintiffs have proven by a preponderance of the evidence that Varvatos knew or showed a reckless disregard [f]or whether or not its compensation of female sales professionals was prohibited by law, you will find that it acted willfully. You may find that Varvatos acted willfully even if you find that Varvatos did not act with an intent to violate the law in determining its legal obligation as to how to pay the female sales professionals. This is because the willfulness can be shown that a defendant acted with a reckless disregard for the law. However, if you find that Varvatos acted unreasonably but not recklessly in determining its obligation as to how to pay the female sales professionals, you must find that its actions were not willful.

(Tr. 643:4-16). For reasons already discussed with respect to the jury finding that Varvatos did not act in "good faith," the Court concludes that Varvatos is not entitled to a judgment as a matter of law or a new trial on willfulness. Given the finding of a lack of good faith, the jury necessarily found, per the jury instruction, that Varvatos did not show it harbored "an honest intention to comply with the law." (Tr. 643:18-19). Accepting that Varvatos had no honest

intention to comply with the law, it is not clear that anything more need be established to prove

that Varvatos showed a "reckless disregard [f]or whether or not its compensation of female sales

professionals was prohibited by law." (Id. 643:6-7.) But to the extent anything more or different

need be established, for the same reasons we have already stated, Varvatos is not entitled to

judgment as a matter of law on this question or a new trial.[12]

    4. Punitive Damages

Plaintiffs argue that Varvatos cannot move under Rule 50 for judgment as a matter of law

on the plaintiffs' entitlement to punitive damages because it did not raise the issue in its

summary judgment motion. See Pl. Mem. at 42. Varvatos concedes as much, stating that it is

moving for a new trial (or, in the alternative, remittitur) under Rule 59 only. See Def. Mem. at

63; Reply at 33.[13] We thus consider Varvatos's argument only under Rule 59.

    a. Finding that Plaintiffs are Entitled to Punitive Damages

To obtain punitive damages, a plaintiff has two options:

> A plaintiff may establish the requisite state of mind for an award of punitive damages
> with evidence (1) that the defendant "discriminate[d] in the face of a perceived risk that
> its actions . . . violate[d] federal law," Kolstad, 527 U.S. at 536, 119 S.Ct. 2118, or (2) of
> "egregious or outrageous acts" that "may serve as evidence supporting an inference of the
> requisite 'evil motive.'" Farias, 259 F.3d at 101 (internal quotation marks and alteration
> omitted) (quoting Kolstad, 527 U.S. at 538, 119 S.Ct. 2118).

---

[12] Varvatos has not sought review of the amount of liquidated damages awarded by the jury as a result of the willfulness finding.

[13] Varvatos argues that "insofar as the tests for willfulness and propriety for awarding punitive damages are based on recklessness, Varvatos also effectively preserved for a Rule 50(b) motion its argument that Plaintiffs are not entitled to punitive damages because it preserved its willfulness argument." Reply at 33-34. It is unnecessary to reach this contention, however, because, for the reasons already discussed, the Court has found no basis for disturbing the jury's verdict on willfulness.

United States v. Space Hunters, Inc., 429 F.3d 416, 427 (2d Cir. 2005); accord Kennedy v.

Supreme Forest Prod., Inc., 761 F. App'x 72, 75 (2d Cir. 2019).

For essentially the same reasons that it was not against the weight of the evidence for the

jury to find Varvatos lacked good faith and was willful in discriminating against female sales

professionals, see sections III.D.2 and III.D.3 above, it was also not against the weight of the

evidence for the jury to conclude plaintiffs were entitled to punitive damages.  As already noted,

given the unclear testimony as to Varvatos's conversations with its attorneys, the lack of details

as to what the other retailers' policies consisted of, the jury's view that there was a plain

disparity in the benefits given to males and females, and Varvatos's view that it was not

"financially feasible" to give a clothing allowance to the females, the jury could properly reach

its conclusion that Varvatos "discriminate[d] in the face of a perceived risk that its

actions . . . violate[d] federal law," Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999).

### b.  Amount of Punitive Damages

The jury was instructed as follows as to the amount of punitive damages:

> As you may recall, the purpose of punitive damages is to punish Varvatos for what it did
> and to deter its repetition by Varvatos and others.  In determining the amount of punitive
> damages, you should consider all relevant factors such as the impact or severity of the
> defendant's conduct and the amount of compensatory damages.  Also, any award of
> punitive damages must be proportionate to the plaintiffs' actual injury.  The purposes of
> punitive damages should be kept in mind as you determine the appropriate sum of money
> to be awarded as punitive damages.  That is, in fixing the sum to be awarded, you should
> consider the degree to which Varvatos should be punished for its wrongful conduct and
> the degree to which an award of one sum or another will deter Varvatos and others like it
> from committing wrongful acts in the future.

(Tr. 791:11-24).

In an action brought under a federal statute, a court's review of a punitive damages award

has both a "supervisory" component and a constitutional component.  Turley v. ISG

Lackawanna, Inc., 774 F.3d 140, 164 (2d Cir. 2014).  Under the "supervisory" component, "a

36

degree of excessiveness less extreme than 'grossly excessive'" will suffice to order a new trial or remittitur of damages.  Id. (citing Payne v. Jones, 711 F.3d 85, 97 (2d Cir. 2013)).  The goal of the court on supervisory review is to ensure that punitive damages are "fair, reasonable, predictable, and proportionate."  Id. (quoting Payne, 711 F.3d at 93).

The court's review as to whether a punitive damages award violates the Due Process clause of the Constitution is more stringent, requiring a showing of "gross" excessiveness.  Id. The Due Process review involves the consideration of three factors: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003) (citation omitted); accord Kennedy, 761 F. App'x at 76.

Nonetheless, even though review for excessiveness is more deferential in the non-constitutional (that is, supervisory) context, the Second Circuit has held that the "three 'guideposts' for reviewing punitive damages awards . . . apply irrespective of whether our review is constitutional or supervisory in nature."  Turley, 774 F.3d at 165.

Turning to these guideposts, given that the jury found punitive damages appropriate, and given that there was evidence to support that determination, the Court agrees that a jury could find that the defendant's conduct was "reprehensible."  The degree of that "reprehensibility," however, is open to debate.  Varvatos correctly points out that the Clothing Allowance policy reflects few, if any, of the characteristics emphasized by the Supreme Court in BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575-76 (1996), and State Farm, 538 U.S. at 419, such as violence, deceit, greed, and repeat offenses.  See Def. Mem. at 65-67.  As the same time, as plaintiffs point

out, Varvatos's discriminatory policy was widespread — spanning the 72 plaintiffs across several years and different states — and there was evidence that it was profit-driven inasmuch as a 2013 discussion about giving female sales professionals a clothing allowance was ended due to cost.  See Pl. Mem. at 44 (citing (Tr. 133, 141-142)).  Furthermore, the jury could find that Varvatos was deceitful in dealing with its female sales professionals who complained about the discrepancy between male and female clothing allowances by telling them at one point that a female sales professional clothing allowance was in the works, see, e.g., Chang: Tr. 149-150; Sergei Emails; Chaparro Emails, even though it never came to fruition.  On balance, however, we cannot say that the degree of reprehensibility is at the high end.

As to the remaining factors, the punitive damage award was $2500 per quarter, which is approximately 83% of the compensatory damage award of $3000 per quarter.  See Jury Verdict Sheet # 1; Jury Verdict Sheet # 2.  If plaintiffs accept the remittitur, it would be 167% of the compensatory damage award.  If we factor in compensatory and liquidated damages, the jury awarded $2,669,009.56 in compensatory damages compared with $847,041.67 in punitive damages, Pl. Mem. at 43, which means the punitive damage award is approximately 32% of the total of compensatory and liquidated damages.  While this number will rise to some degree if the remittitur is accepted, it will still be far less than the punitive sanctions sometimes reversed by courts that involve a multiple of the compensatory damage award.  See State Farm, 538 U.S. at 425 (noting "long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish").  Second, the most a single plaintiff would be awarded in punitive damages would be $50,000, see John Varvatos Collective and Class Action Damage Calculation, annexed as Exhibit 19 to Hassan Decl. (Joy Fusaro).  Thus, the punitive damages award on a per plaintiff basis is less than the

38

damages caps of Title VII and the NY EPA applicable to a single employee.  See 42 U.S.C.

§ 1981a(b)(3)(B)-(C) (Title VII statutory cap for employers with more than 100 but fewer than

201 employees is $100,000 and for more than 200 but fewer than 500 is $200,000); N.Y. Lab. L.

§ 198(1-a) (NY EPA statutory cap is 300% of backpay for willful violation).  This fact "bears

particular importance here, because 'only where an award would shock the judicial conscience

and constitute a denial of justice, for example because it would result in financial ruin of the

defendant or constitute a disproportionately large percentage of a defendant's net worth and

thereby violate due process, should the court reduce an award of punitive damages to below the

appropriate [statutory] cap.'"  Kennedy, 761 F. App'x at 77 (quoting Luciano v. Olsten Corp.,

110 F.3d 210, 221 (2d Cir. 1997)).

As to Varvatos's argument that such a large punitive damages award would result in

"financial ruin," see Def. Mem. at 67 (quoting Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir.

1992)), this factor is of limited relevance given that Varvatos is now in bankruptcy and thus the

Bankruptcy Court will ultimately have control over the implementation of any judgment and will

be able to relieve Varvatos of any non-financially-sustainable burden resulting from the

judgment.[14]

As a result of the above analysis, we have no doubt that the punitive damage award

comports with a constitutional review for excessiveness under the Due Process clause.

Nonetheless, our review here is also pursuant to the Court's supervisory power.  While under

Rule 59, jury awards of damages are normally evaluated as to whether they are "excessive," for

the reasons stated below this is a case that does not necessarily call for review under the

---

[14]  The Bankruptcy Court has permitted plaintiffs to continue the litigation of this lawsuit.
See Letter from William Dunnegan, filed September 4, 2020 (Docket # 391).

"excessive" prong of a Rule 59 analysis.  Rather, this is the unusual case in which we must consider whether a damage award reflects "an error that caused the jury to include in the verdict a quantifiable amount that should be stricken."  Trademark Research Corp., 995 F.2d at 337.

By agreement of the parties, the jury did not make an overall award of punitive damages against Varvatos.  Instead it awarded punitive damages on a per-quarter basis.  See Jury Sheet # 2 at 1.  Critically, the jury apparently tied the punitive damages award to a "quantifiable amount" --- specifically, the compensatory damages award.  That link is reflected first in the structure of the jury verdict sheet itself, which required the jurors to consider the award on a per quarter basis.  Moreover, in his summation arguing for punitive damages, plaintiffs' counsel noted that he was "asking [the jury to] determine the proper relationship between the compensatory damages that you awarded last Friday and the liquidated and the punitive damages that you are going to award today."  (Tr. 784:22-24).  Counsel reminded the jurors that "[y]ou found that damages of $3,000 per pull were appropriate for retail stores," and urged them to pick "a multiple of those amounts that you have already awarded and ask whether it is too much or too little to deter Varvatos from engaging in this conduct and whether it is enough to punish Varvatos from engaging in this conduct."  (Tr. 788:8-14).  Counsel suggested that the jury award "punitive damages of at least two times the compensatory damages that you've already awarded."  (Tr. 789:16-17).  Because liquidated damages were already being awarded, counsel suggested that the jury award in punitive damages the exact amount of compensatory damages the jury had awarded, or "$3,000 per pull."  (Tr. 789:22-23).

The jury of course awarded less than the amount of compensatory damages, or $2500 per pull.  See Jury Verdict Sheet # 2 at 1.  But having found that the compensatory damage number is excessive, it is clear that the jury's verdict as to punitive damages rested on an error: that is,

the error of assuming that the compensatory damage award could appropriately be fixed at $3000.  As we have already explained at length, however, the $3000 compensatory award verdict cannot stand.  Because the punitive damage award was entirely dependent on this finding, we conclude that, if the punitive award is left undisturbed, it will for all practical intents and purposes rest on "an error that caused the jury to include in the verdict a quantifiable amount that should be stricken."  Trademark Research Corp., 995 F.2d at 337.  Indeed, leaving the punitive damage award intact would thwart the jury's obvious intention to fix an award of punitive damages at 83% of the compensatory damage award.  Accordingly, a new trial is ordered on the issue of the amount of punitive damages unless the plaintiffs accept a concomitant reduction in the punitive damage award — that is, to $1250 per quarter. [15]

***

In sum, Varvatos is not entitled to judgment as a matter of law or a new trial except that is entitled to a new trial as to the issue of compensatory and punitive damages, unless plaintiffs accept the proposed remittitur.

IV.  CONCLUSION

For the foregoing reasons, John Varvatos Enterprises, Inc.'s motion (Docket # 374) is denied except that defendant is granted a new trial on the issue of compensatory and punitive damages unless the plaintiffs agree in a writing filed on the docket within 21 days to accept the remittitur described above.  If plaintiffs accept the remittitur, they shall thereafter consult with defendant and submit a new proposed amended judgment consistent with the remittitur.  If they do not accept, they shall so report to the Court and the Court will (1) set a deadline for the filing

---

[15]  As explained in footnote 3 above, this means a remittitur in the punitive damages award to employees of outlet stores from $1250 to $625.

of revised pretrial materials and (2) set a trial date on the issue of compensatory and punitive

damages to take place at a time when jury trials in the courthouse resume.

SO ORDERED.

Dated: January 12, 2021
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge