UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
TESSA KNOX,                                          :

                       Plaintiff,                :          17 Civ. 772 (GWG)

     -v.-                                          :          OPINION AND ORDER

JOHN VARVATOS ENTERPRISES INC.,      :

                Defendant.                    :

-------------------------------------------------------------X

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

        Plaintiff Tessa Knox, on behalf of a certified class of female salespeople, along with 13

other plaintiffs, brought this action against John Varvatos Enterprises, Inc., alleging that

Varvatos's policy of giving a clothing allowance to male salespeople but not female salespeople

violates various federal and state equal pay and anti-discrimination laws.  After a six-day jury

trial, the jury returned a verdict in favor of plaintiffs on all claims.  Varvatos moved to set aside

the judgment or for a new trial.  The Court granted the motion for a new trial on damages but

offered plaintiffs a remittitur, Knox v. John Varvatos Enterprises Inc., --- F. Supp. 3d. ----, 2021

WL 95914 (S.D.N.Y. Jan. 12, 2021), which plaintiffs accepted.  Plaintiffs now seek attorney's

fees of $1,730,304.50 and costs of $14,287.21.[1]  They also seek a service payment to Knox of

---

[1]  Motion for Attorney Fees and an Award of Attorneys Fees and an Incentive Fee for
Tessa Knox as Class Representative from the Punitive Damages Fund, filed April 2, 2020
(Docket # 367); Memorandum of Law in Support, filed April 2, 2020 (Docket # 368) ("Supp.
Mem."); Declaration of Tessa Knox in Support, filed April 2, 2020 (Docket # 369) ("Knox
Decl."); Declaration of William Dunnegan in Support, filed April 2, 2020 (Docket # 370)
("Dunnegan Decl."); Memorandum of Law in Opposition, filed April 24, 2020 (Docket # 383)
("Opp. Mem."); Declaration of Amina Hassan in Opposition, filed April 24, 2020 (Docket # 384)
("Hassan Decl."); Reply Memorandum of Law in Support, filed May 1, 2020 (Docket # 388)
("Reply"); Joint Letter, filed January 27, 2021 (Docket # 401) ("Jan. 27 Let."); Letter from
William Dunnegan, filed February 4, 2021 (Docket # 405).

$300,000 from the punitive damages award and an additional award of attorney's fees between $50,000 and $125,000 from the punitive damages award.

For the reasons stated below, plaintiffs are awarded a total of $748,321.21 in statutory attorney's fees and costs to be paid by Varvatos, and an additional $105,880.21 in attorney's fees to be paid from the damages verdict allocated to punitive damages, for a total of $854,201.42. Also, Knox is awarded a service payment of $20,000 from the punitive damages award.

I.  PROCEDURAL BACKGROUND

Plaintiffs filed this action on February 1, 2017.  (Docket # 1).  After discovery and motion practice, including the granting of a motion for class certification, both parties moved for summary judgment (Docket ## 177, 185), which the Court denied (Docket # 219).  A six-day trial was held between February 24, 2020, and March 2, 2020.  On February 28, 2020, the jury delivered a verdict in favor of plaintiffs on all claims and awarded all the compensatory damages sought by plaintiffs (Docket # 334).  Several days later, the jury awarded punitive damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), see 42 U.S.C. § 1981a(b)(1), to plaintiffs eligible for such an award (Docket # 335).  The awards of compensatory and punitive damages were made on a per-plaintiff basis, calculated based on the amount of time each plaintiff worked at Varvatos.  On March 23, 2020, a judgment was entered on the jury verdict awarding plaintiffs a total of $3,516,051.23 in compensatory and punitive damages (Docket # 361).

Defendant then moved for judgment as a matter of law, a new trial, or remittitur.  (Docket # 374).  In the meantime, Varvatos declared bankruptcy (Docket # 390), though the bankruptcy court later lifted the automatic stay as to this case (Docket # 391).  This Court denied the motion for a judgment as a matter of law but ordered a new trial on compensatory and punitive damages,

unless plaintiffs accepted a remittitur of 50% of the total damage award.  See Knox v. John Varvatos Enterprises Inc., --- F. Supp. 3d. ----, 2021 WL 95914 (S.D.N.Y. Jan. 12, 2021). Plaintiffs accepted the remittitur and an amended judgment of $1,758,025.61 was entered. (Docket ## 399, 403).

Plaintiffs filed the instant motion for attorney's fees and costs as well as the service payment.  The motion was served on the plaintiff class.  (Docket # 371).  Varvatos contests the motion for statutory attorney fees and takes no position on the request for the service payment and the request for the extra attorney fee to be taken from the punitive damages award.

II.  LEGAL STANDARD

Plaintiffs seek attorney's fees and costs, pursuant to the federal Equal Pay Act ("federal EPA"), the New York Equal Pay Act ("NY EPA"), Title VII, and the New York Human Rights Law ("NYHRL").  A prevailing plaintiff in a federal EPA action is statutorily entitled to "a reasonable attorney's fee to be paid by the defendant, and costs of the action."  29 U.S.C. § 216(b).  The NY EPA similarly mandates such an award.  See N.Y. Lab. Law § 198(1-a) ("In any action instituted in the courts upon a wage claim by an employee . . . in which the employee prevails, the court shall allow such employee to recover . . .  all reasonable attorney's fees[.]").  The Supreme Court has held that under Title VII's fee-shifting provision, 42 U.S.C. § 1988, "a prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances." Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 417 (1978).  Similarly, the NYHRL allows the Court to "award reasonable attorney's fees attributable to such claim to any prevailing party[.]"  N.Y. Exec. Law § 297(10).  Varvatos does not challenge plaintiffs' status as the prevailing party or claim that special circumstances exist.

Instead, Varvatos objects that the fees sought "do not meet the reasonableness standard in the Second Circuit." Opp. Mem. at 1.

Under Second Circuit case law, the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany, 522 F.3d 182, 186 (2d Cir. 2008) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). This calculation yields a "presumptively reasonable fee," id. at 183, and is commonly referred to as the "lodestar," id. The lodestar figure "includes most, if not all, of the relevant factors constituting a reasonable attorney's fee," Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 553 (2010) (citation and quotation marks omitted).

III. DISCUSSION

Varvatos challenges both the reasonableness of the rates and the reasonableness of the hours billed by plaintiffs' counsel. Before addressing those issues, we address Varvatos's argument that the requested fees should be reduced based on the plaintiffs' allegedly reduced "degree of success."

A. Degree of Success

Now that the plaintiffs have accepted the proposed remittitur and the jury verdict has been reduced by half, Varvatos argues that this outcome reflects on the plaintiffs' "degree of success." See Jan. 27 Let. at 2. Varvatos points to case law holding that "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained," Fisher v. SD Prot. Inc., 948 F.3d 593, 606-07 (2d Cir. 2020), and argues that because of the 50% reduction in damages, plaintiffs' success at trial was correspondingly reduced, and thus "the attorney's fees awarded must also be reduced." Jan. 27 Let. at 2. It further argues that because plaintiffs'

requested fees "almost equal the amount of damages awarded" following the reduction, this fact alone renders the requested fees excessive.  Id.

The Court rejects both arguments.  First, the plaintiffs achieved exactly what they set out to achieve.  While Varvatos prevailed in its efforts to reduce the amount of damages recovered, plaintiffs are still left with the largest possible compensatory award they could have achieved. And even though the punitive damages award was reduced, it is still a significant amount.  These results do not reflect a lack of success.  Rather, they reflect astounding success.  That plaintiffs' damages were reduced to comply with the amount that could legally be awarded to them does not alter the fact that plaintiffs completely succeeded on every claim brought against Varvatos. Thus, no reduction for lack of success is warranted.  Because plaintiffs have "obtained excellent results" — indeed, the best possible results they could have obtained — their "attorney should recover a fully compensatory fee."  Hensley, 461 U.S. at 435.

Varvatos also points out that, because the verdict has been reduced, the fees plaintiffs seek are about the same amount as the verdict rather than half that amount, as had been true before the remittitur.  See Jan. 27 Let. at 2.  This appears to be an argument that the requested fee award is excessive because it is disproportionate to the verdict.  Any such argument, however, is foreclosed by Second Circuit precedent rejecting "the notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation." Kassim v. City of Schenectady, 415 F.3d 246, 252 (2d Cir. 2005) (citation omitted).  Thus, "attorneys' fee awards well in excess of the amount recovered by plaintiffs are routinely permitted."  Douglas v. Anthem Productions, LLC, 2020 WL 2631496, at *7 (S.D.N.Y. May 26, 2020) (citation omitted); accord Reiter v. Metro. Transp. Auth. of New York, 2004 WL 2072369, at *1 (S.D.N.Y. Sept. 10, 2004) ("Because there is no rule that limits attorney's fees to a

proportion of the damages ultimately awarded, the fee award may exceed the amount of damages.") (citation omitted).  And a review of case law reveals that awards of attorney's fees in excess of damages are common.  See, e.g., Hui Luo v. L & S Acupuncture, P.C., 649 Fed. App'x 1, 3 (2d Cir. 2016) (affirming attorneys' fees award of $64,038 where plaintiff recovered $4,130.75 under the Fair Labor Standards Act ("FLSA")); Boutros v. JTC Painting & Decorating Corp., 2014 WL 3925281, at *8 (S.D.N.Y. Aug. 8, 2014) (awarding $82,531.25 in attorneys' fees in FLSA action where two plaintiffs collectively settled for $66,000); Bridges v. Eastman Kodak Co., 102 F.3d 56, 57-58, 60 (2d Cir. 1996) (upholding a fee award of $753,202.99 in a Title VII case where $117,429.27 in damages was recovered).

B.  Reasonable Hourly Rates

In determining whether the hourly rate is reasonable, "the burden is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984); accord Savoie v. Merchants Bank, 166 F.3d 456, 463 (2d Cir. 1999).

To determine an appropriate hourly rate, Arbor Hill directs that a court engage in the following process:

> [T]he district court, in exercising its considerable discretion, [is] to bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the Johnson factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case.

522 F.3d at 190 (emphasis in original).  The "Johnson factors" are those laid out in Johnson v.

Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).  These are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Arbor Hill, 522 F.3d at 186 n.3 (citing Johnson, 488 F.2d at 717-19).

Arbor Hill specifically identified the following factors to be considered in determining

what a reasonable, paying client would be willing to pay:

> [T]he complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.

Id. at 184.

Importantly, Arbor Hill held that a court must "step[ ] into the shoes of the reasonable,

paying client, who wishes to pay the least amount necessary to litigate the case effectively."  Id.

(emphasis added); accord Lilly v. City of New York, 934 F.3d 222, 231 (2d Cir. 2019).  In other

words, a court awarding statutory attorney's fees is not called upon to determine merely whether

"the attorneys on this case properly command the rates they seek."  Major League Baseball

Properties, Inc. v. Corporacion de Television y Microonda Rafa, S.A., 2021 WL 56904, at *2

(S.D.N.Y. Jan. 7, 2021).  Rather, it must determine the "cheapest hourly rate an effective

attorney would have charged."  O.R. v. N.Y.C. Dep't of Educ., 340 F. Supp. 3d 357, 364

(S.D.N.Y. 2018) (emphasis in original).  Thus, whether the attorneys on this case actually command the rates they seek in the marketplace is not dispositive of the rate that they should be awarded.

Plaintiffs have requested the following rates for the four lawyers and one paralegal from the firm of Dunnegan & Scileppi who worked on this case:

| Name | Hourly Rate (pre-6/30/17) | Hourly Rate (post-7/1/17) |
|------|---------------------------|---------------------------|
| William Dunnegan | $450 | $475 |
| Laura Scileppi | $325 | $375 |
| Richard Weiss | $225 | $325 |
| Andrew Chung | $180 | $180 |
| Jennifer Rafuse | $150 | $160 |

Dunnegan Decl. ¶ 6.

According to plaintiffs, William Dunnegan has practiced law for 39 years, nearly all of which has "involved litigation, primarily intellectual property litigation."  Dunnegan Decl. ¶ 11. He has been lead counsel in 21 federal trials and argued 27 appeals.  Id. ¶¶ 12-13.  Laura Scileppi, a partner at the firm, has practiced law for more than 12 years, and tried four cases, arguing two appeals.  Id. ¶ 17.  Richard Weiss, an associate, has practiced law for more than seven years, trying two cases.  Id. ¶ 18.  Andrew Chung, a former associate, began practicing law in 2017.  Id. ¶ 19.  Finally, Jennifer Rafuse, the paralegal, has worked at Dunnegan & Scileppi since 2007, and assisted with "at least six trials."  Id. ¶ 21.  Plaintiffs have cited to cases in this district where courts have awarded comparable rates to those requested by each attorney in this case, commensurate with the level of experience each brought to bear.  See Supp. Mem. at 9-13.

Varvatos challenges the requested rates as unreasonable, arguing that the attorneys' "lack of experience litigating employment claims and collective and class actions" mandates a reduction.  Opp. Mem. at 4.  Defendant cites to a variety of cases in this district where courts have relied at least in part on an attorney's lack of experience to reduce the rate requested.  See Opp. Mem. at 4-5.  Varvatos offers no suggested amount by which it hopes the rates to be reduced.  Id. at 9.

The Court agrees with Varvatos that the experience of counsel is an important factor for this Court to look to in determining a reasonable hourly rate.  See Arbor Hill, 522 F.3d at 186 n.3 (reciting the Johnson factors, including "the experience, reputation, and ability of the attorneys").  But Varvatos's call to focus solely on this factor as a reason to reduce the requested rates is at odds with Arbor Hill's requirement that a district court should "bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate."  Id. at 190 (emphasis in original).  Focusing solely on one factor among many, to the exclusion of others, would conflict with that obligation.

We therefore look to the other factors as well, though we do not address each factor.  See Lochren v. Cty. of Suffolk, 344 F. App'x 706, 709 (2d Cir. 2009) ("Arbor Hill did not hold that district courts must recite and make separate findings as to all twelve Johnson factors.").  We begin by noting that this case involved novel issues of law, that both sides prosecuted the matter zealously, and that the stakes involved were high.  We also accept that plaintiffs' counsel has produced evidence that the rates requested are those customarily charged by counsel (see Dunnegan Decl. ¶ 15), and that other courts in this district have approved similar or higher rates for experienced counsel in comparable matters, see, e.g., Local 1180, Commc'ns Workers of Am., AFL-CIO v. City of New York, 392 F. Supp. 3d 361, 380 (S.D.N.Y. 2019) (approving rates

of $600 for attorney with 22 years' experience and $350 for an attorney with 10 years' experience).  We are also cognizant of the decision in <u>Fisher v. Aetna Life Ins. Co.</u>, 2020 WL 5898788 (S.D.N.Y. Oct. 5, 2020), which found that the rates requested there by Dunnegan & Scileppi — comparable to the pre-June 2017 rates requested here — were "well within the common ranges for attorney rates in this district and are thus reasonable."  <u>Id.</u> at *9 (approving requested rates of $450 for Dunnegan, $225 for Weiss, and $165 for Chung in employee benefits case).

Of course, <u>Arbor Hill</u> requires that we also consider whether there are other attorneys who could have effectively litigated this case at a lower price.  Case law and the Court's own experience suggests that there are effective attorneys at lower prices for experienced litigators. <u>See</u> <u>Chuk On Chan v. Good Chows Inc.</u>, 2017 WL 9538901, at *7 (S.D.N.Y. Mar. 3, 2017) ("Courts in this District have determined that a fee ranging from $250 to $450 per hour is appropriate for experienced civil rights and employment law litigators.") (citation omitted); <u>Castellanos v. Mid Bronx Cmty. Hous. Mgmt. Corp.</u>, 2014 WL 2624759, at *7 (S.D.N.Y. June 10, 2014) ("In labor and employment cases, courts in this district have approved hourly rates of $300-400 for partners.") (citation omitted).  Less experienced attorneys, including associates, are commonly awarded fees "of about $200 to $275 per hour."  <u>Siegel v. Bloomberg L.P.</u>, 2016 WL 1211849, at *6 (S.D.N.Y. Mar. 22, 2016) (noting that associates with "at least four years of experience" are commonly awarded fees in the $200 to $275 range) (citation omitted); <u>accord</u> <u>Baltierra v. Advantage Pest Control Co.</u>, 2015 WL 5474093, at *13 (S.D.N.Y. Sept. 18, 2015) ("Reasonable hourly rates for junior associates in this district vary, but typically are between $150 and $200 per hour.") (collecting cases).

Nonetheless, in considering a reasonable rate, we put great emphasis on the fact that the performance of the plaintiffs' attorneys in the courtroom and the quality of the papers they filed with the Court was extraordinary — far above the abilities displayed by counsel in the usual labor or employment case. While counsel's lack of experience in employment and class action litigation will, as explained in the next section, result in a reduction in the number of hours awarded, we do not think it should weigh too heavily in the determination of their hourly rate given their superlative performance.

On the other hand, we believe there were "reputational benefits" that counsel could expect to "accrue from being associated with the case," Arbor Hill, 522 F.3d at 190, which counsels for a rate not at the highest end of permissible rates. We conclude this because the litigation of this case has positioned counsel to demonstrate expertise in class action and employment law that did not exist before.

In the end, we have considered all the relevant factors, including the legal experience of the attorneys, the novel issues in this case, the attorneys' performance, and the reputational benefits, and conclude that it would be appropriate to award the attorneys rates commensurate with those recently awarded in Fisher even though we believe those rates are at the high end of what are authorized by Arbor Hill — that is, the "cheapest hourly rate an effective attorney would have charged." O.R., 340 F. Supp. 3d at 364. We will thus award those rates, except that in light of Weiss's experience and excellent performance as an attorney, we find that a rate of $250 for the entire period is appropriate for his rate. As for Scileppi, whose rate was not at issue in Fisher, we will award her pre-2017 rate of $325 for the entire period.

Varvatos also objected to the rates requested for Dunnegan & Scileppi's paralegal noting that "[c]ourts in this district have recently approved lower rates for paralegals, including with

similar seniority."  Opp. Mem. at 11 (citing cases reducing requested paralegal rate to $75 and $125).  This Court has customarily awarded "the standard paralegal rate" of $75 per hour unless it has been shown that the paralegal has specialized skills.  O.R., 340 F. Supp. 3d at 368; accord Griffen Sec., LLC v. Citadel Car Alarms, LLC, 2020 WL 3264173, at *4 (S.D.N.Y. June 17, 2020), report and recommendation adopted, 2020 WL 3791869 (S.D.N.Y. July 6, 2020); Douglas v. Anthem Productions, LLC, 2020 WL 2631496, at *4 (S.D.N.Y. May 26, 2020).  The Court sees no reason to depart from this standard rate, as plaintiffs did not present any evidence of specialized skills.  Thus, the paralegal rate is reduced to $75 an hour.[2]

    C.  Reasonable Hours

    Plaintiffs must also establish that the number of hours for which they seek compensation is "reasonable."  Arbor Hill, 522 F.3d at 188.  "Because attorney's fees are dependent on the unique facts of each case, the resolution of this issue is committed to the discretion of the district court."  Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992).  In exercising this discretion, the district court should look "to its own familiarity with the case and its experience with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties."  Id. (quoting Di Filippo v. Morizio, 759 F.2d 231, 236 (2d Cir. 1985)).  Further, as the Supreme Court notes,

> trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.

---

[2] Varvatos also objects to charging the same rate for plaintiffs' counsel for time entries that appear to involve travel.  Opp. Mem. at 12.  Varvatos identifies a total of 5 hours, out of a claimed 5,035, that present this problem.  Id.  Given the minuscule number of hours at issue, and the fact that the Court is not required to scrutinize "each action taken or the time spent on it," Aston v. Sec'y of Health & Human Servs., 808 F.2d 9, 11 (2d Cir. 1986), the Court will consider these charges for purposes of deciding the reduction to the number of hours requested.

<u>Fox v. Vice</u>, 563 U.S. 826, 838 (2011).

Additionally, it is well-established that "any attorney . . . who applies for court-ordered compensation in this Circuit . . . must document the application with contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done." <u>N.Y. State Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1148 (2d Cir. 1983). In support of their application, plaintiffs' attorneys submitted copies of their billing records showing the date on which services were performed, the hours that were expended, the attorney involved, and a description of the work done. <u>See</u> Dunnegan Decl., Exh. B ("Billing Records"). Plaintiffs attest that these records are compiled from contemporaneous time entries. Dunnegan Decl. ¶ 22. Thus, plaintiffs' records satisfy the contemporaneous time records requirement. <u>See</u>, <u>e.g.</u>, <u>Hollander Glass Tex., Inc. v. Rosen-Paramount Glass Co.</u>, 291 F. Supp. 3d 554, 562-63 (S.D.N.Y. 2018); <u>Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers</u>, 34 F.3d 1148, 1160-61 (2d Cir. 1994).

If a court finds that claimed hours are "excessive, redundant, or otherwise unnecessary," it should exclude those hours from its calculation of the presumptively reasonable fee. <u>Hensley</u>, 461 U.S. at 434; <u>accord</u> <u>Quaratino v. Tiffany & Co.</u>, 166 F.3d 422, 426 n.6 (2d Cir. 1999). However, as the Supreme Court noted in <u>Hensley</u>, "[t]here is no precise rule or formula for making these determinations." 461 U.S. at 436. Because "it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application," <u>Carey</u>, 711 F.2d at 1146, "the court has discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application,'" <u>Kirsch v. Fleet Street, Ltd.</u>, 148 F.3d 149, 173 (2d Cir. 1998) (quoting <u>Carey</u>, 711 F.2d at 1146). Thus, a district court is not required

to "set forth item-by-item findings concerning what may be countless objections to individual billing items."  Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994).

 Plaintiffs represent that their records show that they spent "at least 5,035 hours litigating this action to judgment on March 24, 2020."  Supp. Mem. at 14.  They have divided the case into a number of broad tasks and calculated how many hours they spent for nearly all of the tasks. The attorneys spent 95.5 hours prior to the initial conference on work investigating the case and drafting the complaint (Dunnegan Decl. ¶ 24), 36.8 hours to defend depositions and prepare for those depositions (id. ¶¶ 29-32), 89.5 hours on the motion for conditional approval of the collective action (id. ¶ 33), 125.5 hours on the motion for class certification (id. ¶ 34), 318.6 hours opposing various discovery and other motions made by defendant (id. ¶¶ 35-38), 621 hours on the two summary judgment motions (id. ¶ 39), 502.2 hours preparing pre-trial submissions (id. ¶ 42), 160 hours on settlement negotiations (id. ¶ 50), 408.8 hours of trial preparation (id. ¶ 54), 264.2 hours on the trial itself and calculating the judgment (id. ¶¶ 61-62), and 187.9 hours preparing the fee application, id. ¶ 63.  They also state that they engaged in "narrowly focused discovery" (id. ¶ 25) including "six depositions, some over multiple days," id. ¶ 27.  However, they do not provide an overall estimate for the time spent on discovery.  Altogether, the tasks identified by plaintiffs' counsel amount to 2,810 hours, leaving 2,225 hours unaccounted for in their overall summary, or approximately 44% of the hours requested.  We can only assume the unaccounted time was spent largely on the discovery process inasmuch as this was the one category for which plaintiffs did not provide an estimate of hours.

 Varvatos argues that the total number of hours is unreasonable on its face (Opp. Mem. at 13), that Varvatos should not have to pay for certain specific tasks (id. at 14-25), that plaintiffs' time entries reflect block billing or are too vague to assess the reasonableness of the claimed

entries (id. at 26-32), that some entries are inconsistent, (id. at 32-33), that staffing was excessive (id. at 33-35), and that plaintiffs' counsel seeks fees at attorney rates for non-attorney and clerical tasks (id. at 35-38).  Plaintiffs respond to all of these arguments in their reply, and also contend that what they view as the relatively low hourly rates requested "more than counterbalance any deficiency in the time keeping."  Reply at 18.

We begin by addressing defendant's argument that hours attributable to certain motions should not be compensated at all.  Varvatos points to the relatively few motions that plaintiffs did not win and argues that fees for these motions should be deducted because plaintiffs were either "unsuccessful" or only partially successful.  Opp. Mem. at 17.  We reject this argument because it runs directly counter to Second Circuit case law holding that the reasonableness of hours claimed is not judged on "whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures."  Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992) (citation omitted).  Thus, the mere fact that an attorney makes an unsuccessful motion does not justify a reduction in fees for that motion.  Rather, the issue in a review of an attorney's fee application is whether the hours spent were "reasonable."  An attorney may act reasonably in pursuing or defending a motion even though the attorney does not win the motion.  See, e.g., Rozell v. Ross-Holst, 576 F. Supp. 2d 527, 539 (S.D.N.Y. 2008) (declining to reduce fees for motions that "while unsuccessful, were part of the routine give and take of litigation"); Luciano v. Olsten Corp., 925 F. Supp. 956, 964 (E.D.N.Y. 1996) (declining to "exclude hours expended in preparation of motions that were not granted, in light of the ultimate success of the plaintiff in this action"); see also Grant, 973 F.2d at 99 (courts should not engage in "an ex post facto determination of whether attorney hours were necessary to the relief obtained").

Turning to the other challenges by Varvatos, we find that many of them do not justify a reduction in hours.  While Varvatos cites to time entries as "vague" (Opp. Mem. at 26), we do not view them as so vague as to require their disallowance.  For example, where an entry reads that a certain time period was spent on "Jury instructions," or "SJ Memo," one may reasonably surmise that the entry refers to the preparation of jury instructions or of the memorandum in the summary judgment briefing.  We find the instances of block billing to be minimal.  The entries alleged to be inconsistent (id. at 32-33) appear to be largely instances where one attorney billed for a "conference" with another attorney but the other attorney did not so bill.  Such inconsistencies are easily attributable to one of the attorneys viewing the "conference" as part of another task (such as preparation of a memorandum of law or deposition).[3]  As to the claim that plaintiffs' counsel seeks fees at attorney rates for non-attorney tasks (id. at 35-38), we agree that billing for such tasks is improper, see Ryan v. Allied Interstate, Inc., 882 F. Supp. 2d 628, 636 (S.D.N.Y. 2012), but find such instances to be few.  Rather than separately exclude hours related to these tasks, they will be considered as part of a percentage reduction of hours.

Varvatos's remaining arguments ultimately relate to its contention that the overall number of hours billed is excessive.  And on this point, we are in agreement with Varvatos.

We have no doubt that the 5,035 hours were expended by the plaintiffs' attorneys in a good faith effort to litigate this case as thoroughly and as carefully as possible.  But an attorney's understandable desire to pursue every avenue of inquiry and leave no stone unturned cannot remain unconstrained.  And some of the excess is undoubtedly attributable to the attorneys' utter lack of experience in either class actions or employment litigation.  In the end, the number of

---

[3]  Compare Billing Records at 45 (Dunnegan billing 2.0 hours on 9/5 for meeting with Weiss on different issues, including "Dep") with id. at 48 (Weiss billing 3.4 hours on 9/5 for, among other things, preparing a witness for a deposition).

hours sought is completely out of line with hours awarded in equivalent cases.  Indeed, plaintiffs

do not cite any labor or employment cases that awarded hours anywhere near the number of

hours they seek compensation for here but instead simply attempt to distinguish the cases cited

by Varvatos.  Reply at 5-6.

       We rely to some degree on our own litigation experience to determine the appropriate

number of hours.  But we rely more heavily on case law in this Circuit determining reasonable

hours in labor or employment discrimination suits that went to trial.  Our examination of these

cases reflects that in most instances the hours sought or awarded were under 1000 hours

— sometimes well under — which is a fraction of the number of hours sought here.  See, e.g.,

Figueroa v. KK Sub II, LLC, 2019 WL 1109864, at *13 (W.D.N.Y. Mar. 11, 2019) (889.25

hours awarded in Title VII sexual harassment case with five day jury trial); Leevson v. Aqualife

USA, Inc., 296 F. Supp. 3d 503, 526 (E.D.N.Y. 2017) (858.25 hours awarded for FLSA case

with four-week jury trial), aff'd in relevant part, 770 F. App'x 577 (2d Cir. 2019); Yue Ping Sun

v. Buffet Star of Vestal Inc., 2017 WL 11296886, at *3 (N.D.N.Y. June 21, 2017) (request for

299.4 hours in FLSA collective action case with jury trial in four day period reduced by 15% due

to billing record deficiencies); Abel v. Town Sports Int'l, LLC, 2012 WL 6720919, at *34

(S.D.N.Y. Dec. 18, 2012) (437.52 hours awarded in race discrimination case with 7-day jury

trial); Lynch v. Town of Southampton, 492 F. Supp. 2d 197, 208 (E.D.N.Y. 2007) (476.75 hours

awarded for five attorneys, two support staff, and what appears to have been "five days of trial"

in 42 U.S.C. § 1983 suit); Blumenschine v. Pro. Media Group, LLC, 2007 WL 988192, at *15

(D. Conn. Mar. 30, 2007) (994.8 hours billed by six attorneys and a paralegal in association with

a six-day sex discrimination jury trial); Petrovits v. New York City Transit Auth., 2004 WL

42258, at *6 (S.D.N.Y. Jan.7, 2004) (885.22 hours for two attorneys in six-day gender

discrimination jury trial);.

   We have been able to find some employment cases in this Circuit where the hours sought

were higher, but even those cases usually came nowhere near the level sought by plaintiffs.  See

Olsen v. Cty. of Nassau, 2010 WL 376642, at *6 (E.D.N.Y. Jan. 26, 2010) (1521.21 hours

awarded in three-plaintiff sex discrimination lawsuit with trial held for twenty-five days) (see

Docket Entries of Oct. 6-Nov. 14, 2008 in 05 Civ. 3623); Reiter v. Metro. Transp. Auth. of State

of New York, 2007 WL 2775144, at *18 (S.D.N.Y. Sept. 25, 2007) (1129.71 hours awarded for

three attorneys in six-day trial of employment discrimination suit); Brady v. Wal-Mart Stores,

Inc., 455 F. Supp. 2d 157, 216 (E.D.N.Y. 2006), aff'd, 531 F.3d 127 (2d Cir. 2008) (2345.8

hours awarded in disability discrimination case after four-day trial) (see Docket Entries of Feb.

17-23, 2005, in 03 Civ. 3843); Perdue v. City Univ. of New York, 13 F. Supp. 2d 326, 347

(E.D.N.Y. 1998) (2348 hours sought, 1878 hours awarded after 20% reduction in single plaintiff

Title VII/EPA case that was tried for eight days) (see Docket Entries of Aug. 19-28, 1997, in 93

Civ. 5939).[4]

   We recognize that this case has some characteristics that distinguish it from the typical

labor or employment matter.  But these largely boil down to the fact that many of the legal issues

presented were novel.  The novelty of the legal issues would certainly justify more time spent on

---

   [4]  One employment case the Court has located that came close to the request here was
Wat Bey v. City of New York, 2013 WL 12082743 (S.D.N.Y. Sept. 4, 2013), which was a six-
plaintiff action that had been litigated over a 15-year period and included an appeal to and
remand from the Second Circuit and covered 11 trial days. Id. at *3-4 (see Docket Entries of
Dec. 4-18, 2012, in 99 Civ. 3837).  Two attorneys sought fees, one for 4,263.75 hours and the
other for 544 hours. Id. at *32-33.  The Court ultimately reduced the hours sought by the first
lawyer by approximately ten percent, after some small voluntary reductions. Id. at *37.  We find
this case of limited relevance, however, given the length of the litigation and the appeal.

legal research for purposes of crafting arguments for the summary judgment motion and for jury instructions — perhaps vastly more time. But even adding, say, two-and-a-half months of non-stop full-time legal research — that is, adding an extra 400 hours — to the number of hours typically sought in employment cases would still not come close to reaching the number of hours sought here.

We also recognize that this is a class action lawsuit rather than a suit by individuals, as is true for many of the cases we have cited. But what typically makes class action discovery and trials complex are the multiple factual issues and damages calculations presented — sometimes resulting in dozens of depositions, multiple expert reports, and complex expert discovery. None of that was present in this case. There were no experts. And the factual issues, while presenting novel legal questions, were actually quite simple with almost no variance in circumstances among class members.

We have considered plaintiffs' assertion that some of defendant's litigation tactics unnecessarily increased the number of hours they had to expend. See Supp. Mem. at 16-27 (highlighting Varvatos's "pointless discovery and unnecessary motion practice"). We agree that some of these tactics needlessly ran up fees in this case including, for example, Varvatos's meritless threats of Rule 11 sanctions and ultimately baseless accusations of criminal conduct. But the total number of hours so identified, (id.), about 560 in all, amounts to only 11% of the total hours claimed. Moreover, while we agree that many of defendant's actions identified by plaintiffs resulted in what proved to be unnecessary litigation, some are common in labor and employment litigation — such as opposing the conditional approval motion and the class

certification motion — and thus should not have caused the number of hours claimed by plaintiffs here to have risen much beyond the level found in other attorney fee applications.[5]

In the end, to conform the award here to the reasonable hours awarded in equivalent cases, and to conform to the Court's own view as to the reasonable number of hours, we will reduce the hours sought by each professional by 50%.

The resulting hours, rates, and total amount of fees awarded, after rounding to the nearest tenth of an hour, are as follows:

| Name | Rate Awarded | Hours Requested | Hours Awarded | Total |
|------|--------------|-----------------|---------------|-------|
| Dunnegan | $450 | 1567.8 | 783.9 | $352,755.00 |
| Scileppi | $325 | 122.5 | 61.3 | $19,922.50 |
| Weiss | $250 | 2627 | 1171.8 | $328,375.-0 |
| Chung | $165 | 134.8 | 67.4 | $11,121.00 |
| Rafuse | $75 | 582.9 | 291.5 | 21,862.50 |
| **TOTAL** | | 5035 | 2517.6[6] | $734,036.00 |

---

[5] Plaintiffs point to the fact that Varvatos's attorneys have refused to state how much they charged Varvatos and argue that the amount plaintiffs seek must therefore be "for lower fees than Varvatos's counsel charged." Reply at 1. We do not find this argument helpful because, unlike a party seeking statutory attorney's fees, the defendant here is not constrained to pay its own attorneys the lowest rate that an effective attorney would charge.

[6] This number is 0.1 greater than 50% of the requested hours because of rounding of the individual hours awarded.

D.  Costs

Varvatos makes no arguments opposing plaintiffs' requested costs of $14,285.21.
Plaintiffs presented evidence in the form of invoices substantiating these costs, most of which are
related to conducting depositions.  See Dunnegan Decl. ¶¶ 3-4; id. Exh. A.  In light of the lack of
any objection, the Court awards the entire amount.

E.  Knox's Proposed Service Payment

Plaintiffs also ask that Tessa Knox, the class representative, be awarded a "substantial"
service payment.  Supp. Mem. at 28.  They argue that without Knox's initiative, no suit would
ever have been filed.  Id.  Furthermore, they point out that Knox took on risk by filing the suit, as
it could have damaged her professional reputation, and note that she "incurred substantial
hardship" by being deposed for seven hours, travelling to New York for her deposition and
staying in a hotel at her own expense, and responding to various discovery requests.  Id. at 29.
They also note that, because she did not work at Varvatos for a long time, her compensatory
damage award is smaller than those of other plaintiffs.  Id.

Service payments — also known by many other names combining the term "service,"
"incentive" or "case contribution" with "fee," "payment," "bonus" or "award" — for Rule 23
class representatives are "common in class action cases and serve to compensate plaintiffs for the
time and effort expended in assisting the prosecution of the litigation, the risks incurred by
becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs."
Beckman v. KeyBank, N.A., 293 F.R.D. 467, 483 (S.D.N.Y. 2013) (citation omitted); accord
Rodriguez v. W. Publg. Corp., 563 F.3d 948, 958-59 (9th Cir. 2009) (service payments are
"intended to compensate class representatives for work done on behalf of the class, to make up
for financial or reputational risk undertaken in bringing the action and, sometimes, to recognize

21

their willingness to act as a private attorney general"); see also Strougo ex rel. Brazilian Eq.

Fund, Inc. v. Bassini, 258 F. Supp. 2d 254, 263-64 (S.D.N.Y. 2003) (citing cases approving

service awards).

The legal basis for such awards, however, has been questioned over the years.  See, e.g.,

William B. Rubenstein, 5 Newberg on Class Actions § 17:1 (5th ed. 2020) ("Rule 23 does not

currently make, and has never made, any reference to incentive awards, service awards, or case

contribution awards.  The judiciary has created these awards out of whole cloth. . . .").  Recently,

the Eleventh Circuit has held, in light of two nineteenth-century Supreme Court decisions, that

service payments are impermissible.  See Johnson v. NPAS Sols., LLC, 975 F.3d 1244, 1259

(11th Cir. 2020).  The Second Circuit, however, in upholding a service payment, held that those

same Supreme Court decisions do not prevent the award of a service payment, see Melito v.

Experian Marketing Solutions, Inc., 923 F.3d 85, 96 (2d Cir. 2019).  Thus, we conclude that we

are authorized to approve such a payment.

Approval of service payments usually arises in the context of a settlement that is subject

to approval under Rule 23(e) of the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 23(e).

When it comes to a jury verdict, it is less clear what gives a court the power to divert money

awarded by a jury to class members to the representative plaintiff.  We do not pause long to

consider this question, however, because it is well settled that a jury's verdict in a class action

that creates a "common fund" is appropriately the source of an attorney fee award.  See, e.g.,

Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980).  If, as the Second Circuit has seemingly

concluded in Melito, a court has the power to award a service payment from a settlement fund,

and it is black letter law that an attorney may be compensated from a common fund created by a

jury award, we are prepared to accept that a court's equitable powers also give it the power to

grant a service payment to a class representative from a jury verdict that creates a common fund. The principle that underlies using a common fund to make an attorney fee payment — that "persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," Boeing, 444 U.S. at 478 — applies equally to a service payment to a class representative. We note that a number of cases have made service payment awards from common funds created by a jury verdict. See, e.g., Baez v. LTD Fin. Servs., L.P., 2019 WL 2223773, at *7 (M.D. Fla. May 23, 2019); Ridgeway v. Wal-Mart Stores, Inc., 269 F. Supp. 3d 975, 1003 (N.D. Cal. 2017); Boynton v. Headwaters, Inc., 2012 WL 12546853, at *3 (W.D. Tenn. Mar. 27, 2012).

Here, Knox seeks an award of $300,000. See Supp. Mem at 1. She states that she seeks the amount only from the portion of the punitive damages verdict attributable to those class members who were not also FLSA opt-ins. Id. at 3, 30.

In support of this request, plaintiffs point to one case in which a service payment of as much as $300,000 was awarded to a class representative: Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001), which awarded $300,000 each to four class representatives. See Supp. Mem. at 30. But Ingram involved a $103.5 million settlement fund, Ingram, 200 F.R.D. at 694 n.11. Moreover, the plaintiffs in Ingram presented a "great deal of evidence . . . to the Court regarding the unique and extraordinary contribution these four individuals made to the investigation, prosecution, and settlement of this case." 200 F.R.D. at 694. The recovery here is about 1.75% of the recovery in Ingram, suggesting that a service payment more in the nature of $5000 in this case would be appropriate. In any event, while Knox was the sine qua non of the case's existence and obviously made contributions to its success, we cannot say that she made "extraordinary" contributions. Id. Knox deserves to be recognized for the travel to and

attendance at her deposition and for whatever assistance she gave to counsel.  But Knox was one

of three plaintiffs deposed in this case.  Dunnegan Decl. ¶ 31; ¶¶27-28.  Knox did not testify at

trial or even attend it, even though one of the other plaintiffs did testify at trial.  Id. ¶ 28; Knox

Decl. ¶ 26.  There is no evidence of extraordinary demands on her time.  We have greater

sympathy for the argument that, in light of the power of the internet, a prospective employer

might find out about her association with this suit, making it harder to find a job.  Nonetheless,

the amount she requests is "disproportionately large" in relation to Knox's contribution to the

case and the amount recovered.  Romero v. La Revise Associates, L.L.C., 58 F. Supp. 3d 411,

422 (S.D.N.Y. 2014).

We believe that an award of $20,000 is far more in keeping with the awards of other

courts in similar circumstances.  We reach this conclusion based on our review of case law,

which reflects that an award of $15,000 (or less) is within the range of awards commonly made

for a verdict of the size awarded here.  See, e.g., Manley v. Midan Rest. Inc., 2017 WL 1155916,

at *13 (S.D.N.Y. Mar. 27, 2017) ($15,000 service award out of $912,500 fund for plaintiff who

"assisted counsel's investigation and prosecution of the claims by providing factual information,

producing documents, reviewing defendants' document production, appearing for all depositions,

responding to defendants' discovery requests, assisting with preparation for the mediation and

attending the mediation"); Karic v. Major Auto. Companies, Inc., 2016 WL 1745037, at *8

(E.D.N.Y. Apr. 27, 2016) (service awards of $20,000 each for named plaintiffs who "contributed

significant time and effort to the case," including appearing for depositions, out of $5.5 million

settlement fund); Sierra v. Spring Scaffolding LLC, 2015 WL 10912856, at *7 (E.D.N.Y. Sept.

30, 2015) (service award of $10,000 out of $560,000 settlement fund to named plaintiff deposed

in action); Willix v. Healthfirst, Inc., 2011 WL 754862, at *7 (E.D.N.Y. Feb. 18, 2011) (service

awards of $30,000, $15,000, and $7,500 in FLSA claim out of $7,675,000 settlement fund) (see

07 Civ. 1143, Docket # 311, ¶ 26); Torres v. Gristede's Operating Corp., 2010 WL 5507892, at

*7 (S.D.N.Y. Dec. 21, 2010) (service award of $15,000 to each named plaintiff in the settlement

of their FLSA overtime claim where total recovery was $3,530,000) (see 04 Civ. 3316, Docket

# 368, Exhibit G at 9); Mentor v. Imperial Parking Sys., Inc., 2010 WL 5129068, at *1-2

(S.D.N.Y. Dec. 15, 2010) (service award of $15,000 in class settlement of $690,000 for a

plaintiff who reviewed documents, spoke to current and former employees, and traveled to New

York during the pendency of the class FLSA claim); Khait v. Whirlpool Corp., 2010 WL

2025106, at *9 (E.D.N.Y. Jan. 20, 2010) ($15,000 service payment to each of five named

plaintiffs and $10,000 awards to each of 10 other plaintiffs in FLSA overtime class action with

recovery of $9,250,000); In re Sapiens Sec. Litig., 1996 WL 689360, at *8 (S.D.N.Y. Nov. 27,

1996) (service award of $1500 out of $8.5 million settlement fund for plaintiffs who were

deposed in connection with class certification motion).  We increase the amount awarded beyond

$15,000 based on the evidence that this case would never have been brought without Knox's

initiative.

As noted, Knox seeks to have her service payment come from the portion of the punitive

damages fund attributable to persons other than herself and those who opted into the FLSA

action.  We do see a logic in having the award come from the punitive damages portion of the

award because using this award as the source of funds will prevent any plaintiff from receiving

less than full compensation.  We do not see a good reason for excluding the opt-in plaintiffs from

bearing financial responsibility for the award, however.

Thus, the service payment of $20,000 to Knox shall be taken from the punitive damages award and shall be borne by each plaintiff receiving such an award (including Knox) in proportion to her recovery of punitive damages.

F.   Counsel's Proposed Additional Fee

In their original application, plaintiffs requested a fee of "between $100,000 and $250,000" for their counsel over and above the statutory award to be taken from the punitive damages fund not attributable to the named plaintiffs.  Supp. Mem. at 35.  Following the remittitur, plaintiffs agreed that this amount should be reduced "to account for the 50% reduction in punitive damages."  Jan. 27 Letter at 2.  Thus, plaintiffs seek between $50,000 and $125,000 as an additional payment to counsel.

Counsel justifies this additional request by arguing that "(i) Plaintiffs' counsel took the risk, and continue to take the risk, that a judgment would prove unenforceable as a result of Varvatos's financial condition, and (ii) Plaintiffs' counsel had to endure Varvatos's accusations that plaintiffs' counsel engaged in criminal conduct."  Supp Mem. at 32.  As to the latter point, while the Court believes that defendant's precipitous suggestion that plaintiffs' counsel might have engaged in criminal conduct to have been rebarbative and unnecessarily confrontational, the episode was a brief, one-time event and would not move us to transfer payments from the plaintiff class to its counsel.

The first point, however, does have significant force.  A court may not enhance the statutory lodestar fee — usually done by using a "multiplier" — to compensate for the risks of the litigation because that approach has been foreclosed, except in exceptional circumstances not alleged to be present here, by the Supreme Court's decision in City of Burlington v. Dague, 505 U.S. 557, 563 (1992).  But the Second Circuit has held that Dague's presumption against

adjusting a lodestar to compensate for risk does not apply to fees generated from a "common fund."  See Fresno County Employees' Ret. Assn. v. Isaacson/Weaver Fam. Tr., 925 F.3d 63, 69 (2d Cir. 2019).

       In this case, we agree that there was significant risk in taking on this litigation initially due to the novel nature of the claims.  That risk was magnified before trial when Varvatos told plaintiffs' counsel that it was broke.  See Dunnegan Decl. ¶ 85.  Notwithstanding this knowledge, counsel continued to trial.  Based on the rule in Dague, the defendant cannot be asked to bear any responsibility for that risk.  The question presented by plaintiffs' request is whether the plaintiffs may be required to pay for their attorneys' assumption of that risk: that is, whether counsel may obtain fees both from a statutory fee application and from some portion of the common fund created by the judgment.

       Case law reflects that such hybrid awards — that is, an award for statutory fees and from the common fund — have been made where common funds were created by a settlement, typically in cases under the Employee Retirement Income Security Act of 1974.  See, e.g., Chesemore v. All. Holdings, Inc., 2014 WL 4415919 (W.D. Wis. Sept. 5, 2014); Sobel v. Hertz Corp., 53 F. Supp. 3d 1319 (D. Nev. 2014); Savani v. URS Prof'l Sols., LLC, 2014 WL 172503 (D.S.C. Jan. 15, 2014).  The Second Circuit has not reached the issue of whether such awards are permissible but has approved the award of fees to class counsel from a common fund even though the class would have been entitled to recover fees based on a fee-shifting provision.  See County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1327 (2d Cir. 1990).  While the Seventh Circuit has seemingly barred outright the possibility of obtaining recovery under both a fee-shifting statute and a portion of a common fund, see Pierce v. Visteon Corp., 791 F.3d 782, 787 (7th Cir. 2015), we find more persuasive the view of the Fourth Circuit in Brundle v.

Wilmington Tr., N.A., 919 F.3d 763, 783 (4th Cir. 2019), which reached the opposite conclusion.

As explained in Brundel, a

> "reasonable" fee payable by a *defendant* to compensate the prevailing plaintiff's
> counsel is not necessarily identical to a "reasonable" fee owed by a *recovering
> beneficiary* to plaintiff's counsel, particularly where the contingency risk to
> plaintiff's counsel is substantial.

Id. at 787 (emphasis in original).  Brundle emphasized that, because of Dague, the "reasonable"

fee available under a fee-shifting statute "precludes any compensation for contingency risk."  Id.

It noted, however, that "contingent fees serve an important function in providing under-resourced

litigants access to counsel and the courts."  Id.  Brundle approved an award of statutory attorney

fees of $1,819,631.11 on top of a $1.5 million payment from a common fund, id. at 783, holding

that the "district court retained discretion to award supplemental attorneys' fees from the

common fund," id. at 787.  Consistent with Brundle, we too conclude that, in appropriate

circumstances, a court has the power to award both statutory fees for attorney services and

attorney's fees from a common fund.

Of course, having concluded that we have the power to order the payment of additional

fees from the common fund does not mean that we should do so.  It would certainly be simpler to

conclude that plaintiffs' counsel have been awarded their "reasonable" fee, that they are not

entitled under any statute to more than a "reasonable" fee, and to let that be the end of the matter.

And we imagine that in the typical case that proceeds to trial, we would be unlikely to award fees

from a common fund created by the jury verdict on top of a statutory fee.  But this case has two

unusual aspects that convince us that an additional payment is appropriate.

First, the case presented an uncommon level of risk both on the merits and in terms of

collection.  As to the merits, the issue presented in the case was truly novel in that no party was

ever able to find a case in which a single-sex clothing store had been sued, let alone found liable,

for supplying a clothing allowance to one sex and not the other — even though this practice is apparently routine in the industry.  As to collection, the risk was dramatically changed when, more than a year before trial began, in January 2019, Varvatos informed plaintiffs' counsel that it was in "an extremely precarious financial condition and that Varvatos's insurer, Ironshore, had disclaimed coverage."  Dunnegan Decl. ¶ 85.  This was reiterated a few months later, in April 2019, when a bankruptcy attorney for Varvatos informed plaintiffs that Varvatos "was on the verge of bankruptcy and that the plaintiffs would receive nothing from Varvatos's bankruptcy estate."  Id. ¶ 86.  Nonetheless, plaintiffs' counsel expended many hundreds of hours after that date dutifully preparing the case for trial, conducting the trial, and opposing defendant's extensive motion for a new trial or judgment as a matter of law.

Second, in this case there is a portion of the common fund created by the jury verdict that is not designed to compensate the plaintiffs at all: that is, the award of punitive damages.  Following remittitur, the punitive damages total $423,520.83.  As the Second Circuit has noted, the "rationale" for awarding fees from a common fund is based on the equitable principle that "those benefitting from a lawsuit without contributing to its cost" should not be "unjust[ly] enrich[ed]."  Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000).  The class did nothing to create the punitive damages fund.  And the equities in favor of the attorneys' claim to the punitive damages fund are heightened because that fund is not necessary to compensate the plaintiffs, who in this case have received the maximum compensation permitted.  The purpose of the punitive damages award was to punish "unlawful conduct and deter[] its repetition."  BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996).  Thus, we are presented with the unusual case where awarding the extra amount of attorney's fees will not diminish any plaintiff's receipt of the compensatory damages awarded by the jury.  And taking from the

punitive damages fund will not affect the purpose of the punitive damages award: to punish the defendant and deter others.

After considering the equities of the situation, including the excellent performance of plaintiffs' counsel, the unusual risk that they took, and the existence of a non-compensatory element in the damage award, the Court concludes that plaintiffs' counsel should be awarded one-quarter of the available punitive damages, or $105,880.21 over and above the recovery of statutory attorney's fees.  We conclude that the fee should be drawn from the punitive damages fund rather than the entire fund because of the critical importance the punitive fund played in causing us to weigh the equities in favor of giving the extra award of fees.  The benefit conferred by the punitive damage award inured to all plaintiffs who are eligible for that award; thus the fees shall be borne by all plaintiffs eligible for a punitive damages award, including the named and opt-in plaintiffs.

We note that with this modest augmentation of fees, the lodestar amount has been increased by 14.4%, resulting in the equivalent of a 1.14 multiplier on the lodestar, well within the range permitted by Second Circuit case law and certainly appropriate in light of the unusual risks in this litigation.  See, e.g., Fujiwara v. Sushi Yasuda Ltd., 58 F. Supp. 3d 424, 438 (S.D.N.Y. 2014) (surveying the wide range of multipliers permitted by courts).

IV.  CONCLUSION

For the foregoing reasons, plaintiffs motion for attorney's fees and the service payment (Docket # 367) is granted.  Plaintiffs are awarded a total of $748,321.21 in statutory attorney's fees and costs to be paid by Varvatos, and an additional amount of $105,880.21 in attorney's fees to be paid from the damages award allocated to punitive damages, for a total of $854,201.42 in

attorney's fees.  Plaintiff Knox is awarded a service payment of $20,000 from the punitive

damages award.

        SO ORDERED.

Dated: February 17, 2021
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge